```
                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                             HATTIESBURG DIVISION

JEANETTER GRAHAM INDIVIDUALLY
AND AS WRONGFUL DEATH BENEFICIARY
OF ALBERT GRAHAM, DECEASED                              PLAINTIFF

V.                                        CAUSE NO. 2:13CV67KS-MTP

ALEX HODGE, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS SHERIFF OF JONES
COUNTY; JONES COUNTY, MISSISSIPPI AND
DEPUTY "JOHN DOE" IN HIS OFFICIAL CAPACITY      DEFENDANTS

************************************************************
             DEPOSITION OF SHERIFF EDWARD ALEXANDER HODGE
     Taken at the offices of Jones County Courthouse, 415 North
         5th Avenue, Laurel, Mississippi, on Thursday, June 12,
                   2014, beginning at approximately 9:04 a.m.
************************************************************

APPEARANCES:

     EVERETT T. SANDERS, ESQUIRE
     Sanders Law Firm
     Post Office Box 565
     Natchez, Mississippi   39121-0565
         PRESENT AND REPRESENTING THE PLAINTIFF

     JASON E. DARE, ESQUIRE
     Wyatt, Tarrant & Combs
     Post Office Box 16089
     Jackson, Mississippi   39236-6089
         PRESENT AND REPRESENTING DEFENDANT ALEX HODGE AND
         JONES COUNTY, MISSISSIPPI

REPORTED BY:
                    TRUDIE QUINN
              Raven Court Reporting
              Post Office Box 180506
              Richland, Mississippi   39218
                   (601) 932-5354
```

---

**Page 2**

```
                           I N D E X
                                                    PAGE
Style, Number and Appearances ..................... 1
Index ............................................. 2
EXAMINATION OF SHERIFF EDWARD ALEXANDER HODGE:
         By Mr. Sanders ........................... 3
         By Mr. Dare .............................. 50
Reporter's Page ................................... 52
Signature Page .................................... 53
Certificate of Reporter ........................... 54
                            - 0 -
```

---

**Page 3**

Sheriff Edward Alexander Hodge - 06-12-14

1    P R O C E E D I N G S
2              EDWARD ALEXANDER HODGE,
3    called as a witness, having been duly sworn,
4         was examined and deposed as follows:
5    EXAMINATION BY MR. SANDERS:
6         Q.   Would you state your name, please.
7         A.   Edward Alexander Hodge.
8         Q.   And do you hold an elected position?
9         A.   Yes, sir.
10        Q.   And what is that?
11        A.   Sheriff of Jones County.
12        Q.   All right. Sheriff Hodge --
13             BY MR. SANDERS: Well, can we agree to the
14   general stipulation regarding the use of the
15   deposition and to any objections except as to form
16   are reserved until such time as we --
17             BY MR. DARE: We will agree to the general
18   stipulations under the Federal Rules of Civil
19   Procedure, yes, sir.
20             BY MR. SANDERS: Okay. That will take care
21   of that.
22        Q.   Sheriff, I'll assume that you've given a
23   deposition before?
24        A.   Yes, sir.
25        Q.   So you know that if I ask you something and you

---

**Page 4**

Sheriff Edward Alexander Hodge - 06-12-14

1    don't understand it, please ask me to rephrase it?
2         A.   Yes, sir.
3         Q.   Otherwise I'll assume that you're answering
4    what I ask.
5         A.   Yes, sir.
6         Q.   How long have you been sheriff?
7         A.   I was elected in 2007, took office in January
8    of 2008.
9         Q.   What are your duties and responsibilities as
10   sheriff?
11        A.   My duties and responsibilities as sheriff are
12   to protect and serve the people of Jones County.
13        Q.   What is the Jones County Adult Detention
14   Center?
15        A.   The Jones County Adult Detention Center is the
16   county facility where inmates are incarcerated.
17        Q.   Okay. You say inmates are incarcerated. Who
18   exactly is housed there?
19        A.   Okay. What we do is we house all the inmates
20   in Jones County, and occasionally some federal will come
21   through here. We're not a state certified facility, but we
22   do hold county inmates, municipal inmates.
23             And once individuals are bound over to the State,
24   we have 30 days to get them transferred to the proper
25   facility to which we do.

EXHIBIT 9

Sheriff Edward Alexander Hodge - 06-12-14                          5

1   Q.   When you say bound over, I assume pled guilty?
2   A.   Yes, through Circuit. Once they get bound over
3   to the State then we transport them to whatever facility
4   that they're ordered to go to.
5   Q.   Would a large percentage of your detention
6   population be persons who have not been convicted of
7   crimes?
8   A.   Yes, sir.
9   Q.   So they would basically be pretrial detainees?
10  A.   Yes, sir.
11  Q.   What percentage would you think?
12  A.   I don't have an accurate number, but I would
13  say it would probably be 80 percent.
14  Q.   What is your role in connection with the
15  facility?
16  A.   I do not have a day-to-day role at the
17  facility. I have a warden or a jail administrator that
18  serves in that capacity.
19       I do understand that I'm responsible for the law
20  enforcement in Jones County and everything to which comes
21  under my command, but I do not have a day-to-day role in
22  that facility or the juvenile facility.
23  Q.   Who is the jail administrator?
24  A.   Currently?
25  Q.   Yeah.

Sheriff Edward Alexander Hodge - 06-12-14                          6

1   A.   Major Randy Johnson, and he's over both jails.
2   Q.   You say both jails?
3   A.   I have an adult jail and a juvenile jail here.
4   Q.   Who was the jail administrator in April of
5   2010?
6   A.   Stacy Walls. She was a captain.
7   Q.   Was a captain at that time?
8   A.   That time, yes, sir.
9   Q.   What is she now?
10  A.   She works as the Jones County justice court
11  clerk. She's located right in front of the jail.
12  Q.   So she's no longer employed by you?
13  A.   No, sir.
14  Q.   What were the circumstances surrounding her
15  separation?
16  A.   She just wanted to have an 8:00 to 5:00 job,
17  just hours and the demand on the job and nights and
18  weekends. She just had an opportunity to advance herself
19  as far as it was a good move for her to be able to have a
20  day job, basically off nights, weekends, holidays. So that
21  job came available, she interviewed for it and I supported
22  her in that.
23  Q.   Tell me a little bit about the booking protocol
24  as it relates to the adult facility.
25  A.   Do you want the specifics or policy? If we're

Sheriff Edward Alexander Hodge - 06-12-14                          7

1   gonna speak in specifics I would really like to just go by
2   the policy.
3   Q.   Okay, that's fine. I'd like to talk generally
4   about the policy and then we'll get into some specifics.
5   Okay?
6   A.   Okay.
7   Q.   All right. What is the process for booking in
8   an inmate?
9   A.   Well, when the inmates come in, obviously they
10  are brought into our facility. They are brought into a
11  booking section of the jail by whatever agency brings them
12  in there.
13       There's booking cards that are filled out by the
14  arresting officer that provides the information on that
15  particular inmate.
16       The booking officer then gets involved in it from
17  the standpoint of filling out our paperwork, you know,
18  which is dictated in the policy as to what we exactly do
19  when they come, from medical screenings to photographing
20  and fingerprinting, classifying those inmates as to what
21  they actually are, what segment they will be in.
22       It may be a lunacy or it could be a convicted
23  person who's coming back from court. We just have to
24  classify them as to who they are, what their status is and
25  where they would go in the jail.

Sheriff Edward Alexander Hodge - 06-12-14                          8

1   Q.   What classifications do you have?
2   A.   We can refer to the policy and go to the
3   different classes.
4   Q.   Okay, please.
5   A.   All right. It's gonna be in section 4-3 is
6   where we'll be going to.
7            BY MR. DARE: For the record, that will start
8        at JC706.
9            BY THE WITNESS: Do you want me to basically
10       go through this policy or what specifically do you
11       want me to do?
12  Q.   Well, what classifications do you have for
13  inmates, is it violent offenders or how are they
14  classified?
15  A.   It would be, you know, yes, sir. I mean, it
16  basically states here reading from the policy where it says
17  definition of inmate classification:
18       Is a means of identifying and categorizing various
19  inmate traits, characteristics and potential risk factors;
20  criteria shall not include race, ethnicity or religious
21  preference; this classification plan has as its goal the
22  objective categorization of all inmates in the system; this
23  plan outlines these goals and provides a method of
24  monitoring progress.
25  Q.   Now, would it be fair to say that a person's

Sheriff Edward Alexander Hodge - 06-12-14   9

health condition is something that is considered in terms of classification?

A. We don't have a "health ward" or a medical ward, per se. They do screen the inmates for medical screening when they are booked in the jail.

Q. Do you have a particular cell where persons that have medical problems are kept?

A. To my knowledge, we don't have a segregated medical cell that we would have. Now, it depends on if they are diseased or something of this nature. We have had to segregate or separate, if you will, separate those out.

There's some that may be, for instance, on catheters or different things that we obviously try to get out of jail as quickly as possible, but to say that we don't make a special provision for certain times, you know, we would have to.

Q. Is there a cell block that's A160?

A. There are. Yeah, we do have cell blocks and there is an A160.

Q. Is A160 designated for any particular purpose that you're aware of?

A. Not that I'm aware of.

Q. If persons are say determined to have a heart problem, do you treat them any differently?

A. Well, in the medical screening process, and it

Sheriff Edward Alexander Hodge - 06-12-14   10

does speak of that in the policy, that there are procedures to follow as it relates to people who have medical issues and heart being one of those.

Q. Would you look at it and tell me what it says?

A. I believe that's in 4-2. In the initial processing --

BY THE WITNESS: And you want to quote the page again?

BY MR. DARE: You can. It's just at the bottom. It's JC700.

BY THE WITNESS: Okay. It does outline in the initial processing reading from the policy: Initial jailer offender contact is most often in the receiving or booking area of the jail.

This first meeting normally occurs in the presence of the arresting or transporting officers. All firearms, knives and other weapons of arresting or transporting officers are secured under lock and key before entering a secure area of the jail.

The booking officer verifies the identification of the arresting or transporting officer before the officer and prisoner are allowed to enter the admission area.

During in processing and until the inmate is officially received, transporting or arresting

Sheriff Edward Alexander Hodge - 06-12-14   11

officers must retain control and custody of the detainee. You want me to --

Q. No, sheriff.

A. I was just trying to identify what we actually do that gets to the medical.

Q. Okay. Maybe I should help you. Directing your attention to 702.

A. Okay. Well, I just didn't know if you wanted to go through exactly what they do.

Q. Okay. 4.20 -- well, your policy and procedures is 4.02.

A. Right. 3 and 4 as well, medical, dental, mental and suicide screening.

Q. Yeah.

A. You want me to read --

Q. No. Under that it indicates that the jail administrator or his designee is to be notified if any of the following conditions are noted, and in there it indicates heart problems or a potentially life threatening illness. Now, how would this be identified?

A. During the screening process they will fill out a medical form to where those questions are asked. That's why I was -- I apologize, I was just going through the actual booking process.

And they do fill out a medical screening form to

Sheriff Edward Alexander Hodge - 06-12-14   12

where those questions are asked if they have, like I said, heart problems, diseases or whatever they might have, and it is to be annotated and the procedure is outlined as to what to do.

Q. Okay. Now, if you identify someone as having a history of heart problems, what is to be done with that individual once that identification has been made?

A. Once identification has been made those -- again, reading to the policy, it says anyone in such a case is to -- you know, there's supposed to be a copy of that medical form, just paraphrasing.

The jail administrator's box, the jail nurse's box, those are supposed to be notified that we do have somebody in here so that they can do a follow-up on those people.

Now, we're assuming here that they're not in there having heart problems at the time of check in, because when an agency brings an inmate into the facility who is currently having medical problems they are instructed to carry that person to the hospital.

We don't take them at the jail if they are currently experiencing immediate health problems. In other words, they're coming in there sweating, you know, labored breathing or those kinds of issues.

We refuse them. That agency that brings them in there has been instructed to carry them back to get medical

Sheriff Edward Alexander Hodge - 06-12-14    13

1  help.
2      Q.  What I'm trying to determine is that once you
3  have identified that this person has a heart problem and
4  you say that follow-up is supposed to be done, is there a
5  time period in which this follow-up is supposed to be?
6      A.  If it's at night it would be the next morning
7  because the jail administrator or the assistant comes in
8  and/or the nurse also comes in, makes rounds, checks them,
9  checks on the inmates, and at that time they would just do
10 a follow-up based on that medical form to find out is there
11 anything that you need, do you have medications, those type
12 of things.
13     Q.  So it would be a more specific interview with
14 the inmate?
15     A.  Yes.
16     Q.  Would it entail anything other than a personal
17 interview?
18     A.  To my knowledge, no, sir.  They would just
19 basically go back over that medical form if those medical
20 forms as stated in the policy, those particular ones, if
21 those stuck out then they would just go back and I guess
22 reaffirm, like I said, the information that's on the
23 medical form and any special conditions that need to be
24 met.
25     Q.  Assuming that an inmate is on medication, what

Sheriff Edward Alexander Hodge - 06-12-14    14

1  would be done in that kind of situation?
2      A.  Well, again, speaking generally, if an inmate
3  comes in who is on medication what they would do is they
4  would -- obviously if the inmate doesn't have that
5  medication with him that he's currently taking that he
6  needs based on his own statements and/or the reevaluation
7  then the medication would be -- a phone call would be made
8  to the family or guardian, whoever it is, so that they can
9  bring the inmate's medication up there so we can administer
10 it.
11     Q.  So the family is allowed to bring the
12 medication?
13     A.  Certain medications.  Again, I can't speak to
14 specifics on what they will allow and what they will not
15 allow but that would be above my -- we would have to
16 consult with a physician on it because we don't take pain
17 medicines.  You know, if they say, hey, I'm taking Lortab,
18 we don't take pain medication in the jail.
19     Q.  I understand, they might be passing it around.
20 Well, what about heart medication?
21     A.  To my knowledge, if they're on heart medication
22 then we would have to administer heart medication.
23     Q.  And I understand that I guess you're the CEO of
24 the operation.  You say you assume that they -- when you
25 say they, you're talking about the jail administrator and

Sheriff Edward Alexander Hodge - 06-12-14    15

1  the persons under his supervision?
2      A.  Specifically to what, when I say they to what?
3      Q.  I understood you to say that you assumed that
4  they would do certain things and -- well, let me ask it
5  again.
6          I was asking you about if the person was taking
7  heart medication what would be the protocol that would be
8  utilized with respect to that individual?
9      A.  I would expect them to follow policy and
10 procedure that's outlined.  There's training in place for
11 them on how to handle medical conditions.  If an inmate
12 based on the medical screening --
13     Q.  One second.  You say I would expect them and
14 that's what I'm --
15     A.  Okay, yes.  I don't personally handle the
16 day-to-day operations at the jail, so obviously I'm
17 expecting my staff to comply with the policy and procedure
18 and the training that they've been taught.
19         So I would say that the jail staff, because it's
20 not gonna be specifically the jail administrator that's,
21 you know, A, doing a follow-up, it's gonna be the nurse.
22         It could be the jail administer, but it's gonna be
23 the nurse.  So my staff, I would expect that they would
24 follow the policies and procedures as it relates to
25 medical.

Sheriff Edward Alexander Hodge - 06-12-14    16

1      Q.  What exactly is the role of the nurse?
2      A.  Well, again, my understanding of what the nurse
3  does everyday is that he or she, in this case it's a she,
4  she makes daily rounds checking on the inmates.
5          They do have an opportunity to fill out a medical
6  request to see the nurse for whatever reason, maybe a
7  headache or toothache or whatever they outline is their
8  problem.
9          The nurse then goes around and checks those.  She
10 makes daily rounds to every cell to see if there's any
11 needs there.
12         And then she coordinates with local medical staff
13 if there's any needs that she's not comfortable with or
14 that she thinks need to be carried to the doctor.  She will
15 consult with the physicians at South Central whether it be
16 a dentist or something of that nature.
17     Q.  Now, I notice that you have a sick call deal,
18 and how does that work?
19     A.  I can't speak specifically to how the sick call
20 works.  I think I'm generally explaining it, that if the
21 inmates have made request to see the nurse then when she
22 comes in she goes around -- she's going around anyway.
23         But like I said up front, specifically they do have
24 a request that they can make to see the nurse for whatever
25 reason, and then she follows up with those requests and

### Page 17

Sheriff Edward Alexander Hodge - 06-12-14

1  those requests are documented, and any action she takes is
2  documented.
3      Q.   So does the sheriff's office or the county have
4  an existing contract with any medical facility for treating
5  detainees?
6      A.   We do not have a contract with any facility.
7  South Central Regional Medical Center is a county owned
8  facility, so we do use them for most of our, I would say,
9  major medical needs.
10     I don't know how to define medical major, but we do
11 use Ellisville clinic because it's close just for colds or
12 if somebody is having a bad toothache or something of this
13 nature, but we do have complete access to what I think is
14 South Central Regional Medical Center for anything we need.
15     Q.   Where is the Jones County Adult Detention
16 Facility located?
17     A.   Exit 90 off of Highway 11.  I usually tell
18 people in front of Charlie's Catfish, and they know where
19 Charlie's is at.  Most everybody in this part of the
20 country knows where Charlie's is at.
21     Q.   We're currently at the Jones County Courthouse
22 in Laurel.
23     A.   Yes, sir.
24     Q.   What is the approximate distance from here to
25 the --

### Page 18

Sheriff Edward Alexander Hodge - 06-12-14

1      A.   It's about 8 miles from here to the jail, give
2  or take.  I mean, it's not gonna be more than that.  I
3  mean, I don't know exact but, I mean, it's between 5 and 8
4  miles.
5      Q.   It would be about that same distance from the
6  hospital?
7      A.   Yes, sir.  We're less than a mile from the
8  hospital here.
9      Q.   Okay.  The Ellisville clinic, who operates
10 that?
11     A.   It's operated by the South Central Regional
12 Medical Center.
13     Q.   I notice you say that if someone had something
14 like a cold you would take them to Ellisville clinic?
15     A.   And I probably need to clarify that.  We don't
16 carry everybody that's got a runny nose to the doctor
17 obviously.  But I mean, if they're running a fever, you
18 know, a continuous fever that the aspirin or whatever she's
19 giving them is not cutting the fever, she makes a phone
20 call and determination to take them on to the doctor.
21     Those type of things she's gonna go right there to
22 the clinic.  It's just easier in, easier out.  We do have
23 access to the specialists if we have other issues that we
24 have to deal with through South Central.
25     Q.   At the clinic do you know what medical

### Page 19

Sheriff Edward Alexander Hodge - 06-12-14

1  personnel are located there?
2      A.   No, sir.  I do know there's a nurse
3  practitioner there.  I don't know what their daily staffing
4  is.
5      Q.   Okay.  And when you talked about a cold, I
6  assume that you were using that to suggest that if you had
7  minor problems they would take them to the clinic?
8      A.   Yes, sir, that's when I said I really didn't
9  know about the major.  I mean, we have full access to a
10 medical staff, I mean, from whatever their needs are.
11     And again, we just use the Ellisville clinic for
12 the things that they deal with which I would say would be
13 the toothaches and maybe a staph infection or something of
14 this nature, eardrum, abscessed tooth, those type of
15 things.
16     Q.   A person suffering from a heart condition,
17 would you expect that person to be taken to Ellisville or
18 brought to the hospital?
19     A.   Well, it would depend on what the -- I mean, if
20 he's having blood pressure problems, she would consult with
21 the doctor on that and decide what the exact situation.
22     So I'm not gonna say they would guaranteely carry
23 somebody.  If they are obviously in a state of emergency,
24 yes, we're gonna call and the hospital is gonna deploy an
25 ambulance immediately.

### Page 20

Sheriff Edward Alexander Hodge - 06-12-14

1  Maybe they're having some blood pressure issues or
2  something of that nature.  I'm not gonna say that they
3  wouldn't carry them to Ellisville clinic.
4      Q.   I guess I should have asked this on the front.
5  In terms of the policies that exist, were these policies
6  that you developed during your time as sheriff?
7      A.   I'm not gonna say I developed them but I
8  directed our -- as soon as we come into office in 2008 we
9  immediately begin to consult with the state minimum
10 standards in the state of Mississippi on directions,
11 policies and some procedures.
12     We followed their guidelines, and we also looked at
13 the accreditation requirements to look at possibly one day
14 Jones County Sheriff's Office being accredited.
15     So there was a total overhaul, I guess would be the
16 word, of our policies and procedures from the time we took
17 office in 2008 and they've constantly, you know, we try to
18 keep them up to date and current.
19     Q.   What is it that prevents you from being
20 certified?
21     A.   I'm told that it's our population, the size of
22 our jail.  I've actually had the State come down on more
23 than one occasion.  I've had the commissioner just because
24 I -- you know, Chris Epps has come down, Ron Welch has come
25 down.

Sheriff Edward Alexander Hodge - 06-12-14        21

1  His staff just to -- I mean, because actually I'm
2  not being prideful, but I'm proud of our jail and the
3  cleanliness and the way that we run our jail.
4      So I've actually invited those folks in on
5  occasions but from what I'm told it's because of -- and I'm
6  not being -- I may not be accurate here, but what I
7  understand it was based on the numbers that we have in that
8  jail. You have to have so much free capacity basically to
9  be able to meet their requirements to be state certified.
10     I mean, they've told me and I'm sure they will tell
11 you that as far as the way we conduct our business, the
12 cleanliness of the jail, the operation of the jail, they
13 thought it was topnotch, but it's got something to do with
14 the population.
15 Q.  You don't have enough people or you got too
16 many?
17 A.  Got too many. Again, if your bed space is "X"
18 they want you to have a number to a certain percentage
19 below that as your average daily head count.
20     In other words, they don't want you being maxed
21 out, they won't allow it. So our jail is just too small to
22 meet their requirements basically.
23 Q.  Would the nurse be in a better position to know
24 the specific application of the policies with respect to
25 medical personnel?

Sheriff Edward Alexander Hodge - 06-12-14        22

1  A.  Yes, sir. I can read from the policy, and they
2  know the policy and that's what they're expected to follow,
3  but as far as following her around everyday and her being
4  able to tell you exactly what she does then, yes, she would
5  be the one who would be able to testify better to that.
6  Q.  Who does the nurse report to?
7  A.  To the jail administrator.
8  Q.  And the jail administrator reports to you?
9  A.  Yes.
10 Q.  Do you have a --
11 A.  Can I correct that?
12 Q.  Uh-huh.
13 A.  Actually reports directly to my chief, to my
14 number 2 guy.
15 Q.  What would that --
16 A.  That's Jamie Tedford.
17 Q.  What is that position, that's what I --
18 A.  Chief deputy. I just said that because that's
19 what most people -- I call him my chief operations officer,
20 but it's typically referred to across the industry as your
21 chief deputy, your number 2 man.
22     He reports directly to me. Everybody falls under
23 my direction, I take responsibility for that, but day to
24 day everybody reports under the chief just like the whole
25 department, and your jail administrator and all of his

Sheriff Edward Alexander Hodge - 06-12-14        23

1  staff reports to him; so just a chain of command.
2  Q.  That's what I was trying to get my mind around,
3  the chain of command. There's you?
4  A.  There's me.
5  Q.  And then next?
6  A.  And there's my chief, and then you have majors
7  that you break out. You have a chief investigator, then
8  you have your jail administrator, this is under the major,
9  under my chief operations officer.
10     You have the chief investigator, you have your
11 chief of operations and then you have your jail
12 administrator. So you've got those three majors that fall
13 under the chief and the chief falls under me, and then each
14 one of their departments falls under them. Does that make
15 sense?
16 Q.  So the jail administrator reports to the chief
17 deputy?
18 A.  That's correct, directly.
19 Q.  And the nurse would in fact report to the jail
20 administrator?
21 A.  Yes, sir.
22 Q.  Do you have periodic meetings with the jail
23 administrator and the chief deputy?
24 A.  We do.
25 Q.  How often are they scheduled?

Sheriff Edward Alexander Hodge - 06-12-14        24

1  A.  It's not a set deal. We do have regular
2  meetings, though, at least quarterly where we have
3  management meetings, and then at least twice a year we have
4  departmental meetings to where the whole department meets,
5  and that varies.
6      We do it at least quarterly. Like I said, we may
7  go through a run where we do monthly management meetings
8  but we do a management -- when I say management, that's
9  everybody from your first line supervisors to me, that
10 we're gonna meet at least quarterly, but it can be as much
11 as monthly.
12 Q.  In those meetings do you-all discuss complaints
13 that may have been lodged?
14 A.  We will discuss basically anything. The way
15 those meetings are conducted is obviously I lead the
16 meetings. I call on every person in that room to discuss
17 anything that's going on, anything that we need to address,
18 anything that they need from us as a command staff.
19     So, yes, we pretty much have open meetings, and
20 then the majors below me obviously meet directly with their
21 staff on a more frequent basis.
22     So I want to clarify that I meet with my staff at
23 least quarterly and sometimes even monthly, and we may go
24 six months and meet every month. I don't want to meet them
25 to death, but we do have a lot of meetings.

**Sheriff Edward Alexander Hodge - 06-12-14**  25

1  Q.  If someone had a complaint say about receiving
2  medical care, how would they go about making their
3  complaint and what would be the --
4  A.  The inmate?
5  Q.  Yeah.
6  A.  They have a form that they submit. They have a
7  form that they would submit whether it be for medical call
8  or a complaint that they're saying, hey, I don't feel like
9  I'm getting this or being mistreated or whatever.
10      They submit that form through the staff that's
11 working there that goes to the jail administrator, and
12 those complaints come up to us. We're able to see those as
13 well.
14  Q.  Would you eventually see those complaints?
15  A.  Yes. Typically, yes, I would see those
16 complaints.
17  Q.  What about complaints that are made by persons
18 who are nondetainees regarding the operation of the jail?
19  A.  You mean like a civilian?
20  Q.  Yeah.
21  A.  Somebody that's just free?
22  Q.  Well, say a former detainee, is there a process
23 for them to make a complaint?
24  A.  I don't know of any written process for them.
25 I mean, I have an open-door policy, if that's what you're

**Sheriff Edward Alexander Hodge - 06-12-14**  26

1  asking. I mean, I get about 150, 200 calls a day on my
2  cell phone.
3       So they have access to me if they really need
4  anything, my e-mail, our websites. We have information
5  contact forms on our website. It's easy to get to us if
6  they've got a complaint.
7  Q.  I notice that you indicated that when you came
8  in you made a concerted effort to have a tiptop operation,
9  for want of a better characterization.
10      Were there problems that existed prior to your
11 becoming sheriff that related to the facility that you're
12 aware of?
13      BY MR. DARE: Object to the form of the
14   question. You can answer.
15      BY THE WITNESS: Specifically, I can't say
16   because I wasn't there, but generally speaking from
17   what I was being told through the community in my
18   campaign efforts was that there was some
19   dissatisfaction with the operations of the sheriff's
20   office obviously, and some cases it dealt with the
21   jail.
22  Q.  Did those complaints involve failing to provide
23 proper medical care?
24  A.  I don't recall any specific names, but in
25 general terms there was everything from being mistreated to

**Sheriff Edward Alexander Hodge - 06-12-14**  27

1  medical to cleanliness to unprofessional staff. Obviously
2  there was some needs and concerns within the community,
3  that's why I was elected.
4  Q.  Did you meet Albert Graham during the time that
5  he was an inmate?
6  A.  Not to my knowledge. I do periodically walk
7  through the jail, but I cannot say specifically that I ever
8  spoke to him or knew who he was.
9  Q.  What about his wife?
10 A.  I've never met her.
11 Q.  Did it ever come to your attention that Albert
12 Graham was an inmate in the detention center?
13 A.  Specifically that he was an inmate?
14 Q.  Yes.
15 A.  Not to my knowledge.
16 Q.  It never came to your attention that he had
17 been an inmate in there?
18      BY MR. DARE: During what time?
19      BY MR. SANDERS: I mean ever.
20      BY THE WITNESS: After, yeah.
21 Q.  After what?
22 A.  I mean, I'm just saying before or after he was
23 in the jail? I mean, at any time did I know --
24 Q.  During his incarceration.
25 A.  No, sir.

**Sheriff Edward Alexander Hodge - 06-12-14**  28

1  Q.  When did you first become -- I'll assume as we
2  sit here today you are aware that he was an inmate?
3  A.  Yes, sir.
4  Q.  When did it come to your attention that he was
5  an inmate?
6  A.  The first time that I recall, and I don't know
7  the specifics of a date, was as a result of him being
8  transported to the hospital.
9       I'm usually notified or am notified when we do have
10 someone that's transported outside of our facility to a
11 medical facility.
12 Q.  When did you receive that information, do you
13 know?
14 A.  I would have received that information when he
15 was transported from our facility. I don't have the
16 specific date, but I would have been notified on that date.
17 Q.  Did you go up to the hospital?
18 A.  No, sir. And to be fair, I don't normally go
19 to the hospital.
20 Q.  Okay. That's not critical or an inquiry, it's
21 just a general.
22 A.  It's just not my -- I don't go.
23 Q.  Did there come a time that you discussed with
24 your command staff Mr. Graham's situation?
25 A.  I have not had a specific meeting as it regards

**Sheriff Edward Alexander Hodge - 06-12-14**    29

to Mr. Graham with my command staff. What we did do which would be in any case where we have a situation where there's I feel like it's best and we did in this case when I was notified of it and later notified of his passing, I immediately told my major that we need to go ahead and get in touch with Mississippi Bureau of Investigations and get them here so that they can independently begin taking a look at this case.

Same thing if we have an accident, I'm gonna call somebody else to come look at it. I don't want us looking, being the lead and looking at our own.

Q. Who was it that you said that you directed to contact?
A. Major Robbie Suber.
Q. And what is his position other than being a major?
A. He's retired now, but he was the chief investigator at that time.
Q. When did he retire?
A. Last August. He had his 25 years in.
Q. Did you see a report on what occurred with respect to Mr. Graham?
A. I have not read a report.
Q. You don't usually read reports?
BY MR. DARE: Object to the form of the

**Sheriff Edward Alexander Hodge - 06-12-14**    30

question. You can answer.
BY THE WITNESS: I do read reports, but what I was briefed on in this case, I was never led to believe any different that it was anything outside of a natural death. So I did not read any case reports specifically related to this case.
Q. When you say actual death, what do you mean?
BY MR. DARE: Natural.
Q. Oh, I'm sorry.
A. I was told that it was a natural death, so I didn't --
Q. Who briefed you on that?
A. Major Suber and the state investigator and Jimmy Herzog with the Mississippi Bureau of Investigations.
Q. Jimmy Herzog?
A. Jimmy Herzog, yes, sir. He's the one I specifically, along with Major Suber talked with. Another one of their investigators was Pat Green with the Mississippi Bureau of Investigations. That's the reason that I didn't go into reading any because I'm confident in my staff and what they report to me.
Q. So when did this briefing with Mr. Herzog take place?
A. I don't know the exact date. I mean, they were in constant communication with Major Suber and obviously

**Sheriff Edward Alexander Hodge - 06-12-14**    31

Stacy Walls, and we completely complied with anything that they had which is standard.

At some point after the investigation then they come and talk with me about it and told me that it was a natural death and that they was closing it out.

Q. Did you receive an autopsy report?
A. I personally have not received nor seen an autopsy report.
Q. Do you know if one is in your department?
A. I do not.
Q. Who would know that?
A. If there is an autopsy report the State would have it because they were the lead agency. So they would have been the one who would have received that report.
Q. What I'm asking is if there's one located in your department who would know whether or not?
A. The person that I would talk to to find out if we have possession of anything whether it relates to an autopsy, I would start with Major Jamie Tedford who is the chief operations officer, and then the chief investigator is Major Don Scott who was a captain at the time, and Major Suber was over him at the time before he retired.
Q. What is your understanding of what occurred on the date of Mr. Graham's death?
A. Again, my understanding of it is that they were

**Sheriff Edward Alexander Hodge - 06-12-14**    32

contacted. The staff was contacted about an inmate that was not breathing. The staff went immediately to the cell, discovered the inmate.

It's my understanding they immediately started doing CPR and contacted 911. The ambulance was dispatched and was transported to the hospital

Q. Did it come to your attention that Mr. Graham was a patient who had been taking heart medication?
A. Yes.
BY MR. DARE: Just for clarification purposes, what time frame were you referring to in that question, at any time?
Q. My next question was when did it come to your attention?
A. After the fact is when I knew that he was actually.
Q. And how did it come to your attention?
A. Through the major, through Major Suber.
Q. Did it ever come to your attention that between November the 10th and March the 10th that Mr. Graham had not received any of his medication?
A. It did.
BY MR. DARE: And again, that's at any point in time, correct?
BY MR. SANDERS: I'm gonna narrow it down.

**Page 33 — Sheriff Edward Alexander Hodge - 06-12-14**

1  BY MR. DARE: I'm just making sure.
2  Q. When did it come to your attention?
3  A. After.
4  Q. And how?
5  A. Through the major.
6  Q. Do you find that to be an extraordinary length
7  of time for a person on medication not to receive his or
8  her medication?
9       BY MR. DARE: Object to the form of the
10      question. You can answer.
11      BY THE WITNESS: I would say that I would
12      find that to be an extended period of time, yes, if
13      the person had been asking for their medicine,
14      obviously that would have been addressed.
15      It's my understanding that we have no
16      documentation from the nurse or anyone else saying
17      that he had asked or otherwise showed any reason to
18      need that medication.
19      But again, I was told after the fact that he
20      had went from November to March without particular
21      heart medication.
22  Q. Are you aware that when he was processed in he
23  indicated that he had been taking medication?
24  A. I was made aware of that after, yes, sir, and
25  I'm talking about after his death. Let me clarify,

**Page 34 — Sheriff Edward Alexander Hodge - 06-12-14**

1  anything to do with Mr. Graham came after his death and
2  through the investigation and the briefings that I was
3  given by Major Suber and/or Jimmy Herzog is any and
4  everything that I learned as it relates to this case
5  directly.
6  Q. Would you agree with me that your protocol, and
7  I'm having reference to your policy and procedure, would
8  have required a follow-up once it was determined that Mr.
9  Graham had been taking medication?
10 A. Yes, sir.
11 Q. Do you know whether or not such a follow-up was
12 done in this instance?
13 A. To my understanding it was not.
14 Q. Do you know why it was not done?
15 A. No, sir. The booking officer, as I understand
16 it, has failed to follow procedure as it relates to the
17 medical form being passed to the jail administrator and the
18 nurse.
19 Q. It kind of fell through the crack?
20 A. It just didn't get done to my understanding.
21 Q. And the jail administrator at that time was?
22 A. Stacy Walls.
23 Q. Did it come to your attention that efforts had
24 been made to bring medication to Mr. Graham while he was in
25 the jail?

**Page 35 — Sheriff Edward Alexander Hodge - 06-12-14**

1  A. No, sir.
2  Q. You've not heard that before now?
3  A. No, sir.
4  Q. Would it be fair to say that at some point in
5  time you read those policies and procedures?
6  A. It would be fair to say that I have reviewed
7  the policies and procedures and tried to make myself as
8  familiar as possible. I did approve these policies and
9  procedures but, again, I'm not gonna lock myself into
10 saying I've read every word of it.
11 Q. It's not gonna be a test. Is it general
12 protocol to get a medical release form from an inmate to
13 get his or her medical records?
14 A. I don't know the answer to that.
15 Q. Is there any explanation as to why once it was
16 determined that Mr. Graham was a heart patient that he was
17 not taken to the heart clinic?
18      BY MR. DARE: Object to the form. You can
19      answer.
20      BY THE WITNESS: If you don't mind, I'm
21      trying to process what you said. I'm not trying to
22      actually come up with an answer, but I want to answer
23      your question specifically, so would you mind asking
24      me again.
25 Q. My question was that once it was determined

**Page 36 — Sheriff Edward Alexander Hodge - 06-12-14**

1  that Mr. Graham was a heart patient, and reviewing your
2  records it does reflect that at some point in time during
3  the booking process this information was conveyed, also
4  that it was conveyed that he had been taking medication.
5  And my question now is do you know why or do you
6  have an explanation as to why he was not taken to the heart
7  clinic?
8       BY MR. DARE: Same objection. You can still
9       answer.
10      BY THE WITNESS: I do not have an
11      explanation, and the reason I don't have an
12      explanation is because I think it's, as I understood
13      it, we had no knowledge during that time and/or
14      documented complaints of him needing to go to the
15      heart doctor but once we did, as I understood it,
16      that was handled.
17 Q. One of the questions that was asked of him,
18 according to your records, is do you have or have you ever
19 had any of the following, a heart condition which he
20 replied yes; high blood pressure which he replied, yes.
21      And the question was asked, do you currently take
22 any medication prescribed by a doctor, and the answer was
23 yes; do you have any handicap or conditions that limit
24 activities, and the answer was yes.
25      Now, what I'm asking is that you have an inmate who

**Sheriff Edward Alexander Hodge - 06-12-14**  **37**

1  says that he's been taking medication, that he has a heart
2  problem, and my question is is there any reason that he was
3  not taken to the hospital in connection with his condition
4  to be evaluated?
5      A.   I think by what we've done spoke of here today
6  is at the booking process when that form was completed,
7  there's a procedure that needed to have been followed that
8  was not.
9           And to my knowledge just because somebody comes in
10 and tells us those things doesn't mean he's fixing to get a
11 trip to the hospital, I want to clarify that.
12     Q.   All right.
13     A.   And then secondly, had there been any request
14 that we had been made aware of to see a doctor or
15 complaints of heart problems or any other problems, they
16 would have been addressed regardless of what this form here
17 says but, again, acknowledging that this form here was not
18 followed up on immediately.
19     Q.   What I'm concerned about is that here is a
20 person who says that I've got a heart problem and I was
21 taking medication.
22          I don't see anything in here to suggest that any
23 contact was made with the individual to identify it as his
24 treating physician to determine what medications have been
25 prescribed. Do you have any information otherwise?

**Sheriff Edward Alexander Hodge - 06-12-14**  **38**

1      A.   No, sir.
2      Q.   Can you offer me an explanation as to why it
3  was not done?
4      A.   I can't offer you any explanation as to why
5  this form here, the medical screening form was not followed
6  up on other than what's already in the record.
7           I will say that I have total confidence in our
8  staff and especially our nurse and our jail administrator
9  to where if there had been complaints by the inmate they
10 would have been addressed.
11     Q.   So let me see if I understand you: Even if an
12 inmate says that he was on medication before he came in, if
13 he never complains then medication would never be secured?
14          BY MR. DARE:  Object to the form. That's
15      already been asked and answered, and he's already
16      testified about the exact process of the policies and
17      procedures before.
18              So in other words, I will object to the form
19      as a mischaracterization of this witness' prior
20      testimony.  If you would like to explain again,
21      you're more than welcome to.
22     Q.   I'm trying to understand. You talk about a
23 complaint, and I'm talking about threshold information that
24 I got a heart problem and I was taking medication, and what
25 I'm trying to determine is before you do follow-up on that

**Sheriff Edward Alexander Hodge - 06-12-14**  **39**

1  in terms of the medication side of it, does there have to
2  be an additional complaint by the inmate?
3      A.   No, sir. Normally, the procedure that's in
4  place, if it's followed those questions are asked. In this
5  particular case we know that it wasn't, however, at any
6  point after his booking and being placed into a cell had he
7  made any request for medication and/or to see a nurse
8  and/or doctor I'm confident that that would have been
9  complied with.
10     Q.   Do you know what prompted him to be taken to
11 the doctor on I believe March the 10th?
12     A.   I do not know what exactly prompted that, no,
13 sir.
14     Q.   Were there any disciplinary actions taken
15 against anybody in connection with Mr. Graham's treatment?
16     A.   I can't speak specifically to the booking
17 officer who's no longer with us. I can't speak
18 specifically to whether he had documentation put in his
19 file or not by the jail administrator.
20     Q.   I'm sorry, I guess my question wasn't clear.
21 We have established that there was a failure to follow
22 protocol, and what I'm asking was any employee of the
23 sheriff's office or the detention facility disciplined in
24 connection with the Graham case?
25     A.   I can't answer that.

**Sheriff Edward Alexander Hodge - 06-12-14**  **40**

1      Q.   Who would have the answer to that?
2      A.   The jail administrator and/or the chief in
3  reviewing personnel files.
4      Q.   The jail administrator, that would be, at that
5  time would be?
6      A.   Stacy Walls, and now Randy Johnson as well as,
7  like I said, Chief Jamie Tedford.  If there was any done it
8  would be in the personnel file.
9      Q.   Do you know if there was ever a request made
10 for Mr. Graham's medical records?
11     A.   I do not.
12     Q.   From any of his treating physicians?
13     A.   I don't know.
14     Q.   Do you know if an inmate is administered
15 medication whether the inmate has to sign any kind of form
16 at the time?
17     A.   To receive medication?
18     Q.   Right, to receive medication.
19     A.   I don't know.
20              (BREAK)
21     Q.   (By Mr. Sanders) So you didn't read the report
22 that was prepared by the Mississippi Bureau of
23 Investigations?
24     A.   No, I have not read it.
25     Q.   Who is Sergeant Hare?

Sheriff Edward Alexander Hodge - 06-12-14    41

1   A.   He is now a captain at the jail, but at the
2   time he was assistant with Stacy Walls. He's now under the
3   major or the warden at the jail, second in command to Randy
4   Johnson.
5   Q.   Now, in terms of acquiring medical records on
6   detainees, is that a function of the jail administrator?
7   A.   I don't know.
8   Q.   But the jail administrator should know whose
9   responsibility it is?
10  A.   Yes, sir, if they even get medical records. I
11  don't know that they actually maintain medical records, I
12  don't know at the jail.
13  Q.   What I was talking about is acquiring medical
14  records on detainees for purposes of getting additional
15  medical treatment.
16  A.   She would know.
17  Q.   The nurse's name is Ms. Johnston, right?
18  A.   Carol Johnston.
19  Q.   How long has she been employed?
20  A.   I'm not specific, but I think she's been here
21  pretty much as long as I have. I mean, we hired her but
22  she came in after I did. I'm going to say it was in '08.
23  Q.   Did you interview her?
24  A.   I did not.
25  Q.   Who would have done that?

Sheriff Edward Alexander Hodge - 06-12-14    42

1   A.   The jail administrator.
2   Q.   Ms. Walls?
3   A.   Yes, sir.
4   Q.   Have you become aware since you've been sheriff
5   of any complaints by inmates or detainees relating to a
6   failure to provide them with medication?
7   A.   No, sir. Yes and no. You know, when I'm
8   walking through the jail everybody wants some type of
9   medicine, you know. They want Tylenol for this, and she's
10  just not gonna hand out medicine.
11       So to be honest with you, I have not had a formal
12  complaint of anybody coming to me or sending me
13  correspondence saying I'm not getting medical treatment,
14  but do they complain when you walk through the jail about
15  everything from the food to my tooth hurts and she's not
16  giving me medicine or whatever, yes, I hear that.
17  Q.   I'm sure there is no legitimate reason to
18  complain about the food.
19  A.   Well, actually we keep a garden year round. We
20  have an inmate garden, and actually the food is pretty
21  good, you know, so.
22  Q.   And you don't know anything about -- and I
23  guess I'm -- A160, what does that designate, does that mean
24  anything?
25  A.   It's a cell in the jail. I mean, I can't tell

Sheriff Edward Alexander Hodge - 06-12-14    43

1   you what its designation is. I mean, I know it's there, I
2   know where it's at, but as far as me being able to tell you
3   they call that other than A160 or --
4   Q.   Okay. What would the "A indicate?
5   A.   It's just the block. You're in the loop, you
6   got different blocks.
7   Q.   How many blocks is it?
8   A.   I don't know the exact answer to that.
9   Q.   Well, what I'm trying to get an image of is are
10  the blocks designated by letters?
11  A.   They are.
12  Q.   And within the block there are so many cells?
13  A.   Yeah. Just the main hall, you walk down a main
14  hall and then it opens up into an octagon, and then you
15  have different blocks around that octagon and then you have
16  two separate halls that comes off of that that you got
17  blocks. So the actual numerical layout of the jail as far
18  as that, I can't tell you exactly.
19  Q.   What about surveillance in the jail?
20  A.   We do have surveillance in the jail and outside
21  the jail.
22  Q.   What kind of surveillance do you have inside
23  the jail?
24       BY MR. DARE:   Now or in 2009 and 2010?
25  Q.   Let me ask you about now and then I'm gonna

Sheriff Edward Alexander Hodge - 06-12-14    44

1   contrast it.
2   A.   We've always had surveillance. To be specific
3   as to how many cameras or what kind it is, I can't tell
4   you, but we do have surveillance and have had surveillance
5   cameras and have upgraded those throughout the eight years
6   I've been in office.
7   Q.   Is there any difference between the
8   surveillance today and what existed in April of 2010?
9   A.   I would hope so, because we're trying to
10  continue to improve.
11  Q.   Do you have more cameras now than you had then?
12  A.   I think so.
13  Q.   Or do you know how many cameras you had in
14  April of 2010?
15  A.   No, sir.
16  Q.   Who would know that?
17  A.   I'm gonna say the jail administrator would
18  certainly know because they're looking at them everyday.
19  Q.   The surveillance cameras, are there videos made
20  of the images that the cameras pick up?
21  A.   No, sir.
22  Q.   You don't tape it?
23  A.   It's on a DVR that has so much retention time
24  and it's constantly rolling over. I don't know what the
25  exact time before it starts recording back over is.

### Page 45

Sheriff Edward Alexander Hodge - 06-12-14

You understand what I'm saying, we're not out there stockpiling DVDs or VCH tapes which we have a recorder that maintains up to a certain amount of time and then it starts coming back over.

Q. I notice in the investigative report there was a mention of a tape that Mississippi Bureau of Investigation acquired.

A. Okay. What they would do then is cut it off of that. They would go back within that segment. Again, I don't know the times, I just do know we do this.

If we need to go back and look at something or whatever and we want to make a copy of that segment then they would, I'm assuming, again, I don't know this for a fact, that they would then record whatever they wanted off of that segment of video.

Q. That's why I was asking about the retention period.

A. Yeah, I don't know.

Q. Because if something happened last week and you wanted to look at it today or had a question about it, would that still be available?

A. Yes, sir. Again, I don't know this to be fact, but I'm gonna say surely it's at least 30 days. That number comes out of my mind, it may be totally wrong.

But I know there is a safe period there that you

### Page 46

Sheriff Edward Alexander Hodge - 06-12-14

can go back and look at the video and then make copies as needed from that video.

Q. So in all likelihood if a copy was not made in 2010 you would not have that video?

A. We couldn't have a server that big I don't think. So I'm gonna say, no, sir.

Q. Do you know whether or not a copy of the video which was secured by Mississippi Bureau of Investigations whether you retained a copy of that?

A. I've never seen a copy of it nor do I know that there was a copy.

Q. When I say you, I don't necessarily mean you personally, I mean your facility.

A. I'm not aware of them making a copy or getting a copy, but they had access to that information. So I'm not saying they did or they didn't. I'm not personally aware of any of that.

Q. Sheriff, do you know, what are the training requirements with respect to persons employed at the detention facility?

A. I guess I'll just speak on that. Obviously we require our people to be trained. As a matter of fact, we provide training.

Everybody that works in our facility are or soon thereafter attend a correctional academy that is certified

### Page 47

Sheriff Edward Alexander Hodge - 06-12-14

by the state of Mississippi, and they are provided training based on state standards on what is required to be a correctional officer.

During that training they're also taught on our personal policies and procedures to which again as I testified earlier were developed based on state standards and requirements.

So they are provided with that as well as regular in-service training, i.e., CPR certifications and things of this nature. So I'm extremely big on training and have been since day one, and so we think that we are a well trained department.

Q. And this is true with all of the personnel that work in the adult facility?

A. Yes, sir. Everybody that works in the adult facility as correctional officers are required to receive this training and successfully complete it.

Q. Are the persons that work in the correctional facilities, are they sworn officers?

A. Yes.

Q. And they've all been to the police academy?

A. Let me clarify that. They all go or soon thereafter they are employed they go to the state correctional academy, not the police academy.

Now, we swear them in as sworn officers. The main

### Page 48

Sheriff Edward Alexander Hodge - 06-12-14

reason is if they're attacked by someone, an inmate, they are a sworn officer. They are certified sworn officers.

They do not have law enforcement powers, so when you said police academy, it's a difference. There's a state correctional academy and you have a police academy or highway patrol.

Those are two different distinctions, but they are sworn officers, sworn correctional officers, and we do swear all of them in.

Q. Are they authorized to carry firearms?

A. No, sir. We don't allow firearms in the jail?

Q. I meant anywhere?

A. No, sir. Now, generally speaking, I just happen to think, our transport officers, we do carry them out to the range and certify them to be able to carry a side arm.

So we do have correctional officers, we do have a few that do have the firearm certification, but generally speaking the correctional officers do not carry firearms nor do they enforce the laws out in the state.

Q. That was my next question. Do they have arrest powers?

A. No, sir.

Q. Do the transport officers have arrest powers?

A. No, sir.

### Page 49 — Sheriff Edward Alexander Hodge - 06-12-14

1  Q.  What is the correctional training --
2  Correctional Training Academy, am I correct?
3  A.  Uh-huh.
4  Q.  What is the duration of that program?
5  A.  Again, don't quote me on it, but I think it's
6  three weeks. We actually are a state accredited
7  correctional academy.
8      We actually host and teach corrections here at the
9  Jones County Sheriff's Department for any number of
10 agencies that send their officers here to actually go
11 through our academy. We are a state accredited
12 correctional training academy.
13 Q.  So your officers are trained in-house?
14 A.  Well, yeah, I guess in-house would be. It's
15 in-house through the state accreditation. Our academy is
16 hosted by the sheriff's office.
17     So that would be right, but it's more than just
18 in-house. It's a state accredited monitored training
19 academy that we teach the literature based on what the
20 state provides us to teach for those officers to be
21 certified by the state of Mississippi.
22 Q.  Who are the training instructors?
23 A.  We have a number of instructors. I couldn't
24 list all of them. Currently Sergeant Nick Messersmith is
25 our training director, and then he has a host of other

### Page 50 — Sheriff Edward Alexander Hodge - 06-12-14

1  in-house and outside instructors that are state certified
2  instructors that actually come in and provide that
3  training, but I couldn't tell you a list of the
4  instructors.
5  Q.  Did Ms. Walls receive her -- was she a sworn
6  officer?
7  A.  She would have been a sworn officer.
8  Q.  And have arrest powers?
9  A.  No, sir.
10 Q.  Was she a deputy sheriff?
11 A.  No, sir.
12 Q.  Did she go through the training academy?
13 A.  She should have. I can't tell you absolute
14 just fact, but I would think she would have.
15 Q.  You don't have any personal knowledge of who
16 went through and who didn't?
17 A.  I do not. Training records could be reviewed
18 specifically as to who you're looking at and there would be
19 certificates in their files.
20     BY MR. SANDERS:  All right. I think that's
21 it.
22     BY MR. DARE:  I just got a few follow-ups.
23 **EXAMINATION BY MR. DARE:**
24 Q.  Before you you have a stack of documents. I
25 believe they are JC606 through JC761. What are those

### Page 51 — Sheriff Edward Alexander Hodge - 06-12-14

1  documents?
2  A.  This is Jones County Adult Detention Center
3  Policy and Procedure Manual.
4  Q.  Were those documents in existence in 2007?
5  A.  No, sir.
6  Q.  If I understood your testimony here today
7  correctly, you and your staff implemented these policies
8  and procedures for the adult detention facility, is that
9  correct?
10 A.  Correct.
11 Q.  Were the officers, any and all officers at the
12 adult detention facility, were they retrained on these
13 policies and procedures once you took office?
14 A.  Once I took office and over the course of time
15 they have been trained on these policies and procedures.
16 Q.  In other words, that has all been done since
17 2008?
18 A.  Yes, sir.
19     BY MR. DARE:  Thank you. I have no further
20 questions.
21     (CONCLUDED 10:36 A.M.)

### Page 52 — Sheriff Edward Alexander Hodge - 06-12-14

R E P O R T E R ' S   P A G E

I, Trudie Quinn, in and for the State of Mississippi, the officer before whom this sworn testimony was taken, do hereby state on the record:

That due to interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talk-overs; that same is the proper method for a court reporter's transcription of proceeding; that the dashes (--) do not indicate that words or phrases have been left out of this transcript, and that any words and/or names which could not be verified through reference material have been denoted with the phrase (phonetic).

- o -