IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

JEANETTER GRAHAM INDIVIDUALLY AND AS WRONGFUL DEATH BENEFICIARY OF ALBERT GRAHAM, DECEASED — PLAINTIFF

V. — CAUSE NO. 2:13CV67KS-MTP

ALEX HODGE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS SHERIFF OF JONES COUNTY; JONES COUNTY, MISSISSIPPI AND DEPUTY "JOHN DOE" IN HIS OFFICIAL CAPACITY — DEFENDANTS

**************************************************************

**DEPOSITION OF DAVID HARE**

Taken at the offices of Jones County Courthouse, 415 North 5th Avenue, Laurel, Mississippi, on Thursday, June 13, 2014, beginning at approximately 9:07 a.m.

**************************************************************

APPEARANCES:

**EVERETT T. SANDERS, ESQUIRE**
Sanders Law Firm
Post Office Box 565
Natchez, Mississippi 39121
PRESENT AND REPRESENTING THE PLAINTIFF

**JASON E. DARE, ESQUIRE**
Wyatt, Tarrant & Combs
Post Office Box 16089
Jackson, Mississippi 39236-6089
PRESENT AND REPRESENTING DEFENDANT ALEX HODGE AND JONES COUNTY, MISSISSIPPI

REPORTED BY:

**TRUDIE QUINN**
Raven Court Reporting
Post Office Box 180506
Richland, Mississippi 39218
(601) 932-5354

# I N D E X

PAGE

Style, Number and Appearances .................... 1
Index .......................................... 2
**EXAMINATION OF DAVID HARE:**
By Mr. Sanders ......................... 3
By Mr. Dare ........................... 25
By Mr. Sanders ......................... 27
Reporter's Page ................................. 29
Signature Page .................................. 30
Certificate of Reporter ......................... 31

- 0 -

E X H I B I T S

1 - Policies and procedures .................... 27

- 0 -

P R O C E E D I N G S

DAVID HARE,

called as a witness, having been duly sworn, was examined and deposed as follows:

EXAMINATION BY MR. SANDERS:

Q. Would you state your name, please.
A. David Hare.
Q. Have you given a deposition before?
A. Yes, sir.
Q. Okay. So you know that if I ask a question and you don't understand it, you can ask me to explain it or repeat it?
A. Okay.
BY MR. DARE: And as before, we will agree to the standard stipulations pursuant to the Federal Rules of Civil Procedure.
BY MR. SANDERS: Okay, all right.
Q. How are you employed?
A. As a correctional officer with the Jones County Sheriff's Department.
Q. And how long have you been so employed?
A. Since 2008.
Q. And what is your position?
A. Captain in the corrections department.
Q. And what are your duties and responsibilities?

A. Well, I'm now assistant administrator. So I'm pretty much over all of the correctional officers through the adult and the juvenile detention center.
Q. And how long have you had that position?
A. Approximately two and a half, maybe three years, something like that.
Q. What is your educational background?
A. High school.
Q. What other training have you had?
A. Just correctional officer training. I started out working for the Mississippi State Department of Corrections before I come back to the county jails.
Q. What did you do with the State Department of Corrections?
A. Correctional officer.
Q. Where were you located?
A. Greene County which is Leakesville prison down there.
Q. And the training that you had in corrections, do you have a certification?
A. Yes, sir.
Q. And did you have that before you came to work here?
A. I had it with the State of Mississippi with the Department of Corrections, yes, sir.

Q. You didn't have to be recertified or anything?
A. Yes, sir, sure did.
Q. You did?
A. Yes.
Q. And what did you have to do to be recertified?
A. Now, with Jones County we had -- I think at that time I think it was a two week course in corrections where they had the instructors come down and we go through the whole nine yards of it from hands-on, handcuffing, escorting, report writing, stuff like that.
Q. Did you have anything in the area of medical training?
A. Just first aid, CPR.
Q. Do you do any training of other officers?
A. Just hands-on once they get hired, we just give on-the-job training.
Q. What was your position on April the 5th or April 4, 2010?
A. 2010 I was a shift sergeant.
Q. Tell me about what a shift sergeant does?
A. Well, I'm in charge of what goes on on my shift. I have three other officers along with me. It's just the basic running of the jail, making sure all the inmates are having their state issue and making sure they're all secure, mainly safety and security.

Q. Would it be correct to say that during your shift you're in charge of the facility?
A. Yes, sir, you can say it like that.
Q. Are the inmates classified in any particular order, if you know?
BY MR. DARE: Again, that's in April of 2010?
BY MR. SANDERS: Yeah, I'm sorry, in April.
BY THE WITNESS: The only way you can call them classified is we have the working inmates and the nonworking inmates. You're either a trustee or you're not. That's the only classification we have, or a state inmate.
Q. That would distinguish the inmates. Well, within the inmate population, for example, a medical classification or anything like that?
A. Well, I don't know if you can call it a classification, but now we do ask medical questions.
Q. Well, do you isolate persons with medical problems from the general population?
A. No, sir.
Q. Do you know if there is a policy that calls for any such isolation?
A. Not that I know of.
Q. In April of 2010, cell block A160, was that used for any particular purpose?

A. Yes, sir. It was just an idea that came up since we have so many and so many say they need medicines, and to kind of make it easier to give the medicine out we just tried to put all of the ones that take medicines in one sell.
But it's still a population. It ain't like they're isolated with some disease from everybody else, you know, they go and come.
Q. When was the decision made, if you know, to put the persons who needed medication in A160?
A. I do not remember, but it was a pretty good idea, that way everybody got what they needed. We have them close up front, that was the idea, but now when we started that I don't know.
Q. Were you there when it was started?
A. Yes, sir, but that was way back then, I don't know when. Sometime back then it was done.
Q. Do you know whose idea it was?
A. It had to be an administrator. I wasn't the administrator back then.
Q. Do you know if it's written down somewhere that you do it that way?
A. No, sir. It was just an idea to try to put them -- you know, if they're not a state -- we got state inmates that take medicine.

Now, we can't put the state inmates with the county inmates, we have to separate them. They are all pretrial detainees.
But for those that take medicines, somebody had the idea of this is a bigger dorm, let's try to put them all right here and we can get everybody.
Q. Would it be correct to say that those persons that were in cell block A160, they were pretrial detainees?
A. Yes, sir. If they're in the Jones County jail they're pretrial because they hadn't been convicted.
Q. Did you know Albert Graham?
A. Only as an inmate. I don't know him personally.
Q. When did you become aware of him as an inmate?
A. On this particular incident that we're talking about. I mean, I've been knowing he was in there. We got so many, I didn't know anything about him or paid him any attention until this incident. I mean, he was just another guy in jail.
Q. The incident that you have reference to, when did it occur, do you recall?
A. Well, I think we're talking about the 10th of April.
Q. What happened on the 10th of April?
A. If I got the date correct, this is the date

that Mr. Graham had this medical issue where we had to call Emserv to take him to the hospital, and after that we were told he passed away.

Q. What was the nature of the medical issue and what involvement did you have?

A. Well, I was a sergeant at that time. We come on, it was at night, sometime during the night. We have on the wall an emergency call button.

You know, anytime they had an emergency all they had to do is press that button and it's gonna ring in central control and they let us know we got a problem.

We answered that call, went in there and asked them what's wrong. They said we got a man over here look like he ain't breathing. That's what the inmates told us.

So after we assessed the situation, we saw he was in distress, and what we done after that was one of us sent word to call Emserv while myself and another officer began CPR, if I remember correctly, and we continued that until the ambulance got there and took it over.

Q. You say there's an emergency call button?

A. Yes, sir.

Q. Where is that located?

A. It's right by the door. It's right by the door just right there on the wall.

Q. And it's available for whom to use?

A. It's in the cell with the inmate. Whoever needs an officer in there, just press that button.

Q. Do you know who the first person was to respond to that?

A. First officer?

Q. Yeah, first officer.

A. I do not. I don't know whether it was myself or Officer Fayard, I'm not sure. It was three of us on the floor at that time.

BY MR. DARE: For the record, can you spell Fayard.

BY THE WITNESS: F-a-y-a-r-d.

BY MR. DARE: Thank you.

Q. Did you prepare a report in connection with this incident?

A. I'm pretty sure I did, yes, sir.

Q. Have you had a chance to review it before coming here to testify?

A. I hadn't looked at it today, no, sir.

Q. When was the last time you looked at it?

A. I think I looked at it yesterday morning.

Q. Would you have prepared a jail report in connection with this?

A. What?

Q. This incident that we're talking.

A. The incident report, that is it. That's it, jail report, incident report.

Q. Would you look at that document. I don't know what number.

BY MR. DARE: It's Bates stamped JC825.

BY THE WITNESS: Okay. I'm not familiar with this report.

Q. You didn't prepare that report?

A. This don't look like my report at all.

Q. But it says incident report, doesn't it, at the top?

A. Yeah, jail incident report.

Q. Who would have prepared that report?

A. Well, each officer in there is responsible for preparing a report in his own words, and on there you'll see it's Fayard, myself and Officer Benjamin. Now who prepared that one, I don't know.

Q. Okay. Well, I'm gonna give you 826. Would you look at that and tell me if that's your report?

A. That could be my report there.

Q. That is your report?

A. That could be my report.

Q. You say it could be or is it?

A. Well, it says entered by Benjamin, but I made the report. That's gonna have to be my report down there.

She was probably logged in the computer when I started typing it.

Q. I notice that you talked about the inmates beating on the window. You didn't say anything about the emergency button. Was there any particular reason?

A. In the report, yes, there is.

Q. Okay. Show me.

A. Okay. It's in the other report that you showed me. But anyhow, I didn't put it in there, but there is a button on that thing.

Q. No problem. I was just curious about it.

A. But that's the way they do down there. You know, when they want something, bam-bam-bam, whatever, whatever it take to get our attention, but there's an emergency call button on that wall in there.

Q. But you did go down there in response to it?

A. Absolutely.

Q. Tell me what was the first thing you saw when you got there?

A. Well, when I got there, like always, you're gonna have a bunch of inmates in the way trying to explain things to you and they're all talking at one time, you know.

And we looked at Mr. Graham. They say Mr. Graham was having a problem. We looked at him and assessed the

situation, and sure enough he was in distress, and everybody get on the phone and call the ambulance, call the nurse, call Captain Walls and we'll give him what we need to start CPR on him and try to help him the best way we can.

Q. Okay. You said that he was in distress. What exactly did you observe?

A. Okay. Mr. Graham was laying on the -- he had the first or second rack, I don't know which one it was. When you first enter the door they're lined up on bunk beds lined up down the wall.

I don't remember whether Hemingway was in the very first bottom rack or the second bottom rack, but he was lying on his rack spread out, you know.

He appeared to be in distress, you know. You can tell he was gasping for breath. He couldn't hardly get a breath, at least it appeared.

You know, Officer Fayard, I think if I remember right, I think Officer Fayard began trying to check his pulse and whatever else he was doing, you know.

And what we normally do is go get the blood pressure machine, you know, tell everybody to take the blood pressure.

You know, this guy wasn't breathing good it didn't seem like, so we started trying to do some CPR on him while

the ambulance got there.

Q. Did you have any breathing apparatus like oxygen or anything?

A. Well, we didn't have any oxygen, but we did have this little CPR package where you go get. You know, if you're gonna breathe for them you put this thing over his mouth so you can breathe for him, we did have that.

Q. Was it brought in at the same time the blood pressure machine was brought in?

A. I do not remember.

Q. Do you remember whether or not the blood pressure machine was working?

A. I don't remember that either. That's been so long ago. I mean, we have to look at those reports and see. I do not remember.

Q. If I told you that it was not working, do you have any reason to disagree with that?

A. I would not. It's a battery operated thing. The batteries were probably dead on it.

Q. Do you-all have a protocol or a process in place for verifying -- well, testing it on a regular basis?

A. We don't have a protocol for it, no. It's battery operated. When it start misfunctioning, we mostly just replace the battery in it and it works properly.

I think it's just one of those over the counter

battery operated blood pressure machines. It's not the kind you pump up and you got to hold the thing there, it's not that kind.

Q. Okay. What I was just wondering is say if you check the batteries on a 30 day basis or every 60 days or something like that?

A. Check the battery?

Q. Yeah, to make sure it's operating.

A. I didn't know you could check those batteries. We just replace them when it gets where it's not responding because when the battery is weak it's just not gonna do right, just replace the batteries.

Q. Would it be fair to say that you don't have a protocol that requires you to do that?

A. No, sir, we don't have a protocol for that.

Q. Since you were in charge and when you arrived, did you give any instructions to anybody else to do anything in connection with the situation?

A. I don't understand what you're asking here.

Q. Okay. Example: Did you say Officer "B," go get the blood pressure machine; Officer "C," do this, you know?

A. Any instructions I would have given as sergeant, would phone the information to call the nurse, call Captain Walls, call the ambulance.

I think for the blood pressure cup and the CPR package, I think the other officer was already en route to get all that stuff.

Q. Now, were you interviewed by Mississippi Bureau of Investigation in connection with their --

A. No, I was not.

Q. Did anyone with the Jones County Sheriff's Department interview you in connection with what occurred?

A. I don't remember if I talked directly with one of those investigators or not. They may have just used my report.

Q. Was there a time when Mr. Graham was removed from his bunk?

A. Yes, sir.

Q. Who removed him?

A. Officer Fayard and myself.

Q. And what did you do?

A. We just took him off of that because, you know, it's a bunk bed, and we took him off of that and laid him right there on the floor right next to it so we could do chest compressions and breathe for him.

Q. Did you participate in the CPR?

A. Yes, sir.

Q. What did you do?

A. I did the chest compressions.

Q. And what did Officer Fayard, what did he do?
A. Fayard was checking for breathing and he had the -- I forget the title you call this thing that you put on when you're gonna breathe for him. It's plastic that goes in there and you just kind of --
Q. We'll just call it the breathing thing.
A. Yeah. I forget the proper term for it.
Q. All right. How long from the time that you got the emergency call until the time you arrived at the cell and started CPR, how long elapsed?
A. I couldn't advise you on that. I could not advise you on that.
Q. Once you got to the cell where Mr. Graham was located, did you leave at any time before the emergency assistance personnel arrived?
A. I'm sure I did. Like I said, there were three officers, and I think Officer Benjamin may have taken over on the chest compressions for me while I had to go get on the phone and get ahold of Captain Walls.
Q. Did you speak with Captain Walls at all that night or early morning?
A. Yes, sir, I did. But now, I cannot remember what time it was that I did speak with her but I did speak to her because I think -- well, I know I put in a phone call to her and I think the other two officers did also.

It's an emergency, we're trying to get ahold to her. Now, at what point in there I do not recall.
Q. Do you have a protocol for handling those kind of emergencies?
A. I don't think we have a particular protocol for emergencies.
Q. None that you're aware of anyway?
A. None that I'm aware of, not as far as protocol, no.
Q. At the time the emergency personnel arrived, was Mr. Graham breathing at that point?
A. Ask me again now. I'm sorry.
Q. Okay. Emergency personnel arrived, right?
A. Uh-huh.
Q. And they took him to the hospital?
A. Yes, sir.
Q. Did they take him from the cell?
A. Yes, sir, they did.
Q. At the time that they arrived, was Mr. Graham breathing?
A. Yeah. In my opinion, when the emergency personnel came in and took over Mr. Graham was breathing.
Q. Was he able to say anything at any time while you were there?
A. Well, he never did, Mr. Graham never did. So I

don't know whether he was able to or not. When they took him over I'm thinking the guy was still breathing because of what we was doing.
Q. Did you check his pulse?
A. I didn't check his pulse but, Officer Fayard, I think that's stuff he was working on at the beginning.
Q. The apparatus that we've been referring to as the breathing thing, would that have been a pocket mask?
A. Yes, sir, I think that's what it's gonna be.
Q. You say that Officer Fayard checked his blood pressure, right?
A. I don't know if he checked it or not. It's a blood pressure machine.
BY MR. DARE: The pulse?
BY MR. SANDERS: I'm sorry, I didn't mean blood pressure.
Q. Pulse?
A. Yes, sir, I'm pretty sure Officer Fayard did check his pulse.
Q. How long would you say that you-all performed CPR on him?
A. Sir, I could not advise you. I mean, I don't know, but I do know that once you start you don't stop. So how long it went on I couldn't advise. Like I say, it was three of us.

Q. Did you reach a conclusion as to what Mr. Graham's problem was?
A. No, sir.
Q. Did you interview any of the inmates that were there?
A. No, sir, I didn't interview them. Like I say, when we first walk in everybody, all at the same time, they all want to try to tell you what's going on. But no, I didn't interview any of them.
Q. Did you go to the hospital that night?
A. No, sir.
Q. Have you ever had the same or similar kind of emergency?
A. No, sir.
Q. This was the first?
A. Yes, sir. Hopefully it will be the last.
Q. Was that the first that you heard of occurring since you've been working there?
A. Like that, yes, sir, like that one.
Q. What other kind?
A. Now, there has been other incidents where ambulance have taken somebody out because they supposedly have taken something prior to being arrested.
Q. Medication or drugs or something?
A. Yeah.

Q. Street medication?
A. Yeah, I guess so.
Q. But I meant where a detainee has been there for some --
A. No, not since I've been there.
Q. Who is Officer Santana Benjamin?
A. She was our booking officer at that time.
Q. Was she there lending assistance that night?
A. Yes, sir.
Q. What role did she have?
A. I think at one point when I left out of there to get on the phone, I think she came in and took over the chest compressions, if I remember it right. When I stopped she started on the chest compressions, the best I can recollect.
Q. You say you went to get on the phone?
A. Yes, sir.
Q. Where did you go to?
A. I think I went down to the booking department. We have one in central control and we have one in booking. If I remember right, I think I went down to the booking department.
Q. Okay. Are you satisfied that you-all did everything you could to help?
A. I am. I think we done pretty good for the guy.





Like I say, I'm no medical professional, I don't know what his medical problem was, but he was having trouble breathing. We just did the best we could for him. I'm satisfied with that.
Q. Did any of the prisoners indicate that he was having a heart attack when you-all arrived?
BY MR. DARE: Object to the form.
BY THE WITNESS: They say so much, I don't know. I don't know what them guys -- they all talk at the same time too.
Q. Have you ever reviewed Mr. Graham's -- any of the documents in his file?
A. No, I don't think I've reviewed his file because I don't think -- I'm pretty sure I ain't read it. I don't know what's in his folder.
Q. What's kept in an inmate file?
A. Just booking sheets, you know, arrest charge, a mug shot picture, you know, that kind of stuff was in his folder. If he had any incidents, you know, incident reports would be in there, you know.
For example, if he got in trouble, you know, if he violated something and got put on restriction or something, that stuff goes in his folder.
Q. If he made any complaints, would that be in there?





A. To my knowledge, Mr. Graham was quiet and you never hardly even know it. The only way you know somebody was in there, for them that are making noise, and I never heard anything on Mr. Graham. Like I say, I never knew anything about him until this particular incident with him.
Q. You ever meet his wife?
A. I have met his wife.
Q. And when did you meet her?
A. Actually his wife used to -- before they was married now, his wife used to rent a house from us. My wife did, I never even dealt with her.
Q. Did she ever talk to you about Mr. Graham?
A. No, sir. I have to admit, now she tried once, she tried to flag me down but I wouldn't stop.
Q. About when was that?
A. I don't know. That's probably been a couple of years now seem like.
Q. Was this after his death?
A. Yeah.
Q. Did she ever attempt to talk to you prior to his death?
A. No.
Q. What shift were you the sergeant on?
A. B-Squad. It's called B-Squad. A, B, C and D squad. Four squads. I was on B.





Q. What time period would that be?
A. This is the night shift. At that particular time it was on the night shift, if that's what you're getting at.
Q. I mean, it ran from when to when?
A. 6 p.m. to 6 a.m.
Q. Would it be fair to say it didn't have visitation during that time period?
A. No, sir. I don't remember what day that was. Was it a Saturday or what was it? I don't know.
Q. I'm uncertain. But even if they had visitation, it would not have taken place between 6 p.m. and 6 a.m., inmate visitation?
A. Some cells visit at night.
Q. Is that right?
A. Uh-huh.
Q. What about A160?
A. No, that was on day shift.
Q. I'm just curious, what cells would have night visits?
A. Back in the back you have cells 130, 135, 124, 127, they visit at night.
Q. Why is that?
A. Because every cell -- we visit on weekends. Every cell has an appointed time for visitation.

Q. Oh, okay.
A. They're all scheduled at a certain time frame. We can't mix your pretrial inmates with your already convicted inmates, so they all visit at different times.
BY MR. SANDERS: No further questions.

**EXAMINATION BY MR. DARE:**

Q. Captain Hare, you were asked earlier about an emergency protocol, and I just want to make sure that the terminology used by counsel opposite didn't throw you off.
Is there at the Jones County Adult Detention Facility a policy and procedure entitled Medical Emergencies?
BY MR. SANDERS: Excuse me. What number is that?
BY THE WITNESS: JC740.
Q. Is there a policy and procedure entitled medical emergencies?
A. Yes, sir.
Q. And generally speaking, what is the medical emergencies policy and procedure?
A. First thing you do, you contact our medical staff which would be our nurse; from there we will contact the administrators.
Q. And does the medical emergency policy also provide for contacting of an ambulance agency?

BY MR. SANDERS: To which we object to the form.
BY THE WITNESS: Yes, sir, if one is needed you contact the ambulance services.
Q. If you'll go to the second paragraph of the notification. It's the last paragraph on JC740. Are you there?
A. Yes, sir.
Q. Go to the second sentence, and if you can read that for me, please, sir.
A. (Reading) The plan will list emergency phone numbers for all local ambulance services or agencies, hospitals and other emergency rescue and assistance resources; ambulance access to the facility will be covered in this plan; the plan will specify procedures for prompt identification of inmates being released for a medical emergency and procedures for authorization for releases in an emergency; staff supervision issues where inmates may be removed from the facility as a result of a medical emergency are covered in Jones County Jail Policy Escorted Trips.
Q. And to your knowledge as you sit here today, do you know whether or not the medical emergency policy and procedure of the Jones County Adult Detention Facility was followed on the night of April the 4th of 2010 in relation

to Albert Graham?
A. Yes, sir, it was.
Q. I'm going to have JC740 marked as Exhibit 1 to your deposition, and I have no further questions. Thank you.
**(EXHIBIT 1, POLICIES AND PROCEDURES, WAS MARKED FOR IDENTIFICATION.)**

**REEXAMINATION BY MR. SANDERS:**

Q. You had told me earlier that you didn't have a medical emergency policy, isn't that right?
BY MR. DARE: Object to the form.
BY THE WITNESS: You said protocol, that's the word you used.
Q. And you told me you didn't have a protocol, is that correct?
A. Well, the way you asked it we don't, you know.
Q. What is it that I asked that you don't have?
BY MR. DARE: I'm going to object to the form of the question as it may be a little confusing.
Q. You didn't understand my question when I asked it?
A. Well, I answered the best I could according to the way you asked it.
Q. Okay. Well, my question is did you understand when I asked you about a medical emergency protocol?

BY MR. DARE: I'm going to object to the form. You can answer.
BY THE WITNESS: Well, I understood your question and -- well, I answered it the best I could according to the way you asked it. I don't know what else to --
Q. Okay. Would it be fair to say that you were not aware of the medical emergency policy until you were shown by counsel opposite?
BY MR. DARE: Object to the form. You can answer.
BY THE WITNESS: Okay. Now, I knew about that because that's the way we always do things. I may not remember that it was actually in our policy, just recalled it but, yeah. I forgot all that stuff there.
Q. You say you forgot all that?
A. You know, we got a lot of policy and procedures now. Apparently I just forgot about that particular part. I don't know how to answer that particular question.
BY MR. SANDERS: All right. No further questions.
BY MR. DARE: Thank you.
(CONCLUDED 9:53 A.M.)

REPORTER'S PAGE

I, Trudie Quinn, in and for the State of Mississippi, the officer before whom this sworn testimony was taken, do hereby state on the record:

That due to interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talk-overs; that same is the proper method for a court reporter's transcription of proceeding; that the dashes (--) do not indicate that words or phrases have been left out of this transcript, and that any words and/or names which could not be verified through reference material have been denoted with the phrase (phonetic).

- 0 -

CERTIFICATE OF DEPONENT

DEPONENT: David Hare
DATE: June 13, 2014
CASE STYLE: Jeanetter Graham v. Alex Hodge and Jones County
ORIGINAL TO: Everett Sanders

I, the above-named deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the deposition taken on the date above as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me.

Subject to those corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforementioned time and place.

| Page | Line | Comments |
|---|---|---|
| ____ | ____ | ____________ |
| ____ | ____ | ____________ |
| ____ | ____ | ____________ |
| ____ | ____ | ____________ |
| ____ | ____ | ____________ |
| ____ | ____ | ____________ |
| ____ | ____ | ____________ |

This the ____ day of ____, 2014.

____________________
WITNESS

State of Mississippi
County of ____________

Subscribed and sworn to before me, this the ____ day of __________, 2014.

My Commission Expires:

____________________ ____________________
Notary Public

CERTIFICATE

I, Trudie Quinn, Court Reporter and Notary Public, in and for the State of Mississippi, hereby certify that the foregoing contains a true and correct transcript of the proceedings as taken by me at the time and place heretofore stated and later reduced to typewritten form by computer-aided transcription under my supervision and to the best of my skill and ability.

I further certify that the witness was placed under oath to truthfully answer the questions in this matter.

I further certify that I am not in the employ of or related to any counsel or party in this matter and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature and seal, this the 4th day of July 2014.

____________________
TRUDIE QUINN, COURT REPORTER
CCR# 1368

My commission expires:
August 9, 2015



**Jones County Sheriff's Department**
**Jail and Detention**
**Policies and Procedures**

| **Subject:** Medical Emergencies | **Policy Number:** 7.07 |
|---|---|
| **Issue Date:** | **Revision Date:** |
| **Approval Authority Title and Signature:** | |

**POLICY:**

It is the policy of Jones County Sheriff's Department to provide emergency medical services to inmates that is consistent with community standards of health care.

**PENOLOGICAL INTEREST:**

It is in the penological interest of this detention facility to provide reasonable and necessary health maintenance, and medical services to inmates housed in this detention facility.

**PROCEDURE:**

The primary medical emergency resource in the Jones County Jail is the local hospital. The Jail Administrator will compile a detailed emergency plan on providing emergency medical services to inmates.

**Notification:**
The plan will specify the internal resources available, how they can be accessed, under what circumstances trained detention staff are notified of an emergency, and telephone numbers for on and off duty contact. The plan will also describe the outside medical resources available, under what circumstances community emergency medical resources will be summoned, and the ambulance services that can be called in a medical emergency.

The plan will list the emergency phone numbers for all local ambulance agencies, hospitals, and other emergency rescue and assistance resources. Ambulance access to the facility will be covered in the plan. The plan will specify procedures for prompt identification of inmates being released for a medical emergency and procedures for authorization for releases in an emergency. Staff supervision issues for inmates who may be removed from the facility as a result of a medical emergency are covered in Jones County Jail policy *Escorted Trips*.

RESTRICTED LAW ENFORCEMENT DATA
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.