## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

JEANETTER GRAHAM INDIVIDUALLY
AND AS WRONGFUL DEATH BENEFICIARY
OF ALBERT GRAHAM, DECEASED                    PLAINTIFF

V.                                    CAUSE NO. 2:13CV67KS-MTP

ALEX HODGE, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS SHERIFF OF JONES
COUNTY; JONES COUNTY, MISSISSIPPI AND
DEPUTY "JOHN DOE" IN HIS OFFICIAL CAPACITY    DEFENDANTS

**************************************************************

DEPOSITION OF STACY WALLS

Taken at the offices of Jones County Courthouse, 415 North
5th Avenue, Laurel, Mississippi, on Thursday, June 12,
2014, beginning at approximately 10:54 a.m.

**************************************************************

APPEARANCES:

    EVERETT T. SANDERS, ESQUIRE
    Sanders Law Firm
    Post Office Box 565
    Natchez, Mississippi  39121
        PRESENT AND REPRESENTING THE PLAINTIFF

    JASON E. DARE, ESQUIRE
    Wyatt, Tarrant & Combs
    Post Office Box 16089
    Jackson, Mississippi  39236-6089
        PRESENT AND REPRESENTING DEFENDANT ALEX HODGE AND
        JONES COUNTY, MISSISSIPPI

REPORTED BY:
        TRUDIE QUINN
        Raven Court Reporting
        Post Office Box 180506
        Richland, Mississippi  39218
            (601) 932-5354

## Page 2

### INDEX

| | PAGE |
|---|---|
| Style, Number and Appearances | 1 |
| Index | 2 |
| EXAMINATION OF STACY WALLS: | |
|     By Mr. Sanders | 3 |
|     By Mr. Dare | 36 |
| Reporter's Page | 38 |
| Signature Page | 39 |
| Certificate of Reporter | 40 |

- o -

### EXHIBITS

| | | |
|---|---|---|
| 1 | Medical treatment form | 24 |
| 2 | Booking medical sheet | 25 |

- o -

## Page 3

Stacy Walls - 06-12-14

P R O C E E D I N G S

STACY WALLS,
called as a witness, having been duly sworn,
was examined and deposed as follows:

**EXAMINATION BY MR. SANDERS:**

Q.  Would you state your name, please.
A.  Stacy Walls.
Q.  Okay. Ms. Wallace --
A.  Walls.
Q.  Walls, I'm sorry. As we were introduced before we started, I'm Everett Sanders and I have a few questions to ask you. Have you ever given a deposition before?
A.  No, sir.
Q.  I'm going to be asking questions. If I ask you a question and you don't understand it, if you would ask me to rephrase it or repeat it, otherwise if you give an answer I'm going to assume you understood the question. Is that fair?
A.  That's fair.
    BY MR. EVERETT: All right. The general stipulations as to this?
    BY MR. DARE: Yes, sir. We can agree to the standard stipulations pursuant to the Federal Rules of Civil Procedure.
Q.  Okay. Where do you live, Ms. Walls?

## Page 4

Stacy Walls - 06-12-14

A.  I live in --
    BY MR. DARE: And I'm sorry right after making the stipulation. With officers and former officers, I typically have their actual physical address kept private or at least kept out of the public record. I don't mind if you get this. I don't want it on the -- and that's purely for protective reasons.
    BY MR. SANDERS: I have no problem with that, like social security numbers and stuff like that. I'll get it later.
    BY MR. DARE: Okay.
Q.  Are you employed?
A.  Yes, sir, I am.
Q.  Where are you employed?
A.  Jones County Justice Court.
Q.  And in what capacity?
A.  I'm the court clerk.
Q.  And how long have you been so employed?
A.  With the court system about three years.
Q.  And prior to that where were you employed?
A.  I was employed with the Jones County Sheriff's Department.
Q.  And in what capacity?
A.  I left there as captain.

EXHIBIT 11

## Page 5 — Stacy Walls - 06-12-14

1  Q.  Captain?
2  A.  Yes, sir.
3  Q.  How long were you with Jones County?
4  A.  Eight and a half years.
5  Q.  What were your duties and responsibilities as
6  captain?
7  A.  My duties were over transportation. I was also
8  over the adult and juvenile detention facility and
9  staffing.
10 Q.  You had all of these responsibilities
11 simultaneously?
12 A.  Yes, sir.
13 Q.  Being in charge of the adult facility, what did
14 that involve?
15 A.  It involved the staffing, making sure that the
16 inmates were housed where they needed to be. The typical
17 day-to-day running of the jail, make sure that we had the
18 adequate food that we needed. Basically just -- I'm not
19 real sure how to answer that one.
20 Q.  Were you considered to be the jail
21 administrator?
22 A.  Yes, sir.
23 Q.  How long did you have that position?
24 A.  I had that position I believe for two years.
25 Q.  What is your educational background?

## Page 6 — Stacy Walls - 06-12-14

1  A.  I have my high school diploma and I have some
2  junior college. I also was trained in jail administration,
3  we had went through a course, and I also went through
4  correctional officer training.
5  Q.  Where did you receive your jail administrator
6  training?
7  A.  It was received on the Coast, and I apologize,
8  I do not remember the name. It was something that the
9  sheriff's department sent me to.
10 Q.  Okay. Were you the jail administrator in April
11 of 2010?
12 A.  Yes, sir, I was.
13 Q.  And how long had you been the jail
14 administrator at that time?
15 A.  I'm gonna say maybe a year.
16 Q.  Would you tell me the booking process as it
17 existed in April of 2010?
18 A.  As the inmate is brought in they are booked in
19 through the PTS system. They are fingerprinted and they
20 are also photographed.
21 Q.  Okay. Are they classified in any way?
22 A.  Yes, sir. We check to see if they're gang
23 related. We ask them if they have any medical problems.
24 We ask them, again, if they're gang related.
25 Q.  Okay. If a person has a medical problem, how

## Page 7 — Stacy Walls - 06-12-14

1  is that handled?
2  A.  The officer that was booking the person in
3  would print out the medical sheet and would place it in the
4  nurse's box, and the next morning when the nurse come in
5  she would go to her box and get the paperwork. She would
6  take it to her office and go through it and see what we
7  needed to do for that particular inmate.
8  Q.  Once the nurse reviewed it, who would she
9  report to?
10 A.  Well, if there wasn't any problem she would
11 handle it. She would also get with the inmate and go over
12 the intake form.
13 Q.  Is there any documentation of the follow-up
14 that the nurse would be doing with the inmate?
15 A.  On the medical you would have to ask her. That
16 would be in her office as far as any medical that went on
17 between her and the inmate unless the inmate writes me
18 specifically, which we have forms for them to do that.
19 Q.  Do you in any way segregate persons who have
20 medical problems from the general population?
21 A.  Once they have been taken to the doctor, we
22 would place them in what we call the medical cell unless
23 they have something that's contagious and then, of course,
24 we would put them by themselves until we could further
25 evaluate the situation.

## Page 8 — Stacy Walls - 06-12-14

1  Q.  The medical cell, is that A160?
2  A.  Yes, sir, it is.
3  Q.  How many prisoners or detainees would that
4  house?
5  A.  If I remember correctly, I want to say 16. And
6  then we also had Hall 3 that we would also use, but we
7  tried to keep all medical patients at the front end of the
8  jail, that way it was easier access if they needed
9  assistance.
10 Q.  Who makes the determination as to whether or
11 not a person goes into A160?
12 A.  That would be the nurse.
13 Q.  If an inmate during the course of processing in
14 is determined that the inmate is on medication or was on
15 medication before he or she came into the facility, is
16 there any effort made to secure medication for the inmate?
17 A.  Say that again? I'm sorry.
18 Q.  Let me ask it, maybe I'll do it step by step.
19 If it becomes known that an inmate or a detainee was taking
20 medication before he or she came into the facility, is
21 there any effort made to verify that the inmate was taking
22 this medication?
23 A.  Well, again, the nurse would get with the
24 inmate on the next business day that she was there. She
25 would get with the inmate and go over the medical intake

EXHIBIT 11

**Stacy Walls - 06-12-14**                                                                 9

1  sheet.
2      Q.   And once this is done, is there any effort to
3  get medication for the inmate?
4      A.   The nurse would have contacted the family, and
5  if the family could not provide it or it was not available,
6  then we would take other steps.
7      Q.   And during what period of time would this take
8  place?
9      A.   It would take place within -- let's say
10 somebody comes in on a Sunday, that Monday morning, be it
11 not a holiday, the nurse would get with that inmate.  By
12 that afternoon she would have contacted the family.
13     Q.   So it would take place in a matter of two days,
14 three days?
15     A.   Yes, sir.
16     Q.   If the family brings medication to the
17 facility, is that medication dispensed to the inmate?
18     A.   It is given to the nurse and the nurse would --
19 if it's a narcotic it's not allowed in the jail.  Narcotics
20 were not allowed in the jail.
21          But the nurse would take it and she would dispense
22 it or she would have it placed in the proper container to
23 be given to the inmate at the appropriate time.
24     Q.   If an inmate is receiving medication while in
25 the detention facility, does he or she have to sign off at

**Stacy Walls - 06-12-14**                                                                10

1  the time the medication is administered?
2      A.   I'm trying to think.  That's been a while back.
3  It's been over --
4               BY MR. DARE:  And are you referring to every
5      time that he receives medicine?
6               BY MR. SANDERS:  Yeah.
7               BY THE WITNESS:  I believe that would have
8      been logged into the logbook.
9      Q.   What kind of logbook?
10     A.   Central control logbook.  You have a logbook in
11 central control and also one in booking.
12     Q.   And what does the central control logbook
13 reflect?
14     A.   The day-to-day activities of the jail, the
15 coming and going, who comes in, who goes out, who goes to
16 rec yard, who comes back in from rec yard, what time
17 they're fed lunch, what time they're fed breakfast.
18          Anytime that the officers have contact with the
19 inmate or the nurse, if she takes somebody's blood pressure
20 it would be in the logbook.
21     Q.   That's a central control logbook?
22     A.   Yes, sir.
23     Q.   Do you know where this is maintained?
24     A.   It's maintained in central control.
25     Q.   Say the logbook for 2010, where would it be?

**Stacy Walls - 06-12-14**                                                                11

1      A.   It would be on file at the jail.
2      Q.   Would it be fair to say that the nurse is the
3  one who would make the decision as to whether or not
4  someone needs additional medical attention?
5      A.   Yes, sir.
6      Q.   Would she have to confer -- and I assume this
7  is a she?
8      A.   Yes, sir, it is a she.
9      Q.   Would she have to confer with you before an
10 inmate could get additional medical attention?
11     A.   No.  I was made aware if an inmate was going to
12 the doctor.  It did not -- let's say at night if an inmate
13 -- there were three of us that would be on call at night.
14          If they called the nurse and there was a problem
15 with an inmate, they would call the person that was on call
16 for that weekend or that night to make the determination
17 how the person would be transported to the hospital.
18     Q.   I assume you would have a transport officer, is
19 that correct, or transfer officer?
20     A.   Yes, sir.
21     Q.   The nurse could give instructions to the
22 transfer officer that I need you to take him to the doctor
23 without clearing it with anyone?
24     A.   Well, there is a form that's filled out, yes,
25 sir.

**Stacy Walls - 06-12-14**                                                                12

1      Q.   There is a form?
2      A.   Yes, sir.
3      Q.   Where would that form be?
4      A.   It would be at the jail.
5      Q.   And where would it be?
6      A.   It would either be in the inmate's file or
7  documented in the computer, and it would also be listed if
8  the inmate went to the doctor in the logbook, the central
9  control logbook.
10     Q.   And administration of medication would be in
11 the central control logbook too, right?
12     A.   Yes, sir.  There's also forms that the nurse
13 has showing -- and I don't know what they're called.
14 They're kept in medical showing when the inmate was given
15 the medication and what time they were to get the
16 medications.
17     Q.   Did you have any policy regarding where inmates
18 would be taken to receive additional medical treatment?
19     A.   It depended on the medical need at that time.
20     Q.   Do you know if any inmates have ever been taken
21 to the Hattiesburg Heart Clinic?
22     A.   Not to my knowledge.
23     Q.   If an inmate had a complaint about the
24 provision of medical care, how would they go about
25 registering their complaint?

EXHIBIT 11

Stacy Walls - 06-12-14    13

1  A.  They would write a grievance form and there was
2  also a medical request form.
3  Q.  Would that be in the inmate's file?
4  A.  The medical request form would be in the
5  medical file and the grievance form would come to the
6  captain and it would be in their file.
7  Q.  Whose file?
8  A.  It would be in the inmate's file.
9  Q.  If medical records were requested on an inmate,
10 would that be done by the nurse?
11 A.  I'm sorry?
12 Q.  Medical records, say an inmate had been to the
13 hospital and was having kidney problems and reported that.
14 If you wanted to verify it you could get the medical
15 records from the doctor or from the hospital?
16 A.  I believe so, yes, sir.
17 Q.  And this would be a responsibility of the
18 nurse?
19 A.  Yes, sir, it would.
20 Q.  Did you have any standing order or protocol as
21 to where persons would be taken for medical treatment?
22 A.  Again, it would depend on the medical need, the
23 severity of it at the moment.
24 Q.  Did you know Albert Graham during the time that
25 he was detained?

Stacy Walls - 06-12-14    14

1  A.  To some degree, yes, sir.
2  Q.  When did you first become familiar with him?
3  A.  I became familiar with him when his wife called
4  me.
5  Q.  When was this?
6  A.  I do not remember the date, but she called me
7  to let me know that he was a heart patient and that he's a
8  quiet man, wasn't the type that would complain and that she
9  was concerned about his heart and asked me would I see to
10 it that he got medication.
11 Q.  Did you know his wife?
12 A.  No, sir, I did not.
13 Q.  Have you ever met her?
14 A.  I've met her I believe once, and that was after
15 Mr. Graham's passing.
16 Q.  How long was it before Mr. Graham passed that
17 Mrs. Graham brought this to your attention regarding his
18 heart problem?
19 A.  Beg your pardon?
20 Q.  I was asking approximately how long was it
21 before Mr. Graham's passing was it that Mrs. Graham told
22 you about his need for heart medication?
23 A.  To be honest with you, that's been I think over
24 four years ago.  I honestly couldn't give you an exact
25 specific date or how long it was, but I do remember that

Stacy Walls - 06-12-14    15

1  when she and I discussed it she was very polite and we made
2  sure that he went.  I believe he either went that afternoon
3  or the next day to the doctor.
4  Q.  Now, Mrs. Graham called you on the telephone?
5  A.  Yes, sir.
6  Q.  Did she indicate to you that she had made an
7  effort to try to send medication to the jail?
8  A.  No, sir.
9  Q.  Did it ever come to your attention that
10 medication was brought there on behalf of Mr. Graham?
11 A.  No, sir.
12 Q.  If medication had been brought, what would have
13 been the procedure?
14 A.  If it was during 8:00 to 5:00, Monday through
15 Friday, no holiday, the nurse would have been called up to
16 examine the medication, make sure that it was not a
17 narcotic and that it is something that we would allow into
18 the facility, and then she would take possession of it and
19 it would be locked up in her office.
20 Q.  Did Mrs. Graham call you on more than one
21 occasion?
22 A.  Beg your pardon?
23 Q.  Did Mrs. Graham call you on more than one
24 occasion?
25 A.  She called me right after the first call.  She

Stacy Walls - 06-12-14    16

1  called me a few days later to thank me for taking him to
2  the doctor and getting him on his medication.
3  Q.  Are you aware that when Mr. Graham was
4  processed in he indicated that he was on medication?
5  A.  No, sir, I was not aware of it.
6  Q.  Has it come to your attention since his death?
7  A.  Yes, sir.
8  Q.  How did it come to your attention?
9  A.  It was brought to my attention during the
10 investigation during the booking process after his death.
11 Q.  Mr. Graham was booked in in November of 2009,
12 is that correct?
13 A.  I believe so if you say so.  I don't have
14 paperwork to know.  Like I said, this has been over four
15 years ago.  I haven't looked at any paperwork to verify
16 when the dates occurred.
17 Q.  Do you know approximately how long it was
18 between the time Mr. Graham was taken to the doctor and the
19 time that he died?
20 A.  No, sir, I do not.
21 Q.  Do you know if it was within a month?
22 A.  I'm gonna say it was longer than that.
23 Q.  Do you know if he was taken to the doctor more
24 than one time?
25 A.  I couldn't answer that question to be honest

EXHIBIT 11

**Stacy Walls - 06-12-14** — 17

1  with you. We have so many that go back and forth to the
2  doctor. Mentally I can't remember who went, you know. I
3  can't remember that, I'm sorry.
4      Q.   Okay. After Mr. Graham died Robert Suber
5  conducted an investigation, is that correct?
6      A.   Yes, sir, he did.
7      Q.   Do you recall telling Mr. Suber that Mr. Graham
8  had a history of health problems?
9      A.   No, sir, I don't remember saying -- well, I
10 don't remember saying it. I may have because I had talked
11 to Mrs. Graham. She and I on the day that we had our talk,
12 we had a lengthy discussion about Mr. Graham.
13     Q.   What exactly did Mrs. Graham tell you?
14     A.   Mrs. Graham told me that -- I remember her
15 telling me that he was a good man, that he had cocaine
16 problems and I believe drinking problems when he was out
17 and that he didn't take his medication like he should but
18 that she was concerned about his health.
19          And again, that he would not complain to us but she
20 wanted to see if I would see to it that he got to the
21 doctor and got back on his medication.
22          So that would be the extent of my knowledge of his
23 medical. I can't particularly say I remember her saying --
24 you know, I knew that she had said he had heart problems.
25     Q.   Did you discuss this with the nurse?

**Stacy Walls - 06-12-14** — 18

1      A.   Yes, sir, immediately after our conversation.
2      Q.   Do you remember the time of the year that you
3  had this conversation with Mrs. Graham?
4      A.   No, sir, I don't.
5      Q.   You don't know if it was before or after
6  Christmas in 2009?
7      A.   No, sir, I don't.
8      Q.   Did it ever come to your attention that Mr.
9  Graham was being treated by Dr. Mouannes for heart
10 problems?
11     A.   No, sir.
12     Q.   Mrs. Graham didn't -- you don't recall her?
13     A.   I don't recall her advising me who he was being
14 treated by. I do remember her telling me he had medical
15 problems, but I can't remember exactly specifically what
16 the medical problems were.
17          I do believe that she told me that he had a heart
18 condition, but I can't sit here under oath and say I know
19 that's what she said.
20     Q.   Do you ever review the booking medical sheet?
21     A.   No, sir, I don't. I read the incident reports
22 that are turned in to me. I read the grievance forms, and
23 if an inmate sends me a medical request form I would read
24 it. But no, sir, I don't read the intake sheets.
25     Q.   Do you recall getting any medical requests from

**Stacy Walls - 06-12-14** — 19

1  Albert Graham?
2      A.   No, sir, I do not recall getting any from him.
3      Q.   Would it be fair to say that at the doctor's
4  visit that you testified about with respect to Mr. Graham,
5  it was a result of your initiation as opposed to Mr.
6  Graham's request?
7      A.   Try that again.
8      Q.   Okay. You testified that Mr. Graham was taken
9  to the doctor?
10     A.   Yes, sir.
11     Q.   That was the result of your conversation with
12 Mrs. Graham?
13     A.   Yes, sir.
14     Q.   It was not the result of a request on the part
15 of Mr. Graham?
16     A.   Yes, sir, that is exactly what I would say.
17     Q.   Okay, all right. Do you know if Mr. Graham
18 made any request?
19     A.   No, sir, to my knowledge he did not.
20     Q.   Would that request have come to you if he had
21 made it?
22     A.   Through a grievance form or had he directed a
23 letter, a note or the medical request form to me, it would
24 have come to me.
25     Q.   What is a medical treatment form?

**Stacy Walls - 06-12-14** — 20

1      A.   It's a medical request form. It's where the
2  inmate request to have medical, that they have medical
3  needs, that I have a toothache, I'd like to see a dentist,
4  I'm having bad headaches.
5      Q.   I hand you this document and ask you if you've
6  ever seen it?
7      A.   I was showed this yesterday.
8      Q.   You had not seen it before yesterday?
9      A.   I had seen the form before but not this
10 particular form, no, sir.
11     Q.   Okay. Now you've confused me.
12          BY MR. DARE:  You can explain what you meant
13     by that.
14          BY THE WITNESS:  Yesterday during our
15     briefing we went over --
16          BY MR. DARE:  And not about what we discussed
17     yesterday. I think what she was saying is she has
18     seen this blank form before; she has not seen the
19     completed form as represented in 833.
20          BY THE WITNESS:  No, I have not seen this
21     form. I have seen the blank forms before.
22          BY MR. SANDERS:  Okay. Now, what is that
23     number?
24          BY MR. DARE:  JC833.
25     Q.   When you were talking about the form that would

EXHIBIT 11

**Stacy Walls - 06-12-14** — 21

1  have come to you, is that the form you have reference to?
2     A.   That is one that the inmates can either --
3  normally what they would do is they would fold it and they
4  would put the nurse or they would put captain or whoever
5  they wanted their specific form to go to and then it would
6  be put in -- in central control there is a box for the
7  captain's notes, one for the nurse's notes, and it would be
8  either placed in hers if it was directed to her or to me if
9  it was directed to me.
10    Q.   Is the form as represented in 833, JC833, is
11 that the form that was utilized by inmates to request
12 medical assistance?
13    A.   Yes, sir, it is.
14    Q.   And it's your testimony that you have --
15    A.   No, wait a minute, I'm sorry. Are you asking
16 me is this the form that the inmate would have used?
17    Q.   Yeah.
18    A.   No, sir, this is not the form that the inmate
19 would have used.
20    Q.   Okay. What is JC833?
21    A.   JC833 is the form that the nurse would use to
22 fill out to let billing through the sheriff's department
23 know where the inmate went, if it was an adult or a
24 juvenile, who would be responsible for payment, the county,
25 the state or whatever other agency.

**Stacy Walls - 06-12-14** — 22

1     Q.   So the writing that appears on JC833 would have
2  been prepared by the nurse?
3     A.   Yes, sir.
4     Q.   Would there have been another form backing that
5  or supporting that form? Well, let me rephrase it. Would
6  there have been another form filled out by the inmate
7  supporting the form JC833?
8     A.   If the inmate had the complaint, if the inmate
9  requested, but I believe in Mr. Graham's position it was by
10 a direct order from me that he was taken to the doctor.
11    Q.   Does that time period reflect the direct order
12 from you?
13    A.   I couldn't tell you the exact date that I had
14 told her. I don't know if this was his first visit or if
15 there was a second visit. I can't honestly tell you when I
16 had the conversation with Mrs. Graham.
17    Q.   Looking at that form, can you tell when it was
18 prepared?
19    A.   Looks like on the form that it was prepared on
20 March the 10th of 2010.
21    Q.   Now, Mr. Graham was arrested November the 10th,
22 2009?
23    A.   Yes, sir.
24    Q.   And he indicated that he had a heart problem
25 and that he was on medication. Is that an unusually long

**Stacy Walls - 06-12-14** — 23

1  period of time for him to have been seen by a medical
2  professional?
3         BY MR. DARE: Object to the form. You can
4  answer.
5         BY THE WITNESS: Beg your pardon?
6         BY MR. DARE: I'm just objecting to the form
7  of the question, but you can answer the question.
8         BY THE WITNESS: I really don't know how to
9  answer that. It depends on if the inmate -- a lot of
10 times during booking they will tell you, well, I've
11 been on this but I'm not taking it now.
12        If the inmate request to go to the doctor,
13 then they are taken to the doctor. If an inmate
14 during intake shows signs of distress they are taken
15 immediately to the doctor.
16        There is a form that's filled out. It's to
17 be placed in the nurse's box for her to pick up the
18 next day. That's the policy and procedure.
19    Q.   So an inmate would have to request to go to the
20 doctor in order to be taken?
21    A.   Well, if the medication is not available and
22 they need their medication then, yes, sir, they would be
23 taken to the doctor. That's our protocol, they would be
24 taken to the doctor after having a discussion with the
25 nurse and her doing a medical intake on the inmate.

**Stacy Walls - 06-12-14** — 24

1     Q.   So you say that you never looked at the booking
2  sheet for Albert Graham?
3     A.   No, sir.
4     Q.   At any time?
5     A.   Well, after his passing, yes, sir, I went
6  through his complete file, but before his passing, no, sir,
7  I can't tell you that I did or that I didn't. I don't
8  recall. I'm gonna hand you what is JC830 through 832.
9         (EXHIBIT 1, MEDICAL TREATMENT FORM, WAS
10 MARKED FOR IDENTIFICATION.)
11    Q.   What numbers did I give you? I forgot them.
12    A.   You gave me 830, 31 and 32.
13    Q.   Okay. Looking at that document, you say that
14 you have reviewed it prior to now?
15    A.   Yes, sir.
16    Q.   And when did you review it?
17    A.   I reviewed it during the investigation after
18 his death.
19        BY MR. SANDERS: Can we go off the record.
20        (OFF-THE-RECORD DISCUSSION.)
21    Q.   (By Mr. Sanders) Okay. Looking at 831 and
22 what, 832?
23    A.   Yes, sir.
24    Q.   All right. You say that you had seen this
25 before today?

EXHIBIT 11

## Page 25

Stacy Walls - 06-12-14

1   A.   Yes, sir.
2   Q.   And when was the first time you say you saw it?
3   A.   I saw this after the passing of Mr. Graham.
4        BY MR. SANDERS:  I would like to have that
5   marked as Exhibit 2.
6        (EXHIBIT 2, BOOKING MEDICAL SHEET, WAS MARKED
7        FOR IDENTIFICATION.)
8   Q.   Okay.  If you would look at it, I want to ask
9   you some questions about it.
10  A.   Okay.
11  Q.   Looking at Exhibit 2, on the second page of
12  Exhibit 2 there's an explanation that says congenetive
13  Heart failure, is that correct?
14  A.   Congestive heart failure?
15  Q.   Congestive heart failure, I'm sorry, congestive
16  heart failure.  The information as contained under the
17  explanation, where would that have come from?
18  A.   That would have come from the medical
19  questionnaire during the booking process.
20  Q.   Now, the information that's contained under
21  explanation on Exhibit 2, would that have required any
22  special treatment with respect to Mr. Graham?
23  A.   Now, are you talking about the document?
24  Q.   Yeah.  And when I say -- well, maybe I
25  shouldn't use treatment.  Would that have dictated that he

## Page 26

Stacy Walls - 06-12-14

1   be placed in a separate area of the prison population?
2   A.   He would have been placed on Hall 1.  He would
3   have been dressed out within 12 hours and placed into
4   general population until the nurse done -- again, this
5   would have been printed, placed in her box in the booking
6   area.
7        The next morning she would have come in, she would
8   have -- he was booked in that morning, so she would have
9   seen it sometime during the day.
10       Yes, sir, if he had medical conditions and there
11  was medication he would have been placed in the medical
12  cell.  I'm sorry.
13  Q.   Do you know if he was placed in the medical
14  cell?
15  A.   No, sir, I do not.
16  Q.   Who would know whether or not he was placed in
17  the medical cell?
18  A.   The sergeant over the shift would have made
19  sure that he was placed into the medical cell along with
20  the floor officers dressing him out.
21  Q.   Would he have remained in the medical cell his
22  entire time he was in detention?
23  A.   Under the conditions that he has, yes, sir, he
24  would have remained in the medical cell once the nurse --
25  again, once they come in after the nurse does her

## Page 27

Stacy Walls - 06-12-14

1   assessment and determines that they do have medical issues
2   then they are placed in the medical cell.
3        Under Mr. Graham's position with it being something
4   not like a common cold or something that could be addressed
5   and then taken away he would have stayed in 160.
6   Q.   And that would be predicated upon the
7   information they acquired during the booking process,
8   right?
9   A.   Yes, sir.
10  Q.   Were you on duty April the 5th, 2010?  Well,
11  let me help.  Mr. Graham died on April the 5th, 2010.  Were
12  you on duty on that date?
13  A.   I was on call, but I was not actually at the
14  jail when it occurred.
15  Q.   Did there come a time when you went to the
16  jail?
17  A.   I went to the jail after he was pronounced
18  deceased at the hospital.
19  Q.   Did you talk with any of the personnel at the
20  jail in terms of what had occurred?
21  A.   Yes, sir.
22  Q.   Who did you talk to?
23  A.   I talked to Sergeant Hare.  He contacted me.  I
24  believe he was the officer that contacted me and told me
25  that they were concerned about Mr. Graham and that they had

## Page 28

Stacy Walls - 06-12-14

1   contacted -- I believe they told me they had contacted an
2   ambulance and the ambulance was en route.  If I remember
3   correctly, I believe I met the ambulance at the hospital
4   that night.
5        Normally, I would have gone to the jail to pick the
6   inmate up, but in that position it would have done no good
7   for me to try to transport him in my car, so the ambulance
8   was called.
9   Q.   So you transport inmates sometimes in your car?
10  A.   Yes, sir.  And when I say my car, the patrol
11  unit.
12  Q.   I understand.  What kind of video surveillance
13  did you have on April the 10th, 2010 at the adult facility?
14  A.   Well, the camera system, the positions and all
15  that are constantly changing in the jail.  So I know that
16  we had a camera system that pointed down Hall 1.  I believe
17  there was a camera system pointing down Hall 2 which was
18  the hall that Mr. Graham's -- the location of his cell, but
19  there were no cameras inside the housing unit.
20  Q.   Camera down what hall was it that he was on?
21  A.   He was on Hall 2, and I believe there was a
22  camera pointing down that hall.
23  Q.   Were there tapes made of what occurred that
24  night?
25  A.   Yes, sir.

EXHIBIT 11

### Page 29

Stacy Walls - 06-12-14

1  Q. And by whom?
2  A. I believe I am the one that went in and
3  downloaded them onto DVD and gave them, I believe, to the
4  major or one of the MBI officers. I don't remember who was
5  given it, but I remember that we did make recordings of it.
6  Q. How many did you make?
7  A. I believe it was one.
8  Q. Do you know what happened to it?
9  A. It was either given to the major or it was
10 given to MBI. I don't remember who took possession of it.
11 Q. You didn't make one for your files?
12 A. No, sir.
13 Q. Is there any reason why?
14 A. Well, I mean, there was no reason for us to
15 keep one at the jail. I was told to burn one and that it
16 was given to them. To be honest with you, I don't remember
17 that far back. There may have been one -- you know, I
18 don't remember. Those next 24 hours was pretty tough.
19 Q. Had you had an inmate to die in jail there
20 while you were jail administrator other than Mr. Graham?
21 A. No, sir. I had never seen a death before,
22 anyone die before, so it was pretty traumatic for me for
23 the next few days.
24 Q. How did you receive the information about Mr.
25 Graham?

### Page 30

Stacy Walls - 06-12-14

1  A. What information are you referring to?
2  Q. I'm sorry. Information about Mr. Graham's
3  illness on the night that he died.
4  A. I received a phone call to my phone, and I
5  don't remember the specific, but they informed me that he
6  was in distress and that they had administered aid to him,
7  CPR, and that the ambulance had been called and was en
8  route to the jail to transport him to South Central
9  Regional Medical Center ER.
10 Q. Once you received that information, did you in
11 turn contact anyone?
12 A. No, sir. I got up, I believe I went to the
13 hospital, met the ambulance, went in with them. I was in
14 the room with him and the doctors and nurses. After his
15 passing, I believe I contacted my next in command which
16 would have been Major Suber.
17 Q. Nurse Johnston, were you the person that hired
18 her?
19 A. I was the lieutenant when she was hired. I did
20 not hire her, but I was in on the interview, but I was not
21 the one that made the decision on who to hire.
22 Q. Who was present at the interview?
23 A. That would have been, I believe me and Captain
24 James Grimes at the time.
25 Q. And what was his position?

### Page 31

Stacy Walls - 06-12-14

1  A. He was the jail administrator.
2  Q. So he made the decision to hire her, is that
3  right?
4  A. Well, it's a group. When you're hired on
5  through this administration you have to go through several
6  steps to be in the hiring process.
7  You went through the administrator, the chief
8  deputy, who I believe at the time was Don Sealy. You have
9  to go through a polygraph test. So there are several
10 factors in someone being hired.
11 Q. Did you have the authority to hire and fire
12 people?
13 A. To a certain degree, yes, sir.
14 Q. When you say a certain degree, what do you
15 mean?
16 A. When Chief Sealy was there, if you had an issue
17 you would write the person up and he would make the
18 determination of the discipline.
19 We were allowed to on the hiring part, we were
20 allowed to interview, but they made the final decision if
21 the person was hired.
22 So to a certain degree we had a little to do with
23 the discipline and the hiring and firing, but at the end it
24 was the administration, the sheriff's department
25 administration that made that decision.

### Page 32

Stacy Walls - 06-12-14

1  Q. The next question was about the discipline.
2  Did you have authority to discipline persons?
3  A. I had the authority to write them up but I did
4  not at that time -- if Chief Sealy was still there we were
5  not allowed to determine the discipline, he did.
6  Q. Was anyone written up in connection with Mr.
7  Graham?
8  A. Not to my knowledge, and I apologize. As jail
9  administrator there is so much paperwork you go through
10 with your staffing, inmates writing you, families writing
11 you. I couldn't sit here and give you an honest answer on
12 that.
13 Q. If any disciplinary action was taken in
14 connection with Mr. Graham, Mr. Graham's death or
15 incarceration, where would that be?
16 A. In the personnel file of the person that was
17 wrote up.
18 Q. In preparation for your deposition, did you
19 review any documents?
20 A. No, sir.
21 Q. And you told me yesterday you had seen?
22 A. Well, yesterday, because I had never been
23 through deposition, he was explaining to me about the
24 numbers, what the numbers were and if you asked me to go to
25 certain numbers, that way I would be prepared what to do

EXHIBIT 11

**Stacy Walls - 06-12-14** — 33

1  because I've never been through this before and hope to
2  never go through it again.
3      Q.    I'm sorry it's a bad experience, distasteful
4  experience.  But you referred to the correctional facility
5  policy, is that correct?
6      A.    Yes, sir.
7      Q.    And Exhibit 2, you said you had seen that
8  yesterday, is that correct?
9      A.    No, sir, I did not see this yesterday.
10     Q.    Okay.  Exhibit 1, you saw Exhibit 1?
11     A.    Well, sitting here flipping through, I did see
12 it, I did look at it.  I knew what I was looking at but I
13 didn't read it as just say.
14     Q.    Where did you see it?  I mean, I understood
15 you.  Was it a part of the personnel policy?
16     A.    No, sir.  It was in a stack of -- what do you
17 call this, the exhibits or whatever you call these.  He was
18 explaining to me yesterday about the numbers, and I just
19 kind of flipped through to see what he was talking about
20 and I seen this in part of the paperwork.  I seen a lot of
21 papers in the paperwork yesterday.
22     Q.    Would it be fair to say that you saw Exhibit 1
23 in conjunction with other documents yesterday?
24     A.    Yeah, it would be fair to say that I saw
25 documents.

**Stacy Walls - 06-12-14** — 34

1      Q.    And Exhibit 1 was a part of the documents that
2  you saw?
3      A.    I would say, yes, it was part of the documents.
4      Q.    Was Exhibit 2 part of the documents?
5      A.    I don't recall.
6      Q.    What other documents do you recall seeing other
7  than the correctional facility policies?
8      A.    Like I said, I just flipped through looking at
9  the numbers and I seen that and I just glanced at it.  I
10 did not read.  I guess you can say I seen everything that
11 was on the table because it was in front of me and I just
12 flipped through it.  I did not examine nor did I read
13 anything yesterday.
14     Q.    Okay.
15           BY MR. DARE:  And for the record, I had
16        available JC1 through JC909.
17     Q.    Did you review any of the statements that were
18 given by the detainees?
19     A.    No, sir, I did not.
20     Q.    You've never read them at any time?
21     A.    No, sir, I have not.
22     Q.    Did you interview anybody in connection with
23 what occurred with respect to Mr. Graham?
24     A.    I don't believe I did.
25     Q.    And it's your testimony that it never came to

**Stacy Walls - 06-12-14** — 35

1  your attention that Mr. Graham's medication had been
2  brought to the jail?
3      A.    No, sir, not to my knowledge.  I don't recall
4  ever being told that his medication was brought to the
5  jail.
6      Q.    Had you ever seen a list of the medications
7  that Mr. Graham was taking prior to the time that he was
8  incarcerated?
9      A.    No, sir.
10     Q.    Is there anything else that you know about Mr.
11 Graham's incarceration that I haven't asked you?
12           BY MR. DARE:  Object to the form of the
13        question.  You can answer if you can.
14           BY THE WITNESS:  That's vague.  I don't know
15        how to answer that one.  You know, I didn't know him
16        prior.  I will say he was not an inmate that stood
17        out to me because he was -- those that give you
18        problems, those that write a lot, you remember those.
19           He was an idyll inmate.  He never complained,
20        never give us any problems.  So I didn't really get
21        to know him on a personal note because he wasn't a
22        problem.
23     Q.    Okay.  Tell me about sick call, how does that
24 work?
25     A.    Sick call?

**Stacy Walls - 06-12-14** — 36

1      Q.    Yeah.  You're not familiar with it?  At the
2  facility you-all didn't have anything called sick call?
3      A.    Well, if we have an inmate that is requesting
4  to see the nurse, they would fill out a medical request
5  form or the officer would go over the radio and let the
6  nurse know that there was an inmate that needed her and the
7  nurse would respond to the inmate.
8           She would go to the cell if the inmate needed to be
9  brought out of the cell and taken to medical.  Of course, a
10 male officer or a female officer would have gone with her
11 and escorted the inmate to medical.
12          BY MR. SANDERS:  All right.  I believe that's
13       it.
14 **EXAMINATION BY MR. DARE:**
15     Q.    Captain Walls, you've had an opportunity to
16 review Exhibit 2.  You've now had an opportunity to see
17 Exhibit 2 to your deposition.
18          To your knowledge, was it a violation of the Jones
19 County Sheriff's Department Policies and Procedures to not
20 provide this document and these two pages which is marked
21 as Exhibit 2 to the nurse and to the jail administrator
22 upon completion?
23     A.    Yes, sir.  If anything is marked yes it is to
24 go into the nurse's box and then from her it would have
25 come to me.

EXHIBIT 11

## Page 37

Stacy Walls - 06-12-14

BY MR. DARE: Thank you. That's all I have.
BY MR. SANDERS: Did Exhibit 2 in fact come to you?
BY THE WITNESS: No, sir.
BY MR. SANDERS: All right.
BY MR. DARE: We're done.
(CONCLUDED 12:06 A.M.)

## Page 38

Stacy Walls - 06-12-14

REPORTER'S PAGE

I, Trudie Quinn, in and for the State of Mississippi, the officer before whom this sworn testimony was taken, do hereby state on the record:

That due to interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talk-overs; that same is the proper method for a court reporter's transcription of proceeding; that the dashes (--) do not indicate that words or phrases have been left out of this transcript, and that any words and/or names which could not be verified through reference material have been denoted with the phrase (phonetic).

- o -

## Page 39

Stacy Walls - 06-12-14

CERTIFICATE OF DEPONENT

DEPONENT: Stacy Walls
DATE: June 12, 2014
CASE STYLE: Jeanetter Graham v. Alex Hodge and Jones County
ORIGINAL TO: Jason Dare

I, the above-named deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the deposition taken on the date above as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me.

Subject to those corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforementioned time and place.

| Page | Line | Comments |
|------|------|----------|
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |

This the _____ day of _____, 2014.

_____
WITNESS

State of Mississippi
County of _____

Subscribed and sworn to before me, this the _____ day of _____, 2014.

My Commission Expires:

_____
Notary Public

## Page 40

Stacy Walls - 06-12-14

CERTIFICATE

I, Trudie Quinn, Court Reporter and Notary Public, in and for the State of Mississippi, hereby certify that the foregoing contains a true and correct transcript of the proceedings as taken by me at the time and place heretofore stated and later reduced to typewritten form by computer-aided transcription under my supervision and to the best of my skill and ability.

I further certify that the witness was placed under oath to truthfully answer the questions in this matter.

I further certify that I am not in the employ of or related to any counsel or party in this matter and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature and seal, this the 24th day of June 2014.

_____
TRUDIE QUINN, COURT REPORTER
CCR# 1368

My commission expires:
August 9, 2015

EXHIBIT 11

3-10-10
Faxed to
S.O.



### Jones County Sheriff's Department
**SHERIFF ALEX HODGE**

## MEDICAL TREATMENT FORM

Date 3-10-10                        Time _____

Inmate Name Albert Graham   Inmate # _____   Cell # B102

A.D.F. Inmate ✓   J.D.F Inmate _____

County Inmate ✓   State Inmate _____

Laurel P.D. _____   Ellisville P.D _____

Other Agency _____

Medical Complaint c/o ↑ BP

Treatment [illegible handwriting] states he ain't been on meds in over a yr.

Was inmate transported to a medical facility? Y / N
If so what facility? EMC   Care provider who treated inmate [signature] Scoggins

**All use of ambulance service or hospital treatment must first be approved by administration.**
Administration notified Yes

County Pay (adult) 6156492 ✓   (Juv) 6213147 _____

State Pay 6266923 _____   Laurel Police Pay 5061684 _____

Inmate Pay _____

I understand that the Jones County Sheriff Dept. will not be responsible for any preexisting medical conditions. I understand I will be responsible and I will be required to pay all medical expenses.

Inmate's signature Albert Graham
Print name Albert Graham

DEPOSITION EXHIBIT Walls 06-12-14

EXHIBIT 11

JC000833

# JONES COUNTY ADULT DETENTION FACILITY
Booking Medical Sheet:   67209
11/10/09        9:51

ID #: 2006100853   Name: GRAHAM, ALBERT LEE
Address: 2469 BUSH DAIRY RD
LAUREL, MS 00000000

DOB: 6/01/1951   Race: B   Height: 6- 1   Eyes: BRO   Home Phone
Age: 58 YRS   Sex: M   Weight: 170   Hair: BLK   (601)000-0000
Soc. Sec. No.: 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

| Yes/No | | VISUAL ASSESSMENT |
|---|---|---|
| N | 1. | Is inmate unconscious? |
| N | 2. | Does inmate have any visible signs of trauma, illness, obvious pain or bleeding, requiring immediate medical attention? |
| N | 3. | Is there obvious fever, swollen lymph nodes, jaundice or other evidence of infection that may be contagious? |
| N | 4. | Any signs of poor skin condition, vermin, rashes or needle marks? |
| N | 5. | Does inmate appear to be under the influence of drugs or alcohol? |
| N | 6. | Any visible signs of alcohol or drug withdrawal? |
| N | 7. | Does inmate's behavior suggest the risk of suicide or assault? |
| N | 8. | Is inmate carrying medication? |
| N | 9. | Does the inmate have any physical deformities? |
| N | 10. | Does inmate appear to have psychiatric problems? |

Yes/No        MEDICAL QUESTION
11. Do you have or have you ever had any of the following:

| | | | | | |
|---|---|---|---|---|---|
| N | a) allergies | N e) epilepsy | Y i) high blood pressure | N | m) ulcers |
| N | b) arthritis | N f) fainting spells | N j) psychiatric disorder | N | n) venerial disease |
| N | c) asthma | Y g) heart condition | N k) seizures | N | o) other(specify) |
| N | d) diabetes | N h) hepatitis | N l) tuberculosis | | |

12. Females only:

N a) Are you pregnant?   N b) Do you take birth control pills?   N c) Have you recently delivered?

| | | |
|---|---|---|
| N | 13. | Have you recently been hospitalized or treated by a doctor? |
| Y | 14. | Do you currently take any medication prescribed by a doctor? |
| N | 15. | Are you allergic to any medication? |
| Y | 16. | Do you have any handicaps or conditions that limit activity? |
| N | 17. | Have you ever attempted suicide or are you thinking about it now? |
| N | 18. | Do you regularly use alcohol or street drugs? |
| N | 19. | Do you have any problems when you stop drinking or using drugs? |
| N | 20. | Do you have a special diet prescribed by a doctor? |
| N | 21. | Do you have any problems or pain with your teeth? |
| N | 22. | Do you have any other medical problems we should know about? |

**Medical Insurance:** NONE                              **Doctor:** NONE
**Emergency Contact:** ODELL GRAHAM            **Relationship:** BROTHER
**Address:**
**City:** JOLLIET           **State:** IL  **Zip:**           **Phone:** 8157350725


DEPOSITION EXHIBIT

JC000831

# JONES COUNTY ADULT DETENTION FACILITY

Booking Medical Sheet:   67209
11/10/09      9:51

---

EXPLANATIONS (REFER TO QUESTION NUMBER)
**Q11G: CONGESTIVE HEART FAILURE**
**Q11I: SAYS IT'S BORDERLINE**
**Q14: CORAD**
**Q16: HEART CONDITION**
**Q23: DISABILITY**

---

I CERTIFY THAT I HAVE TRUTHFULLY ANSWERED THESE QUESTIONS ABOUT MY HEALTH.

**Inmate's signature** _____    **Witness** _____

**Attending Officer** _____    **Date** _____    **Time** _____

JC000832