IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

JEANETTER GRAHAM INDIVIDUALLY
AND AS WRONGFUL DEATH BENEFICIARY
OF ALBERT GRAHAM, DECEASED                        PLAINTIFF

V.                                    CAUSE NO. 2:13CV67KS-MTP

ALEX HODGE, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS SHERIFF OF JONES
COUNTY; JONES COUNTY, MISSISSIPPI AND
DEPUTY "JOHN DOE" IN HIS OFFICIAL CAPACITY        DEFENDANTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
DEPOSITION OF PATRICIA CAROL JOHNSTON
Taken at the offices of Jones County Courthouse, 415 North
5th Avenue, Laurel, Mississippi, on Friday, June 13, 2014,
beginning at approximately 10:15 a.m.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEARANCES:

EVERETT T. SANDERS, ESQUIRE
Sanders Law Firm
Post Office Box 565
Natchez, Mississippi  39121-0565
    PRESENT AND REPRESENTING THE PLAINTIFF

JASON E. DARE, ESQUIRE
Wyatt, Tarrant & Combs
Post Office Box 16089
Jackson, Mississippi  39236-6089
    PRESENT AND REPRESENTING DEFENDANT ALEX HODGE AND
    JONES COUNTY, MISSISSIPPI

REPORTED BY:
        TRUDIE QUINN
        Raven Court Reporting
        Post Office Box 180506
        Richland, Mississippi  39218
        (601) 932-5354

---

**Page 2**

1                 I N D E X

2                                          PAGE
3   Style, Number and Appearances .................... 1
4   Index ............................................ 2
5   EXAMINATION OF PATRICIA CAROL JOHNSTON
6       By Mr. Sanders ............................... 3
7       By Mr. Dare .................................. 57
8   Reporter's Page .................................. 61
9   Signature Page ................................... 62
10  Certificate of Reporter .......................... 63
11                      - 0 -
12               E X H I B I T S
13  1 - Booking medical sheet ........................ 7
14  2 - Sick call request form ....................... 17
15  3 - Activity sheet ............................... 25
16  4 - Medical notes ................................ 27
17  5 - Medical notes ................................ 27
18  6 - Medical notes ................................ 27
19  7 - Medical treatment form ....................... 39
20  8 - Authorization ................................ 44
21  9 - Fax .......................................... 44
22  10 - Medical records ............................. 50
23                      - 0 -
24
25

---

**Page 3**

Patricia Carol Johnston - 06-13-14

1              P R O C E E D I N G S
2              PATRICIA CAROL JOHNSTON,
3       called as a witness, having been duly sworn,
4           was examined and deposed as follows:
5   EXAMINATION BY MR. SANDERS:
6       Q.    Would wow state your name, please.
7       A.    Patricia Carol Johnston.
8       Q.    Ms. Johnston, my name is Everett Sanders.  I'm
9   an attorney for Mrs. Jeanetter Graham in this matter.
10      A.    Yes, sir.
11      Q.    Have you given a deposition before?
12      A.    No, sir.
13      Q.    I'm going to be asking some questions, and if
14  you don't understand the question, you can ask me to repeat
15  it or explain it, otherwise, if you respond to it I'm gonna
16  assume that you understood what I was asking.  Is that
17  fair?
18      A.    Yes, sir.
19      Q.    Is that fair?
20      A.    Yes, sir.
21      Q.    Okay.
22      A.    I'm a little hard of hearing, I'm sorry.
23      Q.    I'll speak up.
24            BY MR. SANDERS:  Same stipulation?
25            BY MR. DARE:  Yes.  Just to make sure the

---

**Page 4**

Patricia Carol Johnston - 06-13-14

1   record is clear, we would agree and stipulate to the
2   standard stipulations pursuant to the Federal Rules
3   of Civil Procedure.  Thank you.
4       Q.    Is it Johnston?
5       A.    Yes.
6       Q.    Ms. Johnston, are you employed?
7       A.    Yes.
8       Q.    How are you employed?
9       A.    I'm employed with Jones County.
10      Q.    In what capacity?
11      A.    I am the nurse for the Jones County jail.
12      Q.    And how long have you been so employed?
13      A.    Since October of 2008.
14      Q.    Tell me a little bit about your educational
15  background.
16      A.    I am a licensed practical nurse.  I was an EMT,
17  but I have let that license go.  I have special training in
18  dialysis, worked at an OB clinic and a general
19  practitioner's clinic.
20      Q.    Where did you go to school and get your LPN?
21      A.    J.C., Jones County Junior College.
22      Q.    When did you graduate?
23      A.    I'm not sure.  I think it was '80 or '81, I
24  can't remember.
25      Q.    Have you ever had any disciplinary complaints

EXHIBIT 12

Patricia Carol Johnston - 06-13-14                                    5

1   with respect to the nursing board?
2        A.   No, sir.
3        Q.   Tell me, what are your duties and
4   responsibilities as -- well as nurse. Well, let me ask you
5   this: You said that you worked with Jones County Detention
6   Center. Is that the adult detention center?
7        A.   Yes, sir.
8        Q.   What are your duties and responsibilities
9   there?
10       A.   Give medication, check on the inmates, make
11  sure that they're okay, listen to their complaints, help
12  them if I can, make appointments, doctor's appointments,
13  follow-ups.
14       Q.   Are you involved in the booking process at all?
15       A.   No, sir.
16       Q.   When do you first come in contact with the
17  inmate or detainee?
18       A.   When they come in, if I happen to be in
19  booking, then I'll listen to what their problems are
20  medically. If not, it's after they're booked in, and I
21  normally see their booking sheet normally.
22       Q.   Are the booking sheets routed to you
23  automatically?
24       A.   We have a box that's in booking that they're
25  supposed to put them in if there's any medical problems.

---

Patricia Carol Johnston - 06-13-14                                    6

1        Q.   And who's supposed to put the information in
2   your box?
3        A.   The booking officer.
4        Q.   What form would that information take? When I
5   say that, is it a document that somebody fills out or do
6   they make notes or something and leave in your box? What
7   exactly do they leave in there?
8        A.   There is a medical sheet that they do it on the
9   computer and then put it in the box.
10       Q.   This is 029 and 030. I hand you this document
11  and ask you to compare it and see if that's the same
12  document?
13       A.   I'm sorry, I didn't hear.
14       Q.   I was asking you to compare it to see if that's
15  the same document.
16       A.   No. That's not the same document.
17       Q.   Okay. What's the difference?
18       A.   This is a medical questionnaire; this is the
19  booking sheet.
20       Q.   Okay. Do you see the booking sheet?
21       A.   Right here.
22       Q.   I mean, I know you see it in front of you, but
23  I'm asking do they provide you with a copy of the booking
24  sheet?
25       A.   No, sir. And then that goes with this one.

---

Patricia Carol Johnston - 06-13-14                                    7

1        Q.   Okay, all right.
2             BY MR. SANDERS: Can we go off the record.
3             (OFF-THE-RECORD DISCUSSION)
4             (EXHIBIT 1, BOOKING MEDICAL SHEET, WAS MARKED
5   FOR IDENTIFICATION.)
6             BY MR. DARE: For the record, just so we'll
7   be certain we got Exhibit 1 marked, these are the
8   booking medical sheets that are Bates stamped JC29
9   and JC30.
10       Q.   Is there a policy or procedure for handling
11  persons that have been identified to have medical problems?
12       A.   I really don't know the policies and
13  procedures.
14       Q.   Well, my question is is there one or do you
15  know if there's one?
16       A.   I don't know.
17       Q.   All right. In order to get the job that you
18  have, did you have to have any special training in order --
19       A.   No, sir, I did not have to have any special
20  training.
21       Q.   Okay.
22             BY MR. DARE: And also so the record is
23  clear, make sure he's finished his question before
24  you jump in. I know, most people have a bad habit of
25  doing that. The other reason for doing that is

---

Patricia Carol Johnston - 06-13-14                                    8

1   because you don't know what he would finish up his
2   question with.
3             BY THE WITNESS: Okay.
4        Q.   You don't know if the sheriff's department has
5   a procedure as to how inmates that have medical problems
6   should be handled?
7        A.   Right, I'm not sure.
8        Q.   Okay. How do you determine how you handle
9   inmates with medical problems?
10       A.   When I see the booking sheet, the medical
11  booking sheet, I go and look and see what's going on with
12  them, what they've told the officers.
13       Q.   And then what do you do?
14       A.   And then I talk to the inmates to find out what
15  their medical problems are.
16       Q.   After you see the medical booking sheet, how
17  long after then do you talk to the inmate?
18       A.   As soon as I can get back to where they are.
19  If they're on Hall 1, I can talk to them there, if not I
20  have to go to the cells.
21       Q.   Do you talk to them on the same day or the next
22  day or what? Do you talk to them the same day you receive
23  the booking sheet or do you talk to them on the next day?
24       A.   Usually the same day.
25       Q.   And what is the purpose for your talking to the

**9**

Patricia Carol Johnston - 06-13-14

1  inmates?
2       A.    To get information to find out what's wrong
3  with them.
4       Q.    And once you get the information, what do you
5  do with it?
6       A.    If they're on medicine I try to get their
7  medication.
8       Q.    How do you go about trying to get the
9  medication?
10      A.    Call on their family or making sure that they
11  get a phone call so they can call their family to get it.
12      Q.    Do you record anywhere what occurred in your
13  interview with the inmate?
14      A.    No, sir, not usually.
15      Q.    Okay.  You say not usually.  I assume that
16  there are circumstances in which you do it?
17      A.    If I talk to them and they need their
18  medication, they're entitled to one call whenever they get
19  through being booked in, and I tell them that when they get
20  their call to make sure that they get their medicine or
21  I'll call and get it.  Did I answer your question?
22      Q.    Yeah.
23            BY MR. SANDERS:  Can we go off the record for
24       a second.
25                 (TELEPHONE INTERRUPTION.)

**10**

Patricia Carol Johnston - 06-13-14

1       Q.    (By Mr. Sanders) You say you ask them to call,
2  and if they are not successful, they don't get the
3  information, what do you do then?
4       A.    If they don't get to their family to pick up
5  the medicine?
6       Q.    Right.
7       A.    I tell them to get up-to-date medicine.  If
8  it's at the pharmacy, I'll call the pharmacy to see if they
9  have medication there.  We have picked up medication for
10  inmates before.
11      Q.    Now, if you make a call -- well, do you ever
12  call the inmates' families?
13      A.    Yes, sir.
14      Q.    When you make your calls, is there a place that
15  you make a notation that you made the call?
16      A.    In the activities on the computer.
17      Q.    Is that what it's called, activity?
18      A.    Uh-huh.
19      Q.    Is a hard copy generated?
20            BY THE WITNESS:  Do you know what --
21            BY MR. DARE:  Generally speaking.
22            BY THE WITNESS:  That is an activity sheet.
23      Q.    Is there one for each time that you have an
24  encounter with the inmate?
25      A.    Yes, sir.  When I put them in the activities,

**11**

Patricia Carol Johnston - 06-13-14

1  yes.
2       Q.    You do that every time you talk to the inmate?
3       A.    Not every time.
4       Q.    How do you decide when you're gonna put
5  something in versus not putting it in?
6       A.    I don't know.
7       Q.    There is no set procedure whereby you have to
8  put in certain things, is there?
9       A.    No, sir.
10      Q.    Now, once you interview the inmate and you
11  determine that they need medication, you tell them to talk
12  to the family, is that correct, or you talk to the family,
13  is that correct?
14      A.    Yes.
15      Q.    And sometimes you put this information in the
16  activity form?
17      A.    Yes.
18      Q.    And sometimes you contact the pharmacy to
19  determine the prescriptions that the individuals have?
20            BY MR. DARE:  Object to the form.  You can
21       answer.
22            BY THE WITNESS:  Sir?
23            BY MR. DARE:  You can answer.  I was just
24       objecting to the form of the question.
25            BY THE WITNESS:  Yes.

**12**

Patricia Carol Johnston - 06-13-14

1       Q.    If you make a contact with the pharmacy, is
2  that entered on the activity sheet?
3       A.    Not all the time.
4       Q.    If you make a contact with the detainee's
5  family, is that entered on an activity sheet?
6       A.    Not all the time.
7       Q.    Now, is the only reason that you interview the
8  detainee is to determine whether or not they need
9  medication?
10      A.    No, sir.  When I talk to them it's to get their
11  medication that they're on and to find out about their
12  office visits, doctor's visits.
13      Q.    Is that to determine what doctor was treating
14  them before they came in?
15      A.    Yes, sir.
16      Q.    Do you also determine what their problems or
17  complaints are?
18      A.    Complaints, yes, sir.
19      Q.    Now, once you determine the treating
20  physicians, what do you do with that information?
21      A.    If everything is up to date, their
22  prescriptions and all, then I follow the doctor's orders as
23  far as when to give them their medicine.
24      Q.    Okay.  You make contact with the doctor to see
25  if -- I'm not trying to put words in your mouth, I'm just

Patricia Carol Johnston - 06-13-14

**13**

1 trying to understand the step-by-step process. You contact
2 the doctor's office for what reason?
3      A.    If I contact the doctor's office it's to find
4 out when they have follow-up appointments, to get refills
5 if they need them.
6           And I don't contact every doctor when they come in
7 and say that they have a certain doctor. If their
8 medications are up to date and everything, then I don't
9 have to contact that doctor.
10     Q.    Now, if the meds are not up to date, then you
11 would contact the doctor?
12     A.    Yes, I will try.
13     Q.    If the doctor issues a prescription after you
14 contact him, do you play any role in terms of getting it
15 filled?
16     A.    We get the prescription to a pharmacist and,
17 yes, we get it filled.
18     Q.    Okay. Now, is there any other reason that you
19 talk to the inmates other than medication related?
20     A.    I see the inmates everyday. They will come to
21 talk to me some time, no special reason.
22     Q.    I understand. What I'm saying is, once you get
23 your medical booking sheet and you say you talk to them
24 about medication, is it any other reason that you interview
25 them other than to discuss medication?

Patricia Carol Johnston - 06-13-14

**14**

1      A.    No.
2      Q.    Do you ever play a part in the inmates being
3 taken to the doctor?
4      A.    Yes, sir.
5      Q.    Tell me about that.
6      A.    If they're having medical problems, if they're
7 complaining of pain or discomfort, having symptoms of
8 problems.
9      Q.    Okay. Are you the one that makes the decision
10 as to whether or not someone goes to see a physician?
11     A.    If I see that somebody needs to go, I will
12 contact the major or the captain and we will get them to
13 the doctor.
14     Q.    Okay. But it's done on your recommendation?
15     A.    Not just mine.
16     Q.    Does the major interview the detainees, the
17 medical detainees?
18     A.    No, I wouldn't think so.
19     Q.    Does the captain interview them?
20     A.    No.
21     Q.    So it would be fair to say that you're the only
22 person that interview them?
23     A.    Right.
24           BY MR. DARE:  Related to medical reasons?
25           BY MR. SANDERS:  Medical reasons, yeah.

Patricia Carol Johnston - 06-13-14

**15**

1           BY THE WITNESS:  Yes.
2      Q.    Okay. So it's based upon your interview that
3 you bring the matter to the attention of the captain or the
4 major that they need to go see a physician, is that right?
5      A.    Okay, yes.
6      Q.    And you recommend to them, you say this guy or
7 this lady needs to see a physician?
8      A.    Yes.
9      Q.    Do you ever make a decision that someone needs
10 to see a physician without that individual requesting to
11 see the physician?
12     A.    I'm sorry, say that one more time, please.
13     Q.    All right. Based upon your interview and
14 review of the medical records sheet, do you ever make a
15 recommendation that a detainee see a physician even though
16 the detainee has not requested a physician?
17     A.    Yes.
18     Q.    What would be instances where you would do
19 that?
20     A.    If he is having signs and symptoms of a
21 problem.
22     Q.    Would the nature of the illness have anything
23 to do with your making the decision to send them to a
24 physician?
25     A.    Are you asking just by looking at this?

Patricia Carol Johnston - 06-13-14

**16**

1      Q.    Well, looking at that and talking to the
2 detainee.
3      A.    If he's having symptoms or signs that I think
4 he needs to go to the doctor for right then, I would want
5 him to go. I would tell him that I needed him to go.
6      Q.    I understand that. What I'm saying is, will
7 the kind of illness that the person has, even without signs
8 and symptoms, cause you to feel that that person needed to
9 go to the doctor?
10     A.    No, sir.
11     Q.    So the kind of illness has nothing to do with
12 it, that alone has nothing to do with it?
13           BY MR. DARE:  Object to the form. Do you
14     understand the question?
15           BY THE WITNESS:  If he puts on here that he
16     has a certain problem but he has no complaints, no,
17     sir.
18     Q.    Okay. Without complaints you don't go to the
19 doctor?
20     A.    Right, unless you have a follow-up visit.
21     Q.    Do you have something called sick call?
22     A.    Yes.
23     Q.    Tell me about that, what is that?
24     A.    It's a form that they fill out if they have a
25 problem.

Patricia Carol Johnston - 06-13-14                                    17

1       BY MR. DARE:  Did I give you the sick call
2   form?
3       BY THE WITNESS:  That's it.
4       Q.    All right.  Let me look at it a second.  Okay.
5   I hand you -- is that the sick call document?
6       A.    Yes, sir.
7       BY MR. SANDERS:  Could we have that marked as
8   Exhibit 2.
9       (EXHIBIT 2, SICK CALL REQUEST FORM, WAS
10  MARKED FOR IDENTIFICATION.)
11      Q.    Who fills that form in?
12      A.    The inmates.
13      Q.    And where do they get those from?
14      A.    From the officers.
15      Q.    They have to request it?
16      A.    Yes.
17      Q.    Okay.  Once those forms are filled out, what
18  happens next?
19      A.    They are put in my box in central control
20  office and I get them from there.
21      Q.    And what do you do with them?
22      A.    I read them and go back to whatever their
23  complaint is, I go back and talk to them.
24      Q.    Do you file those somewhere?
25      A.    Yes, sir, I have them, I keep them.

Patricia Carol Johnston - 06-13-14                                    18

1       Q.    And where do you keep them?
2       A.    In my office.
3       Q.    Is it filed under the inmate's name or is it
4   filed by date or how is it?
5       A.    I file bimonthly, by the month.
6       Q.    And year?
7       A.    Yes.
8       Q.    And how long do you retain them?
9       A.    I have them as far back as I've been there,
10  2008.
11      Q.    Okay.  So once you get that document, you look
12  at the medical intake form?
13      A.    Yes.
14      Q.    And what the comparative?
15      A.    Right.
16      Q.    Where do you keep the medical intake, which is
17  Exhibit 1, the booking medical sheet?
18      A.    Okay.  This is on the computer; so I can just
19  pull it up on the computer.
20      Q.    So you don't maintain a hard copy of that?
21      A.    Right.
22      Q.    But do you maintain a hard copy of Exhibit 2?
23      A.    Yes, sir.
24      Q.    As a result of the sick call sheet, do you
25  speak with the inmate?

Patricia Carol Johnston - 06-13-14                                    19

1       A.    Yes.
2       Q.    What is the purpose of talking to the inmate?
3       A.    Just to go over this, find out what is wrong
4   with them.
5       Q.    Are the inmates examined by a physician on a
6   regular basis?
7       A.    No, sir.
8       Q.    Would it be correct to say that the inmates do
9   not see a physician unless they make complaints?
10      A.    Yes, sir.
11      Q.    Now, I don't know if I asked you this:  When
12  you talk to the inmates or the detainees during the sick
13  call process, do you make any notes anywhere other than on
14  Exhibit 2?  Well, let me ask you:  Do you make any notes on
15  Exhibit 2?
16      A.    Yes, sir.
17      Q.    And do you make any notes anywhere else?
18      A.    No, sir.
19      Q.    So if an inmate went to sick call they would
20  have to fill out that form, number 2, or Exhibit No. 2, is
21  that right?
22      A.    Yes, but I also get sick calls on any piece of
23  paper.  If they don't have a form and the officers didn't
24  get it in there quick enough, they will write it on any
25  paper.

Patricia Carol Johnston - 06-13-14                                    20

1       Q.    Let's say you talk to the person and you decide
2   that you're gonna recommend that they go to the doctor or a
3   particular physician, do you make a notation on the sick
4   call form or whatever form it is that reaches you?
5       A.    Yes, sir.
6       Q.    So anytime anybody went to the doctor, there
7   would be a notation on there by you recommending that they
8   go, is that correct?  And when I say on there, I mean the
9   sick call form or piece of paper or whatever it is.
10      A.    Yes, but I may have missed a few writing a note
11  on there.
12      Q.    Generally, it would be on there?
13      A.    Generally, yes.
14      Q.    All right.  Directing your attention to on or
15  about November the 10th, 2009.  Did you receive Exhibit 1
16  in connection with Albert Graham?
17      A.    No, sir.
18      Q.    You never received that?
19      A.    No, sir.
20      Q.    How can you be certain?
21      A.    I am pretty sure that I did not receive this.
22      Q.    Okay.  Well, you're looking at the medical
23  intake sheet for Albert Graham?
24      A.    Yes, sir.
25      Q.    It reflects that he was booked in on November

Patricia Carol Johnston - 06-13-14                                    21

1  the 10th, is that correct, 2009?
2      A.    Yes.
3      Q.    What makes you so certain that you did not
4  receive it?
5      A.    Because I do not remember talking to him right
6  after he was booked in.
7      Q.    Did there come a time when you talked to him?
8      A.    Yes, sir.
9      Q.    And when was that?
10     A.    Probably weeks after he was there.
11     Q.    Who was the person that booked -- do you know a
12 Christopher Hillman?
13     A.    Yes, sir.  He was a sergeant at the jail at one
14 time.
15     Q.    Where is he now?
16          BY MR. DARE:  If you know.
17          BY THE WITNESS:  No, sir, I don't know.
18     Q.    When was the last time you saw him?
19     A.    Probably a couple of years ago.
20     Q.    What was he doing at that time?
21     A.    He was at Taco Bell one day.
22     Q.    When was the first time that you saw that form
23 which is Exhibit 1?
24     A.    I don't know.
25     Q.    Did you see it during 2009?


Patricia Carol Johnston - 06-13-14                                    22

1      A.    Yes, sir.  I go to every cell everyday but I
2  don't --
3          BY MR. DARE:  And he was asking you if you
4     saw this form as Exhibit 1 in the year of 2009.
5          BY THE WITNESS:  I'm sorry, I misunderstood
6     you.  Yes, I would have seen this form because I
7     pulled it up on the computer.
8      Q.    Did you see it during the month of November of
9  2009?
10     A.    I don't remember seeing it.
11     Q.    Did you see it during December of 2009?
12     A.    I don't remember when I first saw it.
13     Q.    When you first saw Exhibit 1, did you do
14 anything in connection with it?
15     A.    I don't remember.
16     Q.    You don't remember?
17     A.    No, sir.
18     Q.    When you saw it, did you read it?
19     A.    Yes, sir.
20     Q.    And at the time that you saw it you realized
21 that you had not seen it before?
22     A.    I'm sure.
23     Q.    And it did not cause you to take any action?
24     A.    Well, I would have gone and talked to Mr.
25 Graham.


Patricia Carol Johnston - 06-13-14                                    23

1      Q.    Well, did you go and talk to him?
2      A.    I'm sure I did.
3      Q.    What evidence do you have that you talked to
4  him?
5      A.    None.
6      Q.    You didn't make any notations that you talked
7  to him?
8      A.    No, sir, not the first time I talked to him,
9  no, sir.
10     Q.    Well, when was the first time you talked to
11 him?
12     A.    I don't remember.
13     Q.    Do you have a listing -- what is cell A160?
14     A.    A160 is the medical cell.
15     Q.    And are you familiar with the people who are
16 generally in A160?
17     A.    Yes, sir.
18     Q.    And do you see them on a daily basis?
19     A.    Yes, sir.
20     Q.    You see all of them on a daily basis?
21     A.    Yes, sir.
22     Q.    Why is it that you see them on a daily basis?
23     A.    Because I go to that cell everyday.  I stand at
24 the door.  I can see into the cell.
25     Q.    The persons in A160, are they there because


Patricia Carol Johnston - 06-13-14                                    24

1  they receive medication?
2      A.    Yes, sir.
3      Q.    The first time that you saw Mr. Graham, was he
4  in A160?
5      A.    No, sir.
6      Q.    Where was he?
7      A.    I think it was 102, A102.
8      Q.    And what is A102?
9      A.    Just a regular cell.
10     Q.    Do you have records that will indicate when Mr.
11 Graham was transferred to A106?
12     A.    Yes, sir.  That should be in the activities.
13     Q.    Okay.  Would you look at the transfer sheet.
14 When does it reflect that Mr. Graham was transferred to the
15 medical cell?
16          BY MR. DARE:  Object to the form.
17          BY THE WITNESS:  March the 10th --
18          BY MR. DARE:  I'm just objecting to the form
19     of the question.  You can answer.
20          BY THE WITNESS:  March the 10th, 2010.
21     Q.    Can you tell what caused him to be transferred?
22     A.    He was put on medication and he went to see the
23 doctor.
24     Q.    He was put on medication?
25     A.    Yes, sir.

Patricia Carol Johnston - 06-13-14                               25

1    Q.    And he went to see the doctor.
2         BY MR. SANDERS: I would like to have that
3    marked as an exhibit.
4         (EXHIBIT 3, ACTIVITY SHEET, WAS MARKED FOR
5    IDENTIFICATION.)
6    Q.    Did you talk to Mr. Graham before he was
7    transferred to A106?
8    A.    Before he was transferred to 160?
9    Q.    Yeah, A160. I'm sorry.
10   A.    Yes, sir.
11   Q.    And where did you talk to him?
12   A.    It would be A102.
13   Q.    And how many days before his transfer did you
14   talk to him?
15   A.    Sir, I don't know.
16   Q.    Was it a week before?
17   A.    I don't know.
18   Q.    Did your conversation with Mr. Graham have
19   anything to do with his being transferred?
20   A.    Him being put on medicine is why he was
21   transferred to that cell.
22   Q.    Well, did your conversation with Mr. Graham
23   have anything to do with his being put on medicine?
24   A.    I'm sure, yes, sir.
25   Q.    What was the conversation about?

Patricia Carol Johnston - 06-13-14                               26

1    A.    It would have been about his medical problems.
2    Q.    About his medical problems?
3    A.    Yes, sir.
4    Q.    Now, why were you discussing his medical
5    problems with him?
6    A.    Mr. Graham never complained to me. I don't
7    remember what led up to me talking to him other than seeing
8    the sheet, the medical sheet.
9    Q.    So you saw the medical sheet at some point?
10   A.    Yes, sir.
11   Q.    And as a result of that you went and talked to
12   Mr. Graham?
13   A.    Yes, sir.
14   Q.    How long after you saw the medical sheet did
15   you go and talk to him?
16   A.    I don't remember.
17   Q.    Was it the next day?
18   A.    It's possible, but I don't remember.
19   Q.    Was it the same day?
20        BY MR. DARE: I'm gonna object to the form.
21   It's asked and answered. I'm objecting to the form
22   because you've now said you don't remember twice.
23   Q.    Do you have any notes or anything that would
24   help you recall?
25   A.    Where I took his blood pressure on February the

Patricia Carol Johnston - 06-13-14                               27

1    22nd.
2    Q.    You took his blood pressure on February the
3    22nd, okay. So that means that you -- well, what caused
4    you to take his blood pressure on February 22nd?
5    A.    I don't remember. He may have asked me to. I
6    don't remember.
7    Q.    What was his blood pressure at that time?
8    A.    140/90.
9    Q.    And how is that, is that good?
10   A.    Borderline, a little bit high.
11        BY MR. SANDERS: I would like to have that
12   marked as an exhibit.
13        (EXHIBIT 4, MEDICAL NOTES, WAS MARKED FOR
14   IDENTIFICATION.)
15        (EXHIBIT 5, MEDICAL NOTES, WAS MARKED FOR
16   IDENTIFICATION.)
17        (EXHIBIT 6, MEDICAL NOTES, WAS MARKED FOR
18   IDENTIFICATION.)
19   Q.    All right. Now, if you took his blood pressure
20   on February the 22nd, you would have seen Exhibit 1 before
21   you took his blood pressure, is that correct?
22   A.    Yes, sir.
23   Q.    And you're not certain why you went and took
24   it?
25   A.    No, sir. He may have asked me to. I really

Patricia Carol Johnston - 06-13-14                               28

1    don't remember.
2    Q.    And you don't know how soon after you saw
3    Exhibit 1 that you took his blood pressure?
4    A.    Right.
5    Q.    On Exhibit 4 there is a notation 2-23. Does
6    that relate to Mr. Graham, at the bottom?
7    A.    No, sir.
8    Q.    Okay. All right. Would you look at Exhibit 5.
9    Does that relate to Mr. Graham?
10   A.    The blood pressure.
11   Q.    Was there a test done? Would you read what it
12   says.
13   A.    Mr. Graham's blood pressure is about the middle
14   of the sheet.
15   Q.    Okay. Tell me about that.
16   A.    I checked his blood pressure on March the 9th.
17   Mr. Graham's blood pressure was 140/82.
18   Q.    And is that good?
19   A.    Yes, sir.
20   Q.    Did he have any complaints at that time?
21   A.    No, sir.
22   Q.    And he was still in the general population?
23   A.    Yes, sir.
24   Q.    Would you look at Exhibit 6. What does that
25   relate to? What date did you see Mr. Graham?

---

**29**

Patricia Carol Johnston - 06-13-14

1   A.   March the 31st.
2   Q.   And what was the reason for seeing him?
3   A.   What was the reason I took his blood pressure?
4   Q.   Yeah.
5   A.   Just took it.
6   Q.   No reason?
7   A.   I don't remember any reason.
8   Q.   Okay. Now, Exhibits 4, 5 and 6, what are they?
9   A.   Just some notes that I kept.
10  Q.   And where do you keep these?
11  A.   I kept them in a notebook.
12  Q.   Does that notebook reflect all encounters that
13  you had with Mr. Graham?
14  A.   I couldn't find anything else on Mr. Graham
15  when I was looking.
16  Q.   And where do you keep this notebook?
17  A.   They're in my office.
18  Q.   And do you keep a note of every contact that
19  you make with inmates?
20  A.   No, sir.
21  Q.   Now, you cannot tell me when you first saw
22  Exhibit 1, is that correct?
23  A.   Right.
24  Q.   If you had seen Exhibit 1 on the day that Mr.
25  Graham was booked into the facility, what would you have

---

**30**

Patricia Carol Johnston - 06-13-14

1   done?
2   A.   I would have talked to him.
3   Q.   What reason, why would you have talked to him?
4   A.   Because it says that he has some medical
5   problems and it says that he takes medication.
6   Q.   And he had some serious medical problems,
7   didn't he?
8        BY MR. DARE: Object to the form of the
9   question to the extent that it calls for a legal
10  conclusion notwithstanding or even a medical
11  conclusion. Notwithstanding that fact you can answer
12  to the extent you can.
13  Q.   He had some serious medical problems, didn't
14  he?
15       BY MR. DARE: Same objection. You can
16  answer.
17       BY THE WITNESS: I think so.
18  Q.   Congestive heart failure, do you know what that
19  is?
20  A.   Yes, sir.
21  Q.   What is it?
22  A.   It is because of the fluid around the heart.
23  Doctors normally put someone on a fluid pill for congestive
24  heart failure. The heart is not pumping right.
25  Q.   And that's a serious matter, isn't it?

---

**31**

Patricia Carol Johnston - 06-13-14

1   A.   Yes, sir.
2   Q.   Now, it also indicated that he was on a
3   medication, didn't it?
4   A.   Yes, sir.
5   Q.   And what was that medication?
6   A.   It says Corad.
7   Q.   Do you know what that was? It was Coreg,
8   wasn't it?
9   A.   Coreg, probably.
10  Q.   Did you associate that with a medication that
11  one who has congestive heart failure would be given?
12       BY MR. DARE: Object to form.
13  Q.   Do you know if that's a medication that a
14  person with congestive heart failure might be given?
15  A.   I know that that is a medication for someone
16  with a heart condition.
17  Q.   And based upon this you knew that Mr. Graham
18  had a heart condition?
19  A.   Yes.
20  Q.   In fact, when he was processed in he indicated
21  he had a heart condition, did he not?
22  A.   Yes.
23  Q.   And he indicated that he was on disability?
24  A.   Yes.
25  Q.   And he indicated that he was borderline

---

**32**

Patricia Carol Johnston - 06-13-14

1   hypertensive, didn't he?
2   A.   Yes.
3        BY MR. DARE: Object to the form.
4   Q.   Okay. And once you read Exhibit 1 you knew
5   this, right?
6   A.   Yes.
7   Q.   Knowing this -- assume that you knew this on
8   November the 10th, what would you have done other than talk
9   to Mr. Graham?
10  A.   On November the 10th?
11  Q.   Yes, ma'am.
12  A.   Talk to him, found out who his doctor was, what
13  medications he's on.
14  Q.   You would talk to him and find out his
15  physician and his meds?
16  A.   Yes.
17  Q.   Did you ever talk to him and find out who his
18  physician was and --
19  A.   I tried.
20       BY MR. DARE: He was still asking his
21  question.
22       BY THE WITNESS: Oh, I'm sorry. That's where
23  that can't hear good comes in. I'm sorry.
24  Q.   Did you ever talk to Mr. Graham about his meds
25  and his physician once you received the information that's

Patricia Carol Johnston - 06-13-14                                        33

```
1    contained in Exhibit 1?
2        A.    I'm sure I did.
3        Q.    Do you know if you did?
4        A.    Yes, sir.
5        Q.    But you don't know when it was?
6        A.    Right.
7        Q.    And what did he tell you?
8        A.    When he was booked in he did not know his
9    doctor.
10       Q.    How do you know that?
11       A.    Because it says it.  He says he doesn't have a
12   doctor.
13       Q.    Did you ask him if he had a doctor, if he knew
14   his doctor?
15       A.    I'm sure I did.
16       Q.    But you don't know what he told you?
17       A.    I don't remember.
18       Q.    You don't know if he told you his physician's
19   name or the medication he was taking?
20       A.    I don't remember that.
21       Q.    Did you contact Odell Graham?
22       A.    No, sir.
23       Q.    Why not?
24       A.    I don't know.
25       Q.    And you told me earlier that one of the things
```

Patricia Carol Johnston - 06-13-14                                        34

```
1    you do is contact the relatives of the person to find out
2    the medication they were on, is that correct?
3        A.    For the family to help me get the medication,
4    yes.
5        Q.    But you didn't do it in Mr. Graham's case, is
6    that correct?
7        A.    No, sir, I don't remember that I did that.
8        Q.    You don't remember doing that?
9        A.    Right.
10       Q.    Did Mr. Graham qualify based upon Exhibit 1 to
11   be placed in cell block A160?
12       A.    Yes, sir, he could have been put in there.
13       Q.    Did you request that he be transferred there
14   once you saw that?
15       A.    No, sir.
16       Q.    And we have to assume that you saw it sometime
17   before February the 22nd, 2010, is that correct?
18       A.    Yes, sir.
19       Q.    Did it bother you that he had these medical
20   conditions and nothing had been done to try to determine
21   the name of his physician or the medication that he was
22   taking during the month of November, December or January?
23       A.    You asked if it bothered me?
24       Q.    Yeah.
25       A.    I want all of them to get help.
```

Patricia Carol Johnston - 06-13-14                                        35

```
1        Q.    Well, Mr. Graham had been there for three
2    months or better than three months and he had not been
3    interviewed by you, is that correct?
4        A.    I'm not sure.
5        Q.    Well, he had been there at least two months and
6    hadn't been interviewed by you, isn't that correct?
7        A.    I don't remember when I talked to him the first
8    time.
9        Q.    Well, you will agree with me that you talked to
10   him before February the 22nd?
11       A.    Okay.  I probably did.
12       Q.    And you have no indication that even on
13   February the 22nd that you tried to determine who his
14   physician was, is that right?
15       A.    I don't remember when I talked to him or
16   anything.
17       Q.    Well, you will agree with me, will you not,
18   that on February the 22nd that you were armed with the
19   information that he had congestive heart failure, that he
20   was borderline hypertensive and he had a heart condition
21   and he was disabled and that you did nothing on February
22   22nd to try to determine who his physician was?
23       A.    I don't remember if I made calls to the doctors
24   or I don't remember what I did.
25       Q.    Do you have anything that would indicate that
```

Patricia Carol Johnston - 06-13-14                                        36

```
1    you did do it?
2        A.    No, sir.
3        Q.    It didn't alarm you that he had been in --
4    well, strike that.  Look at Exhibit 1.  Doesn't Exhibit 1
5    indicate that Mr. Graham was on medication prior to coming
6    into the detention facility?
7        A.    Yes.
8        Q.    As a nurse did it not concern you that he had
9    been in there the month of November, the month of December,
10   the month of January and at least half of February and he
11   had not received any medication?
12       A.    Yes, it concerned me.
13       Q.    Did it concern you enough on the 22nd to try to
14   send him to a doctor.  And when I say the 22nd I mean the
15   22nd of February.
16       A.    I don't remember.
17       Q.    You don't remember whether it concerned you?
18       A.    I'm sure it concerned me.
19       Q.    Well, you will agree that you did not send him
20   to a doctor?
21       A.    Yes.
22             BY MR. DARE:  On February 22nd.
23       Q.    On February 22nd?
24       A.    Yes.
25       Q.    Are you familiar with the Hattiesburg Clinic?
```

37

Patricia Carol Johnston - 06-13-14

1    A.    Yes.
2    Q.    Do they have cardiologists there?
3    A.    Yes.
4    Q.    Did you make any effort to try to find out if
5  he was a patient there?
6    A.    I'm sure that I asked him.
7    Q.    And what did he tell you?
8    A.    I don't remember.  Evidently he didn't tell me
9  nothing.  He said he didn't have a physician.
10    Q.    I'm not talking about what he said when he was
11  booked in.  I'm talking about armed with the information
12  that you had, did you make any effort to try to find out
13  who his physician was as of February the 22nd, 2010?
14    A.    I don't think so.
15    Q.    Okay.
16    A.    I don't remember, but I don't think so.
17    Q.    Okay.  Now, did you make any effort to try to
18  determine what medication he was on prior to February the
19  22nd, 2010?
20    A.    I don't remember that.
21    Q.    Is there a medication called Corad?
22    A.    There is one called Coreg.  I don't know that
23  there's one called Corad.
24    Q.    When you saw Exhibit 1 and it had Corad, did it
25  dawn on you that that was a typographical error?

38

Patricia Carol Johnston - 06-13-14

1    A.    Yes, sir.
2    Q.    And did you call any pharmacist to see if he
3  had had any prescriptions filled there?
4    A.    No, sir, I do not think I did.
5    Q.    Are there other cardiologists in Laurel that
6  you are aware of other than at the Hattiesburg Clinic?
7    A.    Yes, sir.
8    Q.    Did you contact their office?
9    A.    No, sir.
10    Q.    Did you contact the county hospital to see if
11  he had been treated there?
12    A.    No, sir, I do not think I did.
13    Q.    Now, did there ever come a time when Mr. Graham
14  went to the hospital?
15    A.    Mr. Graham went to Ellisville Medical Clinic.
16    Q.    When did he go?
17    A.    March the 10th.
18    Q.    Okay.  I hand you the document.  What is that
19  document?
20    A.    This is a medical treatment form.
21    Q.    And who filled that in?
22    A.    I did.
23    Q.    And what does it say?
24    A.    It gives the date, Mr. Graham's name, the cell
25  that he was in, B102, adult detention facility inmate,

39

Patricia Carol Johnston - 06-13-14

1  county inmate, it gives the complaint.
2    Q.    Read the complaint.
3    A.    Read the complaint?
4    Q.    Yes, ma'am.
5    A.    Complaints of elevated blood pressure.
6    Q.    Did you take his blood pressure?
7    A.    I took it on the 9th, March 9th.
8    Q.    Was it elevated on the 9th?
9    A.    No, sir, 140/82.
10    Q.    Did Mr. Graham fill out a sick call?
11    A.    No, sir.
12    Q.    How did you get to filling out -- well, let's
13  have that marked.
14          (EXHIBIT 7, MEDICAL TREATMENT FORM, WAS
15    MARKED FOR IDENTIFICATION.)
16    Q.    How did you get to filling out Exhibit 7?
17    A.    Sometimes when I go to the cells they will just
18  tell me things.  I don't remember if that's what happened.
19  The inmates will just come to me and tell me things.  I
20  don't remember how this came about, but.
21    Q.    Well, did you take his blood pressure on the
22  10th?
23    A.    I don't have documentation of it.
24    Q.    But you have documentation for the other days?
25    A.    Yes, sir, for the 9th.

40

Patricia Carol Johnston - 06-13-14

1    Q.    You feel like it was important to document his
2  blood pressure?
3    A.    Yes, sir.
4    Q.    And on the 9th his blood pressure was fine,
5  right?
6    A.    Yes.
7    Q.    But you documented that?
8    A.    Yes, sir.
9    Q.    On the 10th according to the form that you
10  filled out he had an elevated blood pressure?
11          BY MR. DARE:  Object to the form.  You can
12    answer.
13          BY THE WITNESS:  He complained of an elevated
14    blood pressure.
15    Q.    Well, did you verify his complaint?
16    A.    No, sir.
17    Q.    And that's your writing in there?
18    A.    Yes, sir.
19    Q.    Isn't that one of the things that you do when
20  complaints are made to determine whether or not they are
21  legitimate?
22    A.    Yes, sir.
23    Q.    And the way you would determine that was by
24  taking the blood pressure?
25    A.    Yes, sir.

Patricia Carol Johnston - 06-13-14                                          41

1   Q.   But you didn't do it in this instance?
2   A.   Right, yes, sir.
3   Q.   But you sent him to the doctor?
4   A.   Yes, sir.
5   Q.   And he was still in the general inmate
6  population at that point?
7   A.   Yes, sir.
8   Q.   So you will agree with me that up to March the
9  9th, 2010 that Mr. Graham had not received any medication?
10  A.   Yes, sir.
11  Q.   And he had not seen a doctor?
12  A.   Yes, sir.
13  Q.   And the date on Exhibit 7 is what, the 10th?
14  A.   Yes, sir.
15  Q.   Did you talk to Mr. Graham on that day?
16  A.   Yes, sir.
17  Q.   Do you know what he told you?
18  A.   He stated that he hasn't been on meds for over
19 a year.
20  Q.   You put that on the form?
21  A.   Yes, sir.
22  Q.   Did that bother you?
23  A.   That I put it on here or that he hadn't been on
24 meds?
25  Q.   No, that he hadn't been on meds for a year.

Patricia Carol Johnston - 06-13-14                                          42

1   A.   Yes, sir, it does.
2   Q.   Did you ask him at that point where he bought
3  his medication from?
4   A.   I don't remember.
5   Q.   And you understood that with congestive heart
6  failure and having been on Coreg that going without
7  medication that long was problematic?
8        BY MR. DARE:  I'm gonna object to the form of
9        the question.  This witness has not been qualified to
10       answer that question, and you are not to answer that
11       question.
12  Q.   Are you there to attend to all the medical
13 needs of the prisoners?
14  A.   I don't understand.
15  Q.   Are you supposed to make a determination as to
16 whether or not the detainees need medical attention?
17  A.   Yes, sir.
18  Q.   Now, did it ever come to your attention that
19 Mr. Graham had been a patient at the heart clinic?
20  A.   I don't remember.
21  Q.   You don't remember?
22  A.   I don't remember.  I'm sure that we talked
23 about it.
24  Q.   Did you ever request the medical records of --
25  A.   Yes.

Patricia Carol Johnston - 06-13-14                                          43

1   Q.   Did you do that pursuant to a medical
2  authorization from Mr. Graham?
3   A.   Yes, I did.
4   Q.   And when did that happen?
5   A.   I don't remember.
6   Q.   You have documents 836 and 837.  Do you
7  recognize those?
8   A.   Yes, sir.
9   Q.   Document 836, what is that?
10  A.   Okay.  This is an authorization to disclose
11 health information.
12  Q.   And who is it signed by?
13  A.   It is signed by Mr. Graham.
14  Q.   And what is the date on that?
15  A.   February the 17th, 2010.
16  Q.   So would it be fair to say that you had talked
17 to Mr. Graham about his condition at least on February the
18 17th or earlier?
19  A.   Yes, sir.
20  Q.   And on February the 17th you knew that Mr.
21 Graham had been going to the heart clinic?
22       BY MR. DARE:  Object to form.  You can
23       answer.
24       BY THE WITNESS:  Yes.
25  Q.   Did you call the heart clinic at any time?

Patricia Carol Johnston - 06-13-14                                          44

1   A.   I don't think it was called the heart clinic.
2  I think it was the Heart Care Center.
3   Q.   All right.  Well, did you call the Heart Care
4  Center?
5   A.   I don't remember.
6   Q.   If you had called them, would you have some
7  kind of notation to indicate it?
8   A.   I'm sure I would have had.
9        BY MR. SANDERS:  Now, let's have 0836 marked
10       as Exhibit 8.
11       (EXHIBIT 8, AUTHORIZATION, WAS MARKED FOR
12   IDENTIFICATION.)
13       (EXHIBIT 9, FAX, WAS MARKED FOR
14   IDENTIFICATION.)
15  Q.   All right.  Exhibit No. 8, would it be fair to
16 say that you had seen Exhibit No. 1 prior to February the
17 17th, 2010?
18  A.   Yes, sir.
19  Q.   And up in the left-hand corner of Exhibit 8
20 there's a fax number.  Do you know what number that is?
21  A.   March the 2nd, 2010?
22  Q.   I'm talking about written in handwriting where
23 it says fax.  Do you see where I'm talking about?
24  A.   No, sir.  I don't think I hear you.
25  Q.   Okay, I'm sorry.  You see this right here.  Is

Patricia Carol Johnston - 06-13-14                                             45

1  that your handwriting?
2       A.    Yes.
3       Q.    And what fax number is that?
4       A.    425-5525.
5       Q.    And what is that the number to?
6       A.    The Heart Care Center, I'm pretty sure it is.
7  I don't remember exactly, but.
8       Q.    So at least as of February the 17th you knew
9  that Mr. Graham was a patient at the Heart Care Center?
10             BY MR. DARE:  Object to the form of the
11         question.
12      Q.    Is that correct?
13      A.    Yes, sir.
14      Q.    Now, would you look at Exhibit No. 9.  Did you
15  fax that on March the 2nd, 2010?
16      A.    Yes.
17      Q.    Tell me why you waited that span of time?
18      A.    I don't remember.
19      Q.    You knew that Mr. Graham had been in the
20  detention facility from November the 10th?
21      A.    Yes.
22      Q.    Up until February 17th, 2010, is that correct?
23      A.    Yes.
24      Q.    You knew that he had congestive heart failure,
25  is that correct?

Patricia Carol Johnston - 06-13-14                                             46

1             BY MR. DARE:  Object to the form.  You can
2         answer if you knew that he had congestive heart
3         failure.
4             BY THE WITNESS:  I knew that that's what he
5         said on his booking sheet.
6       Q.    And you didn't have any reason to doubt it, did
7  you?
8       A.    I can't think of any.
9       Q.    But yet and still you waited until March the
10  2nd to fax the release to the Heart Care Center, is that
11  right?
12      A.    Yes.
13      Q.    Did you receive any medical records from the
14  Heart Care Center?
15      A.    Yes, sir.
16      Q.    When did you receive the medical records?
17      A.    I don't remember.  It would have been after
18  March the 2nd.
19      Q.    It would have been after?
20      A.    After I sent the authorization.
21      Q.    So did you have his medical records when you
22  sent him to the doctor on March the 10th?
23      A.    I think I did.
24      Q.    Did you send those medical records to the
25  doctor?

Patricia Carol Johnston - 06-13-14                                             47

1       A.    No, sir.
2       Q.    You didn't feel that it was important for the
3  physician that was gonna be treating him to have his
4  medical records?
5       A.    I knew that the doctor could get the medical
6  records probably quicker than I could.
7       Q.    Where did you send them?
8       A.    To Ellisville Medical Clinic.
9       Q.    You knew that Ellisville Medical Clinic did not
10  have a cardiologist, didn't you?
11      A.    Yes, sir.
12      Q.    And you knew that Mr. Graham had congestive
13  heart failure or he indicated he had congestive heart
14  failure?
15      A.    Yes, sir.
16      Q.    You chose not to send him to the heart care
17  Clinic, didn't you?
18      A.    Yes, sir.
19      Q.    You could have sent him there if you chose to
20  do so, isn't that correct?
21      A.    In my opinion I could get him in quicker to
22  Ellisville Medical Clinic; wouldn't have to make an
23  appointment.
24      Q.    You could have gotten him in quicker at the
25  emergency room at the hospital, could you not?

Patricia Carol Johnston - 06-13-14                                             48

1       A.    Yes.
2       Q.    And the hospital was better equipped to deal
3  with someone that claimed they had heart failure than the
4  Ellisville Clinic, wasn't it?
5             BY MR. DARE:  Object to the form of the
6         question.  You can answer if you can.
7             BY THE WITNESS:  Say the question again,
8         please.
9       Q.    You're a nurse, is that correct?
10      A.    Yes.
11      Q.    You're familiar with the medical care
12  facilities in this area?
13      A.    Most of them.
14      Q.    And would it be fair to say that you are aware
15  that the Jones County Hospital was better equipped to deal
16  with someone who claimed to have congestive heart failure
17  than Ellisville Clinic?
18             BY MR. DARE:  Object to the form.  You can
19         answer if you can.
20             BY THE WITNESS:  They are better equipped.
21      Q.    You told me that you did not send the medical
22  records of Mr. Graham to the Ellisville Clinic.  Did you
23  inform the personnel at the Ellisville Clinic of Mr.
24  Graham's complaints?
25      A.    When I send this medical treatment with Mr.

Patricia Carol Johnston - 06-13-14

49

1   Graham to go to the doctor or any other inmate, I also send
2   this with them.
3       So when they go to the doctor they have both of
4   these, what their complaints is when they're booked in and
5   then what's going on when I send them to the doctor.
6       Q.   There was nothing that you sent to the
7   Ellisville Clinic that would indicate that Mr. Graham had
8   been previously treated at the Heart Care Center, was
9   there?
10      A.   No, sir.
11      Q.   And there was nothing that you sent to the
12  Ellisville Clinic that would indicate the kind of
13  medication that Mr. Graham had previously had?
14      A.   Just what Mr. Graham told us he was on, the
15  Coreg.
16      Q.   Now, when you got the medical records from the
17  heart clinic, did you review those?
18      A.   The best that I can remember I did.
19      Q.   Did those records have in there medications
20  that Mr. Graham had taken and been prescribed?
21      A.   Yes, it did.
22      Q.   And were there a series of medications besides
23  Coreg that had been prescribed to him?
24      A.   I think.
25      Q.   And most of the medications were heart related,

Patricia Carol Johnston - 06-13-14

50

1   were they not?
2           BY MR. DARE:  Object to the form.  You can
3   answer if you can.
4           BY THE WITNESS:  I don't remember.
5       Q.   Do you have those medical records with you?
6           (OFF-THE-RECORD DISCUSSION.)
7           (EXHIBIT 10, MEDICAL RECORDS, WAS MARKED FOR
8   IDENTIFICATION.)
9       Q.   Would you look at Exhibit 10?
10      A.   Yes, sir.
11      Q.   Page 843 at the bottom?
12      A.   Yes.
13      Q.   Would you look at the diagnosis section.  Okay.
14  Would you indicate the medications that were prescribed?
15      A.   Okay.  Aspirin, 81 milligrams once daily; Coreg
16  6.25 milligrams one twice a day; Digitek 0.125 milligrams
17  once a day; Diovan 40 milligrams once a day; KCL 20
18  milliequivalents once a day; Lasix 40 milligrams twice a
19  day.
20      Q.   And you received that information in the
21  medical records of Mr. Graham from the heart clinic, is
22  that correct?
23      A.   Yes, sir.
24      Q.   Did you try to find out from Mr. Graham where
25  those medications were purchased?

Patricia Carol Johnston - 06-13-14

51

1       A.   I don't remember that.
2       Q.   Would it be fair to say that you did not
3   communicate to the Ellisville Clinic that he had been
4   prescribed these medications?
5       A.   No, sir, I didn't.
6       Q.   Okay.  Look at 847 of Exhibit 10 under
7   impressions.
8       A.   Okay.
9       Q.   What are the impressions that are indicated?
10      A.   (Reading) Nonischemic dilated cardiomyopathy;
11  mild renal insufficiency; status post congestive heart
12  failure; abnormal adenosine myoview study back in November
13  showing a large inferolateral defect but no ischemia.  And
14  that is dated 1-24-08.
15      Q.   Okay.  Would you look at 845 of Exhibit 10?
16      A.   Which one?
17      Q.   The impressions.
18      A.   Okay.
19      Q.   What were the impressions?
20      A.   (Reading) Acute left parietal stroke; history
21  of severe nonischemic cardiomyopathy with an ejection
22  fraction of 15 -- I can't read that.
23      Q.   Okay.  That's okay.
24      A.   Okay.  Mild renal insufficiency and history of
25  nonsustained ventricular tachycardia.

Patricia Carol Johnston - 06-13-14

52

1           BY MR. DARE:  He just asked you to read the
2   admitting impressions.
3       Q.   That's fine.  Now, Mr. Graham had indicated
4   that he had congestive heart failure, correct?
5       A.   Yes.
6       Q.   That was corroborated by the medical records
7   that you received?
8           BY MR. DARE:  Object to the form of the
9   question.  You can answer if you can.
10          BY THE WITNESS:  According to the records, it
11  says that he has status post congestive heart failure
12  on 1-24-08.
13      Q.   Okay.  He indicated on admissions that he had a
14  heart condition, right?
15      A.   Yes.
16      Q.   And that's born out by the medical records,
17  right?
18      A.   Yes.
19          BY MR. DARE:  Object to the form.
20      Q.   He also indicated that he had had a stroke, is
21  that correct?
22          BY MR. DARE:  In Exhibit 1?
23          BY MR. SANDERS:  No, I mean in the medical
24      records.  It's not in Exhibit 1, okay.
25          BY THE WITNESS:  I don't see it in Exhibit 1.

**Patricia Carol Johnston - 06-13-14**                    53

1   Q.   Okay.  He also indicated that he was taking
2  Coreg, is that right?
3   A.   Yes.
4   Q.   And that's born out in the records, right?
5   A.   Yes.
6   Q.   You had all this information but you still
7  didn't feel like it was necessary to convey it to the
8  Ellisville Clinic?
9   A.   I did not send his records.
10   Q.   And you didn't call and tell them, did you?
11   A.   I'm sorry?
12   Q.   You didn't call and tell them, tell the
13  Ellisville Clinic?
14   A.   Not that I remember.
15   Q.   Okay, all right.  As a medical professional,
16  you understand that a history is an important part of the
17  medical treatment?
18   A.   Yes.
19   Q.   And the information that you had was a
20  reflection of his medical history, is that correct?
21   A.   Yes.
22   Q.   Was Mr. Graham transferred to A160 based upon
23  your recommendation?
24           BY MR. DARE:  Object to form.  I think it's
25      been asked and answered a couple of times now.  You

**Patricia Carol Johnston - 06-13-14**                    54

1      can answer it again.
2           BY THE WITNESS:  Probably, but I don't
3      remember.
4   Q.   Would there be a document that would?
5   A.   No, sir.
6   Q.   Do you know what kind of medication was
7  prescribed at the Ellisville Clinic for Mr. Graham?
8   A.   I know that it was a blood pressure medicine.
9  I do not remember the name.
10   Q.   When did you become aware of the medication?
11   A.   When they brought him back from the doctor or
12  from the Ellisville Clinic.
13   Q.   And the form that you sent to them indicated a
14  complaint with respect to blood pressure, right?
15   A.   Yes.
16   Q.   And they gave him a blood pressure medication?
17   A.   Yes.
18   Q.   And nothing else.  I hand you those two
19  documents and ask you if you can tell me what those are?
20   A.   These are the medical administration records.
21   Q.   Can you tell me what that document is?
22   A.   It is a medical administration record.
23   Q.   And whose is it?
24   A.   This is Mr. Albert Graham.
25   Q.   What does it reflect?

**Patricia Carol Johnston - 06-13-14**                    55

1   A.   When he took his medications.
2   Q.   And when did he start taking them?
3   A.   He started taking them on the 11th.
4   Q.   I see a series of signatures or?
5   A.   Initials.
6   Q.   Whose initials are they?
7   A.   Those are mine.
8   Q.   And did you personally give him the medication?
9   A.   I gave him the medication except on the
10  weekends, and the officers would give it, and then I would
11  look at the records from the weekend to make sure that he
12  took them that day and then fill it in.
13   Q.   So although you initialed all this, you didn't
14  personally see him take all of that?
15   A.   On the weekends I did not.
16   Q.   How many times did he take the medication?
17   A.   From March 11th through the 31st and April the
18  1st through April the 5th.
19   Q.   Okay.  You will agree that Mr. Graham was not
20  seen by you within 24 hours after he was brought into the
21  adult detention facility?
22   A.   Yes, sir.
23   Q.   You will agree with me that Mr. Graham was not
24  given a physical examination within 14 days after he was
25  booked?

**Patricia Carol Johnston - 06-13-14**                    56

1   A.   Yes, sir.
2   Q.   You will agree with me that he was not given a
3  physical examination within 90 days after he was booked?
4   A.   Yes, sir.
5   Q.   You will agree with me that once you saw Mr.
6  Graham's medical information sheet, which is Exhibit 1,
7  that he was not scheduled for the next sick call?
8   A.   I didn't understand.
9   Q.   Okay.  After you saw Exhibit 1, you will agree
10  with me that Mr. Graham was not scheduled for the next sick
11  call?
12   A.   No, sir.
13   Q.   He was not?
14   A.   Sick call, you mean to give him the form sick
15  call?
16   Q.   Yeah.  He was not scheduled for any medical
17  treatment within the next day or two?
18   A.   No, sir.
19   Q.   Were you present on April the 4th or 5th of
20  2010 when Mr. Graham became ill?
21   A.   I know that I was there the day that he got
22  sick that night.
23   Q.   Did you see him on the day that he became ill?
24   A.   Yes, sir.
25   Q.   Did you give him any medication on that date?

## Patricia Carol Johnston - 06-13-14 — 57

1  You can look at the records. I believe you did.
2      BY MR. DARE: He was asking you about the 4th
3  and the 5th.
4      BY THE WITNESS: Yes, sir, he had his
5  medication.
6      Q. Okay. Did he indicate any complaints on that
7  day?
8      A. No, sir.
9      Q. Do you know what day of the week the 5th was?
10     A. No, sir.
11     Q. All right.
12     A. Not now.
13         BY MR. SANDERS: I think I'm just about done,
14  unless you've got some questions you want to ask.
15         BY MR. DARE: Sure. Through?
16         BY MR. SANDERS: I'm through. Thank you very
17  much.
18  EXAMINATION BY MR. DARE:
19     Q. Let's go first to Exhibit 10. Can you go to
20  page 847 for me, please, ma'am. Now, you were reading
21  earlier under the impressions, and under number 3 under
22  impressions, you see it has status post congestive heart
23  failure. What does the post there mean?
24     A. After.
25     Q. So the congestive heart failure had cleared up

## Patricia Carol Johnston - 06-13-14 — 58

1  according to this note?
2      BY MR. SANDERS: To which we object to the
3  form.
4      Q. Is that what post means?
5      A. Post means it's after.
6      Q. And what date is that document again?
7      A. 1-24-08.
8      Q. You were also asked to read a bunch of home
9  medications from JC843. What is the date of that document?
10     A. February the 5th, '08.
11     Q. Now, as of March 10th, 2010, had Mr. Graham
12  ever told you whether or not he had taken medication within
13  the prior year?
14     A. He stated that he had not taken any in over a
15  year.
16     Q. And he specifically told you that, is that
17  correct?
18     A. Yes, sir.
19         BY MR. SANDERS: Object to the form, leading.
20     Q. You were asked multiple times when the first
21  time that you saw Exhibit 1 is. I believe, and correct me
22  if I'm wrong, that your testimony was you don't know when
23  you first saw Exhibit 1, is that right?
24     A. Yes, sir.
25         BY MR. SANDERS: Object to form.

## Patricia Carol Johnston - 06-13-14 — 59

1      Q. I'm gonna go to Exhibit 8 now. Do you know on
2  what date you wrote fax 425-5525, do you know what date you
3  wrote that in there?
4      A. Probably the day that I faxed it.
5      Q. What date did you fax that document?
6      A. 3-2-10.
7      Q. Do you know what date you wrote the heart
8  clinic into this document?
9      A. February the 17th, 2010.
10     Q. And this is generally in 2009 and 2010. Did
11  you make rounds within the jail?
12     A. Yes, sir.
13     Q. In other words, did an inmate have to be in
14  A160 in order for you to see them?
15     A. No, sir.
16     Q. I'm not sure this was asked. In 2009 and 2010,
17  when did you work at the jail, what days of the week?
18     A. Monday through Friday, and I'm on call 24-7. I
19  make rounds in the jail everyday, Monday through Friday.
20     Q. What areas of the jail did you make rounds in?
21     A. All of them, from the kitchen to every hall,
22  men, women and the loop at least once a day, sometimes two
23  or three times.
24     Q. These may be some obvious questions. Are you a
25  cardiologist?

## Patricia Carol Johnston - 06-13-14 — 60

1      A. No, sir.
2      Q. Are you a physician?
3      A. No, sir.
4      Q. As an LPN are you allowed to prescribe
5  medication?
6      A. No, sir.
7      Q. As an LPN are you allowed to administer
8  medication that has been prescribed in the past but which
9  is outdated?
10     A. No, sir.
11         BY MR. DARE: All right. Thank you. I have
12  no further questions at this time. We're done.
13             (CONCLUDED 12:39 P.M.)

# JONES COUNTY ADULT DETENTION FACILITY

Booking Medical Sheet: 67209
11/10/09        9:51

ID #: 2006100853     Name: GRAHAM, ALBERT LEE
                     Address: ███████████████
                     LAUREL, MS 00000000



DOB: ████████     Race: B       Height: 6- 1    Eyes: BRO     Home Phone
Age: 58 YRS       Sex:  M       Weight: 170    Hair: BLK      (601)000-0000
Soc. Sec. No.: ███████████

## VISUAL ASSESSMENT

Yes/No

| | | |
|---|---|---|
| N | 1. | Is inmate unconscious? |
| N | 2. | Does inmate have any visible signs of trauma, illness, obvious pain or bleeding, requiring immediate medical attention? |
| N | 3. | Is there obvious fever, swollen lymph nodes, jaundice or other evidence of infection that may be contagious? |
| N | 4. | Any signs of poor skin condition, vermin, rashes or needle marks? |
| N | 5. | Does inmate appear to be under the influence of drugs or alcohol? |
| N | 6. | Any visible signs of alcohol or drug withdrawal? |
| N | 7. | Does inmate's behavior suggest the risk of suicide or assault? |
| N | 8. | Is inmate carrying medication? |
| N | 9. | Does the inmate have any physical deformities? |
| N | 10. | Does inmate appear to have psychiatric problems? |

## MEDICAL QUESTION

Yes/No

11. Do you have or have you ever had any of the following:

| | | | | | |
|---|---|---|---|---|---|
| N | a) allergies | N | e) epilepsy | Y | i) high blood pressure |
| N | b) arthritis | N | f) fainting spells | N | j) psychiatric disorder |
| N | c) asthma | Y | g) heart condition | N | k) seizures |
| N | d) diabetes | N | h) hepatitis | N | l) tuberculosis |

N  m) ulcers
N  n) venerial disease
N  o) other(specify)

12. Females only:

N  a) Are you pregnant?   N  b) Do you take birth control pills?   N  c) Have you recently delivered?

| | | |
|---|---|---|
| N | 13. | Have you recently been hospitalized or treated by a doctor? |
| Y | 14. | Do you currently take any medication prescribed by a doctor? |
| N | 15. | Are you allergic to any medication? |
| Y | 16. | Do you have any handicaps or conditions that limit activity? |
| N | 17. | Have you ever attempted suicide or are you thinking about it now? |
| N | 18. | Do you regularly use alcohol or street drugs? |
| N | 19. | Do you have any problems when you stop drinking or using drugs? |
| N | 20. | Do you have a special diet prescribed by a doctor? |
| N | 21. | Do you have any problems or pain with your teeth? |
| N | 22. | Do you have any other medical problems we should know about? |

Medical Insurance: NONE                    Doctor: NONE
Emergency Contact: ODELL GRAHAM            Relationship: BROTHER
Address:
City: JOLLIET          State: IL  Zip:          Phone: ███████████



Δ π EXHIBIT
Deponent Johnston
Date 06-13-14   Rptr. vb
WWW.DEPOBOOK.COM

JC000029

# JONES COUNTY ADULT DETENTION FACILITY

Booking Medical Sheet:    67209
11/10/09      9:51

## EXPLANATIONS (REFER TO QUESTION NUMBER)

**Q11G:** CONGESTIVE HEART FAILURE
**Q11I:** SAYS IT'S BORDERLINE
**Q14:** CORAD
**Q16:** HEART CONDITION
**Q23:** DISABILITY

I CERTIFY THAT I HAVE TRUTHFULLY ANSWERED THESE QUESTIONS ABOUT MY HEALTH.

Inmate's signature _____    Witness _____

Attending Officer _____    Date _____    Time _____

JC000030

**Jones County Sheriff's Department**
**Adult Detention Facility**

*Medical Sick Call Request Form Only*

Inmate Name _____    Inmate # _____    Cell# _____

Jurisdiction _____    Date of Request _____

Medical Complaint
_____
_____
_____
_____

How long have you had this problem? _____
Have you been treated for this problem before? _____    (If yes, how many times?) _____

## DO NOT WRITE BELOW THIS LINE

Date the request was received _____
Date of the Sick Call Visit _____
Time of the Sick Call Visit _____

Medical Staff Comments
_____
_____
_____
_____
_____
_____

_____
Medical Staff Signature

**There is a $10.00 charge for all sick call visits.**



# JONES COUNTY ADULT DETENTION FACILITY

### Activity Sheet for Booking #: 67209
### 04/23/10    11:37

**ID #: 2009110172**                    **Name: GRAHAM, ALBERT LEE**                    **Cell: A160**

**Status: MIN**            **Class: JCSO**                **Hold Reason: CH**            **Holding For:**

---

Activity Date/Time: 03/10/10  18:42      Activity: MVMT TRANSFER

Old Facility:  JCADF          Old Cell: 102          New Facility:  JCADF          New Cell: A160

Amount:              Qty:        1      Extension:                  Phone #:                  Completed:

Appointment Date/Time:                              Officer:                  2010020058

Notes:



Δ π EXHIBIT 3
Deponent Johnston
Date 06-13-14 Rptr hz
WWW.DEPOBOOK.COM

JC000045



Δ π EXHIBIT 4
Deponent Johnson
Date 06-13-14  Rptr. AL

441 4626  call Pine Belt
601-649-7121

3-9-10
3-10-10 freq. Test ⊕ on
, Mrs Bonnie at PD
Contacted. Inmate C/o spotting
small amount, Mrs Bonnie noted
states she will get her appt
ASAP. Albert Graham BP 140/82
3-10-10                    in 102 C/o toothache
Returned call to Columbia jail
left Message. Spoke ē Pine Belt
States will pick up
meds today.                  433-11
Attempted to call
at 2:34pm. No Ans. Left Message
then phoned 649-5450. No Ans.

Δ π EXHIBIT 5
Deponent Johnston
Date 2-13-14  rptr. 2
WWW.DEPOBOOK.COM



3-31-10 — Albert Graham BP 137
Spoke c Dr Davis regarding
dentist appt. for
4-9-10 at 10:00 ,
and ████████████████ Receptor
will call back c appt.


Blood & Swab - Not Cheap
Try urology If son or He (ym)
not admissible in court
JCHD doesn't do requested



Δ π EXHIBIT  6
Deponent Johnston
6-13-14  Rptr NR
WWW.DEPOBOOK.COM

3-10-10
faxedto
S.O.
SY



*Jones County Sheriff's Department*
SHERIFF ALEX HODGE

## MEDICAL TREATMENT FORM

Date **3-10-10**                    Time _____

Inmate Name **Albert Graham**   Inmate # _____   Cell # **B102**

A.D.F. Inmate **✓**   J.D.F Inmate _____

County Inmate **✓**   State Inmate _____

Laurel P.D. _____   Ellisville P.D _____

Other Agency _____

Medical
Complaint **C/o ↑ BP** _____
_____
_____

Treatment *Reassessing condition*
*Stated no pain or meds.*
*moves too*

Was inmate transported to a medical facility? **(Y)** N
If so what facility? **EMC**   Care provider who treated inmate **O Scoggins**

**All use of ambulance service or hospital treatment must first be approved by administration.**
**Administration notified** **Yes**

County Pay (adult) 6156492 **✓**   (Juv) 6213147 _____

State Pay 6266923 _____   Laurel Police Pay 5061684 _____

Inmate Pay _____

I understand that the Jones County Sheriff Dept. will not be responsible for any preexisting medical
conditions. I understand I will be responsible and I will be required to pay all medical expenses.

Inmate's signature *Albert Graham*

Print name **Albert Graham**



Δ π EXHIBIT 7
Deponent Johnston
Date 6-13-14 Rptr 4R
WWW.DEPOBOOK.COM

JC000028

Graham, Albert L
MRN: 6948038
DOB: 6/1/1951 58.5 yr M

03/02/2010 TUE 15:12  FAX 601  3630 JCSO BOOKING                        ☒002/002

MAR 04 2010

Fax 425 5525    faxed

# AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

I hereby authorize the use or disclosure of my individually identifiable health information as described below. I understand that I may refuse to sign this authorization. I understand that, when the information is used or disclosed, it may be subject to being redisclosed and may no longer be protected by federal privacy regulations.

Patient Name: *Albert Graham*  Medical Record Number: _____

Social Security Number: 587 _____  Date of Birth: *6/1/51*

Individual/Organization authorized to make the disclosure: *The Heart Clinic*

Date(s) of service to be disclosed: _____

Please check the type of information to be used or disclosed:

- ___ Admission Record
- ___ Emergency Record
- ___ Discharge Summary
- ___ Radiology Reports
- ___ History & Physical
- ___ Operative Report
- ___ Laboratory Reports
- ___ Entire Record
- ___ Immunization Dates
- ___ Physician Clinic Visits
- ___ Films, slides, or videos
- ___ Other
- ☒ General Abstract (includes: Admission record, D/C summary, H&P, ER record, consults, lab, radiology, EKG, EEG, operative report, cardio respiratory reports, other dictated reports)

This information may be disclosed to and used by the following individual(s) or organization(s):

*Jones County Jail*
(Name and Address)

for the purpose of: *Continued Care*

- I understand that these records may include information relating to AIDS (Acquired Immunodeficiency Syndrome) or infection with HIV (Human Immunodeficiency Virus), psychiatric care, or treatment of alcohol and/or drug abuse.
- I understand that I have a right to revoke this authorization at any time by notifying the providing organization in writing, but if I do it will not have an effect on any actions taken in reliance on my authorization before the disclosing organization received the revocation. I understand that the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy.
- To request a Revocation of Authorization form, I may contact: SCRMC Privacy Officer, P.O. Box 607, Laurel, MS 39441.
- Unless otherwise revoked, this authorization will expire on the following date, event, or condition:
  (If no date is specified, this authorization will expire in six months from the date it is signed.)
  ☐ This authorization will not expire because the health information is being disclosed for research purposes.
- I understand that treatment, payment, enrollment, or eligibility for benefits may be conditioned on obtaining the authorization in the following circumstances:
  - For research related purposes
  - If the authorization is sought by the health plan for eligibility or enrollment determinations relating to the individual or for its underwriting or risk rating determinations.
  - When the provision of health care is solely for the purpose of creating protected health information for disclosure to a third party.

NOTICE TO PATIENT: The patient or patient's representative may inspect and/or request a copy of the health information to be used or disclosed in accordance with SCRMC policies.

Patient Name: *Albert Graham*
(Please Print)

Signature of patient or patient's representative: *Albert Graham*    Date: *2-17-10*

If signed by legal representative, relationship to patient: _____

Witness: _____

___

TO BE COMPLETED BY PROVIDER:

Complete only if authorization is for marketing purposes.
SCRMC  ☐ will  ☐ will not receive direct or indirect remuneration or compensation in exchange for using or disclosing the information listed above.

Date of Disclosure: _____    Clerk Initials: _____

___

DO NOT WRITE BELOW THIS LINE
SOUTH CENTRAL
REGIONAL MEDICAL CENTER
P.O. BOX 607, Laurel, Mississippi 39441

| P |
| A |
| T |
| I |
| E |
| N |
| T |
| B |
| A |
| R |
| C |
| O |
| D |
| E |

DO NOT WRITE BELOW THIS LINE

6948038

RELEASE OF INFORMATION
DATE: 3/4/10  PAGES: 25
MAILED/FAXED  EMP. 60

AUTHORIZATION TO DISCLOSE INFORMATION
AUTHDISC Rev. 11-2003

Δ π EXHIBIT 8
Deponent Johnson
Date Feb-13-11 Rptr 1L
WWW.DEPOBOOK.COM

JC000836

# JONE COUNTY SHERIFF'S DEP. TMENT
## JONES COUNTY ADULT DETENTION FACILITY
### SHERIFF ALEX HODGE

---

### FACSIMILE TRANSMITTAL SHEET

TO: _The Heart Center_          FROM: _Carol_

DATE: _3-2-10_          TOTAL NO. OF PAGES INCLUDING COVER: _2_

FAX NUMBER: _601-425-5525_          RE:

---

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

---

**601-649-7502**
**5178 HIGHWAY 11 NORTH**
**ELLISVILLE, MS 39437**



Δ π EXHIBIT _9_
Deponent _Johnston_
Date _06-13-14_   Rptr. _hl_
WWW.DEPOBOOK.COM

JC000837

HISTORY
PHYSICAL EXAMINATION

GRAHAM, ALBERT L.
7837569
Wassim Mouannes, MD

DATE OF BIRTH   06/01/51
ADMITTED   02/05/08

CHIEF COMPLAINT. Acute left parietal cerebrovascular accident.

HISTORY OF PRESENT ILLNESS. This is a 56-year-old black male, known to the Heart Care Center with a past medical history of nonischemic cardiomyopathy with an ejection fraction of 10% to 15%, nonsustained ventricular tachycardia, mild renal insufficiency, congestive heart failure. The patient was walking today, and while he was walking, he states that his right arm began to "flap," and that he was unable to control his right arm. He states that he also felt tingling and numbness in his right upper extremity, and in his right leg. The patient states that he was able to walk but slowly was able to walk back home. The patient states that over the course of the day, his symptoms have gradually improved, and now he no longer has right upper extremity weakness. He is able to move his right arm and right leg. The patient states also that when he first noticed the symptoms, approximately 9:30 a.m. this morning, he was having a hard time articulating his words at that time, but since then, he notices improvement. The patient denies any chest pain, shortness of breath, palpitations, syncope, or presyncope.

PAST HISTORY. Past Medical History: See above. Past Surgical History: Appendectomy.

HOME MEDICATIONS
1.   Aspirin 81 mg once daily.
2.   Coreg 6.25 mg 1 twice a day.
3.   Digitek 0.125 mg once a day.
4.   Diovan 40 mg once a day.
5.   KCl 20 mEq once a day.
6.   Lasix 40 mg twice a day.

ALLERGIES. No known drug allergies.

FAMILY HISTORY. His sister has congestive heart failure and chronic obstructive pulmonary disease. His mother is living and is healthy. Father's history is unknown.

SOCIAL HISTORY. He is married. He smokes about a pack per day. The patient used to drink about 6 beers per day. He denies any heavy liquor. Continued

HISTORY
PHYSICAL EXAMINATION

GRAHAM, ALBERT L.
7837569
Wassim Mouannes, MD

SOUTH CENTRAL
REGIONAL MEDICAL CENTER
P.O. BOX 607 • LAUREL, MISSISSIPPI 39441 • (601) 426-4000
TRANSCRIPTION #1/MR                Approved 11/92

RECEIVED FEB 15 2008
CONFIDENTIAL



Δ π EXHIBIT 10
Deponent Johnston
Date 06-13-14   Rptr YB
WWW.DEPOBOOK.COM

JC000843

HISTORY
PHYSICAL EXAMINATION

GRAHAM, ALBERT L.
7837569
Wassim Mouannes, MD

ADMITTED  02/05/08

GENERAL.  The patient is alert and oriented, in no acute distress.

HEENT.  Pupils are round, regular, equal, and reactive to light and accommodation.

NECK.  No jugular venous distention or carotid bruits.

CHEST.  Lungs are clear without rhonchi, rales, or wheeze.

HEART.  Regular rate and rhythm without any obvious murmur, rub, or gallop.

ABDOMEN.  Soft, nontender, with positive bowel sounds.

EXTREMITIES.  No clubbing, cyanosis, or edema.  Pedal pulses are 2+ in the upper and lower extremities.

SKIN.  Warm, dry, and intact.

NEUROLOGIC.  The patient is alert and oriented x3.

DATA.  EKG showed sinus rhythm with leftward axis deviation, poor R-wave progression with some nonspecific ST- and T-wave abnormalities.  CBC reveals white blood cell count of 4.4, hemoglobin 13.2, hematocrit 38.9, platelets 253, sodium 141, potassium 3.8, chloride 105, CO2 of 27, calcium 9.0, glucose 112.  BUN 12, creatinine 1.28, pro-time 13.1, INR 1.1, APTT 27.2.  Digoxin level is less than 0.2.

ADMITTING IMPRESSION
1.    Acute left parietal stroke.
2.    History of severe, nonischemic cardiomyopathy with an ejection fraction of 15%.
3.    Mild renal insufficiency.
4.    History of nonsustained ventricular tachycardia.


Continued

CONFIDENTIAL

HISTORY
PHYSICAL EXAMINATION

GRAHAM, ALBERT L.
7837569
Wassim Mouannes, MD

RECEIVED FEB 15 2008

SOUTH CENTRAL
REGIONAL MEDICAL CENTER
P.O. BOX 607 • LAUREL, MISSISSIPPI 39441 • (601) 649-4000
TRANSCRIPTION  t/MR        2661069        Approved 11/02

JC000845

HISTORY
PHYSICAL EXAMINATION

GRAHAM, ALBERT L.
7837569
Wassim Mouannes, MD

Continuation, page 2 of Physical Examination

PLAN
1. Will admit to telemetry.
2. Neurologic consultation.
3. Lovenox 40 mg subcutaneous daily.
4. The patient may need to begin Coumadin secondary to severely reduced ejection fraction, which may have possibly been the cause of the patient's stroke.
5. Further recommendations pending the patient's clinical course and response to treatment.


Bmudi Garris, MSN, ACNP


Wassim Mouannes, MD

D: 02/05/08
T: 02/05/08/dn

CONFIDENTIAL

HISTORY
PHYSICAL EXAMINATION

GRAHAM, ALBERT L.
7837569
Wassim Mouannes, MD

RECEIVED FEB 1 5 2008

**SOUTH CENTRAL REGIONAL MEDICAL CENTER**
P.O. BOX 607 - LAUREL, MISSISSIPPI 39440 - (601) 426-4000
TRANSCRIPTION SHARE     2601869     Approved 1102

rg Clinic

Page 4 of 4

3/4/2010 2:24:49 PM

JC000846

**HATTIESBURG CLINIC**
415 S. 28th Avenue
Hattiesburg, MS 39401 (601)264-6000

**Electronically Signed**

Patient: Graham, Albert L                     Patient ID: 6948038                          Date: 1/24/2008

Cardiology - Laurel          Office Visit

DATE OF SERVICE: 01/24/2008
PATIENT NAME: GRAHAM, ALBERT L
MRN: 6948038 DOB: 06/01/1951

DOB: 6/1/1951

HISTORY OF PRESENT ILLNESS: This is a pleasant, 56-year-old,
African-American gentleman who is here for 1 week follow-up on his
cardiomyopathy which was diagnosed in December. His ejection fraction
is 10 to 15%. He did have nonsustained ventricular tachycardia, mild
renal insufficiency, and congestive heart failure in the hospital. I
asked him to increase his Coreg, the last time he did not increase it
because he thought he could slow his heart beat by himself. His heart
rate is still 77 beats per minute denies any chest pain, shortness of
breath, palpitations, syncope. He does have mild dyspnea on exertion.

Past medical history, social history, surgical history, family
history, review of systems otherwise unchanged.

CURRENT MEDICATIONS: Reviewed IC Chart.

PHYSICAL EXAMINATION:

VITAL SIGNS: Pressure 99/63 Pulse 77.

GENERAL: The patient looks alert, oriented and in no distress.

HEENT: PERRLA. Extraocular movements intact.

NECK: No jugular venous distention. No bruits.

CARDIOVASCULAR: Regular rate and rhythm.

LUNGS: Clear to auscultation bilaterally. No rales, wheezing.

ABDOMEN: Soft. Nontender. Non-distended.

EXTREMITIES: Good peripheral pulses in all 4 extremities. No
clubbing, cyanosis or edema.

NEUROLOGICAL: Intact.

SKIN: Warm and dry.

IMPRESSIONS:
1. Severe nonischemic dilated cardiomyopathy.
2. Mild renal insufficiency.
3. Status post congestive heart failure.
4. Abnormal Adenosine Myoview study back in November showing a large
inferolateral defect but no ischemia.

JC000847

PLAN:
At this time, I have urged the patient to go up on the Coreg to 6.25
twice a day to continue it for 3 months and at that time we may
increase it again.  He will follow-up with me in 3 months.


Wassim E Mouannes MD

TR: WEM/HW  D:  01/24/2008 09:56:42 T:  01/24/2008 14:21:33
Conf #:  U1418439  Dictation ID:  1964495

cc:

| Approved & Electronically Signed:  Wassium Mouannes, MD | 1/24/2008 3:39:00 PM |
|---|---|

CONFIDENTIAL

Hattiesburg Clinic                    Page 2 of 2                    3/4/2010 2:24:57 PM

JC000848