Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION


JEANETTER GRAHAM, ETC.                 PLAINTIFF


VERSUS              CAUSE NO. 2:13CV67-KS-MTP


ALEX HODGE, ET AL.                 DEFENDANTS
*****************************************************
DEPOSITION OF JEANETTER GRAHAM
*****************************************************
APPEARANCES NOTED HEREIN

DATE: MARCH 28, 2014
PLACE: WYATT, TARRANT & COMBS
4450 OLD CANTON ROAD, STE 210
JACKSON, MISSISSIPPI
TIME: 9:18 A.M.


REPORTED BY: TODD J. DAVIS
CSR #1406, RPR



DAVIS COURT REPORTING
Post Office Box 44
Madison, Mississippi 39130
(601) 856-8889
www.daviscourtreporting.com

Jeanetter Graham
March 28, 2014

---

**Page 2**

1  APPEARANCES:
2
3  EVERETT SANDERS, ESQ.
   Sanders Law Firm
4  Post Office Box 565
   Natchez, Mississippi 39120
5
6
       COUNSEL FOR PLAINTIFF
7
8
9  JASON DARE, ESQ.
   Wyatt, Tarrant & Combs
   Post Office Box 16089
10 Jackson, Mississippi 39236
11
12     COUNSEL FOR DEFENDANTS
13
14
15
16
17
18
19
20
21
22
23       TODD J. DAVIS
       DAVIS COURT REPORTING
       Post Office Box 44
24     Madison, Mississippi 39130
       (601) 856-8889
25

---

**Page 3**

1           INDEX
2  Style and Appearances ..................... 1
3  Index ...................................... 3
4  Examination by Mr. Dare .................. 4
5  Certificate of Court Reporter ............ 67
6  Certificate of Deponent .................. 68
7
8  EXHIBITS:
9  Exhibit No. 1 ........................ 20
10 Exhibit No. 2 ........................ 27
11 Exhibit No. 3 ........................ 40
12 Exhibit No. 4 ........................ 52
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1           JEANETTER GRAHAM,
2  having been first duly sworn, was examined and
3  testified under oath as follows:
4  EXAMINATION BY MR. DARE:
5      Q.  Can you please state your full name for
6  the record, please?
7      A.  Okay.  Jeanetter Ann Graham.
8      Q.  Ms. Graham, have you ever given a
9  deposition before?
10     A.  No.
11     Q.  All right.  Real easy, couple of ground
12 rules just going through.  What I'm going to do is
13 I'm going to ask you a series of questions.  It is
14 based on what you know.  That's all I need to know
15 is what you know.
16         If you don't --
17     A.  Okay.
18     Q.  -- understand my question, will you
19 please feel free to ask me to rephrase it.  If you
20 answer a question, I will assume that you
21 understood the question as asked.
22     A.  Okay.
23     Q.  We also have a court reporter trying to
24 take down everything that both you and I say.
25 Makes it a lot easier on him if you wait until I

---

**Page 5**

1  finish asking the question before you answer it.
2  Also, he can't take down head nods or uh-huhs and
3  uh-uhs.
4      A.  Okay.
5      Q.  So if you say uh-huh, I will ask is that
6  a yes or is that a no, just to make sure that we
7  have our record clear.
8      A.  Okay.
9      Q.  All right.  What is your maiden name?
10     A.  Barnett.  That's B-A-R-N-E-T-T.
11     Q.  Okay.  Where do you currently live?
12     A.  I live at 716 South Magnolia in Laurel,
13 Mississippi.
14     Q.  How long have you lived there?
15     A.  Goodness.  About four years.
16     Q.  Who currently lives there with you?  Who
17 currently lives there with you?
18     A.  I have two grandchildren.
19     Q.  Either over the age of 18?
20     A.  Neither one.  I have a three and a six.
21 I did have my daughter living with me, but she's
22 in college.  So I'm not claiming her.
23     Q.  Okay.  Where do you currently work?
24     A.  I work for Bill and Barbara Helen
25 Mullins out of Laurel, Mississippi.

Davis Court Reporting, LLC   601.856.8889
marytodd@daviscourtreporting.com   877.496.0079

Jeanetter Graham
March 28, 2014

Page 6

1   Q.   What do you do there?
2   A.   I am a personal caregiver.
3   Q.   Okay.  Do you have a professional
4   license?  LPN?  RN?  CNA?
5   A.   I have the CNA.  I -- yeah.
6   Q.   How long have you worked there?
7   A.   I've been there about seven years.
8   Q.   In 2009, I guess you worked for
9   the Mullinses as well; is that correct?
10   A.   That's correct.
11   Q.   What was your typical schedule?  How
12   many days a week did you work, and when did you
13   start working?  When did you typically finish
14   work?
15   A.   Well, it kind of varied.  But Monday
16   through Friday, I worked like from 8:00 to 4:00 or
17   8:00 to 5:00.
18   Q.   That's 8:00 a.m. to 4:00 or 5:00 p.m.?
19   A.   Right.
20   Q.   Okay.
21   A.   As needed on Saturday.  His wife had a
22   CVA, so I have to get her up and stuff.  And on
23   Sunday, I come in, and I would get her up to get
24   dressed for church.  And that would be one to two
25   hours on Sundays.

Page 7

1   Q.   Okay.
2   A.   And I still do that.
3   Q.   Okay.  So you are a -- as a personal
4   caregiver, the Mullinses are not -- they don't
5   have a company in which you go out and provide
6   outside medical care?
7   A.   No.
8   Q.   This is personally for his wife?  Mr.
9   Mullins' wife?
10   A.   Correct.
11   Q.   Okay.  Has an estate been opened for
12   Albert Graham?
13   A.   No.
14   Q.   Okay.  Can you provide me the names of
15   all of Albert Graham's children, whether or not
16   living or deceased?
17   A.   He has a daughter Keisha.  I have no
18   idea where she is.  She had lost contact with her
19   dad.  I did see her at the funeral.
20   Q.   How long prior to his death did she lose
21   contact with her dad?
22   A.   About two years.
23   Q.   Okay.
24   A.   They just had an argument and fell out.
25   Q.   Okay.  Do you know her last -- Keisha's

Page 8

1   last name?
2   A.   No.  Because she's married.  But she was
3   a Graham.
4   Q.   To your knowledge, did Albert Graham
5   have any more children?
6   A.   No.
7   Q.   When were you and Albert Graham married?
8   A.   We was married in 2008.  March 1st.
9   Q.   Was he married prior to you?
10   A.   Yes.
11   Q.   What was the name of his prior wife?
12   A.   Betty.
13   Q.   Do you know Betty's maiden name?
14   A.   Moffett.
15   Q.   M-O-F-F-E-T-T?
16   A.   Yes.
17   Q.   Do you know when they were divorced?
18   A.   1975.
19   Q.   Was Albert Graham working in 2009?
20   A.   No.  He was on disability.
21   Q.   What was his disability?  What was the
22   disability?
23   A.   Well, cardiac complications.  He had a
24   heart attack.  He had a CVA, which is a stroke.
25   Q.   In 2009, were you also living at 716

Page 9

1   South Magnolia in Laurel?
2   A.   No.  We was at 2469 Bush Dairy Road.
3   Q.   Is that also in Laurel?
4   A.   Correct.
5   Q.   Okay.  In or around November of 2009,
6   who all was living at 2469 Bush Dairy Road in
7   Laurel with you and Albert?
8   A.   Nobody.
9   Q.   Okay.
10   A.   Now, at 2469, also, there was a house
11   there, and his mother stayed in that house; and we
12   both seen about her.  But we stayed in an old
13   trailer there.  Uh-huh (affirmative response).
14   Q.   Is his mother still living?
15   A.   She died a few months after he did.
16   Q.   I believe I've seen that you were
17   actually caring for his mother in November of 2009
18   as well; is that correct?
19   A.   Yes.  I made sure she was clean.  And
20   breakfast and supper.
21   Q.   Okay.  Do you have any paperwork at your
22   house or somewhere else that you can obtain
23   relating to Mr. Graham's disability?
24   A.   Yes.
25   Q.   In other words, I'd like to know how

Davis Court Reporting, LLC   601.856.8889
marytodd@daviscourtreporting.com   877.496.0079

Jeanetter Graham
March 28, 2014

## Page 10

1  much he received a month for the disability.
2      Do you have that?
3      A. Yes.
4      Q. All right. As you sit here today, do
5  you know the exact dollar amount of how much he
6  received per month for disability?
7      A. About 1,800.
8      Q. Okay.
9      A. He also received a pension from Ingalls
10 Shipyard.
11     Q. Okay. How much was that?
12     A. About 1,230.
13     Q. How long after his death did you still
14 receive checks from the government for any form of
15 disability?
16     A. They canceled after then. Everything
17 was dropped. Even the pension. The pension, the
18 way it was set up, it was for his -- until he --
19 lifetime. As long as he lived, he would receive
20 it, but when he died, it canceled.
21     Q. Okay. All right. Other than the
22 incarceration that he was, I guess, serving in
23 November of 2009 through April of 2010, do you
24 know if Albert Graham had ever been to jail prior
25 to that time?

## Page 11

1      A. In the '70s, I believe, he was in
2  Illinois.
3      Q. And Mr. Graham also fought in Vietnam;
4  did he not?
5      A. He did.
6      Q. I believe I've seen paperwork where
7  there has been a determination that his death was
8  caused whether in whole or in part by Agent
9  Orange; is that correct?
10     A. Complications from it.
11     Q. Complications from Agent Orange?
12     A. Uh-huh (affirmative response).
13     Q. Did you receive a check from the
14 government for his death as a result of
15 complications from Agent Orange?
16     A. I did get compensated.
17     Q. How much?
18     A. After a year. I'm trying to see. About
19 12,000.
20     Q. Okay. Did you have to file a suit to
21 get compensated for that?
22     A. No. I just had to get all my papers
23 together and send it to the appropriate people.
24     Q. Okay. Do you still have the paperwork
25 that you sent off to the appropriate people? Did

## Page 12

1  you make copies of what you sent off?
2      A. Sure.
3      Q. All right. And do you still have those
4  as we sit here today?
5      A. Yes.
6      Q. I understand probably not with you,
7  but --
8      A. No -- I don't know. No. I don't
9  have -- I get a pension from -- from the VA.
10     Q. Do you still get that?
11     A. I do.
12     Q. How much of a pension do you get from
13 the VA? And is it paid monthly? Yearly?
14     A. Monthly.
15     Q. And how much do you get a month for
16 pension from the VA?
17     A. Twelve.
18     Q. 1,200?
19     A. That's correct.
20     Q. Okay.
21     A. That poison killed my husband, too.
22     Q. And to your knowledge, did Albert Graham
23 ever file any civil lawsuits during his lifetime?
24     A. None that I'm aware of.
25     Q. Had he ever been sued?

## Page 13

1      A. Not that I know of.
2      Q. Okay. Do you know if he had ever filed
3  for bankruptcy?
4      A. Not that I know of.
5      Q. Have you ever filed for bankruptcy?
6      A. No, I have not.
7      Q. Okay. Other than his mother living in
8  the house at 2469, did anyone else live in that
9  house with his mother at 2469 Bush Dairy Road?
10     A. No.
11     Q. Did anyone else live in the trailer with
12 you and Albert Graham in November of 2009 at 2469
13 Bush Dairy Road?
14     A. No. I have a daughter.
15     Q. And is that the same daughter that's --
16     A. That's in college.
17     Q. -- in college?
18     A. Uh-huh (affirmative response).
19     Q. And is it her children that you are
20 keeping at your house now?
21     A. One of them. I actually have three
22 children. And I had all three of them in college
23 at the same time. So it's been rough.
24     Q. Now, were you married prior to your
25 marriage with Albert Graham?

4  (Pages 10 to 13)

Jeanetter Graham
March 28, 2014

Page 14

1    A.   Yes.
2    Q.   Okay.  And when were you divorced?
3    A.   Gosh, '92.
4    Q.   What are the names of all of your
5  children that are above the age of 18?
6    A.   Above the age of 18?
7    Q.   Yes, ma'am.
8    A.   Okay.
9    Q.   Including married names and maiden
10  names, please.
11   A.   Okay.  Addrianna Jones,
12  A-D-D-R-I-A-N-N-A.  Dewitt Jones.  Nicole Jones.
13   Q.   And where is Addrianna Jones living?
14   A.   She is in Mobile now.
15   Q.   That's in Alabama?
16   A.   Uh-huh (affirmative response).
17   Q.   Yes?
18   A.   Yes.
19   Q.   Thank you.
20        Where is Dewitt Jones living?
21   A.   Los Angeles, California.
22   Q.   And Nicole Jones?
23   A.   Mobile, Alabama.
24   Q.   Does Albert Graham have any brothers and
25  sisters living in or around the Laurel, Jones

Page 15

1  County area?
2    A.   No.
3    Q.   Okay.  Does Albert Graham have any
4  brothers or sisters living in Mississippi?
5    A.   No.
6    Q.   Okay.
7    A.   I'm sorry.  He has a brother in a
8  nursing home.  I forgot about him.
9    Q.   What is his name?
10   A.   His name is Eudell Graham.
11   Q.   E-U-D-E-L-L?
12   A.   That's correct.
13   Q.   Okay.  Are both of Albert Graham's
14  parents deceased?
15   A.   Yes.
16   Q.   Okay.  Other than the pension from
17  Ingalls Shipyard or the check for disability that
18  you have mentioned today, did Albert Graham have
19  any other source of money coming into him in or
20  around November of 2009?
21   A.   No.
22   Q.   Okay.  Getting into the event that
23  occurred between you and Mr. Graham on or around
24  November the 10th of 2009.
25        Do you recall that incident as you

Page 16

1  sit here today?
2    A.   Yes.
3    Q.   I believe it started about eight o'clock
4  that morning when you were going to work; is that
5  correct?
6    A.   Yes.
7    Q.   And can you tell me, as you sit here
8  today, what you recall occurring?
9    A.   I personally recall him getting angry
10  because he wanted to use the vehicle, and I wanted
11  to go to work.  And he wasn't himself at the time.
12  I could tell he was under the influence.
13        Words was passed, strong words.  So
14  I got in my car, and I was driving to get away.
15  He said he thought I was going to run over him.
16  And he took out his .38 and shot through the
17  windshield and shot me.
18   Q.   Where did he shoot you?  You are
19  indicating.
20   A.   Upper -- upper chest area.
21   Q.   In your left upper chest area?
22   A.   Uh-huh (affirmative response).  But
23  it's -- the bullet is in my -- it is here.
24   Q.   The bullet is still inside of you?
25   A.   It is.

Page 17

1    Q.   Okay.  Mr. Graham wanted to use the
2  vehicle to go get more beer and cigarettes; did he
3  not?
4    A.   What he wanted to use it for, I'm not
5  sure.  But I know he wanted the vehicle, and it
6  just was not happening.
7    Q.   Was he carrying the .38 on his person,
8  or did he have to go inside and come back out and
9  shoot into the vehicle?
10   A.   He reached behind himself, and he pulled
11  out the gun --
12   Q.   So --
13   A.   -- and he shot.
14   Q.   -- it was in his back pocket or in his
15  back --
16   A.   The belt.
17   Q.   -- belt?
18   A.   Uh-huh (affirmative response).
19   Q.   Okay.  Had Mr. Graham ever been violent
20  with you before?
21   A.   Yes.
22   Q.   I believe he had tried to
23  strangle you before; is that correct?
24   A.   Yes.
25   Q.   Had he ever threatened to kill you

Davis Court Reporting, LLC   601.856.8889
marytodd@daviscourtreporting.com   877.496.0079

Jeanetter Graham
March 28, 2014

Page 18

1  before?
2      A.  Yes.
3      Q.  How many times did he -- had he
4  threatened to kill you prior to this November 2009
5  incident?
6      A.  Numerous.  I can't say exactly how many
7  times.  But if he was under the influence, I --
8  you know, what can I say?  He -- it was several
9  times.  I can't say exactly how many times.  But
10  that was when he was not himself.
11     Q.  Did he drink on a daily basis?
12     A.  No.
13     Q.  How often during a week would you say
14  that he got drunk?
15     A.  First of the month.
16     Q.  Was that when he got his pension check
17  in?
18     A.  Yes.
19     Q.  And would he typically use all of his
20  pension check on beer and cigarettes?
21     A.  Yes.  Recreational things.
22     Q.  What about the check from the VA?  Would
23  he typically use all of that on beer, cigarettes
24  and --
25     A.  He did not --

Page 19

1      Q.  -- recreational things?
2      A.  He did not receive a check from the VA.
3      Q.  Sorry.  The disability check?
4      A.  Yes.
5      Q.  Now, when you say recreational things,
6  did Mr. Graham ever use illegal narcotics?
7      A.  Yes.
8      Q.  What were those?  What types of drugs
9  did he use?
10     A.  It was crack cocaine, and I don't know
11  what else.
12         MR. SANDERS:  Were these provided to us?
13         MR. DARE:  I just got it yesterday.
14         MR. SANDERS:  Oh, okay.
15         MR. DARE:  That can actually be your
16     copy.
17  BY MR. DARE:
18     Q.  What I'm going to do, Ms. Graham, I'm
19  going to have marked as Exhibit 1 to your
20  deposition the entirety of some statements
21  provided to the Jones County DA that I just
22  received yesterday.  Have the fax line at the top
23  even.
24         And what I'm going to do -- the
25  copy that you have before you is actually a copy

Page 20

1  for your attorney.  I'm going to get you to review
2  the one that I have marked.  They're all the same,
3  but just so that we are certain that you're
4  reviewing the correct one.
5         (Exhibit No. 1 marked for
6         identification.)
7  BY MR. DARE:
8      Q.  Ms. Graham, I'm going to hand you what
9  has been marked as Exhibit 1 to your deposition.
10  If you could review that for me, please, ma'am.
11         MR. DARE:  Go off while she is reading
12     that.
13         (A short recess was taken.)
14  BY MR. DARE:
15     Q.  You can hang on to that.  I would like
16  to go over a few of the points in here.
17         And for the record, I am going to
18  flip to what appears to be a sworn statement by
19  you.  This is on -- in Exhibit 1, this is JC-869.
20         Is that your signature right above
21  name?
22     A.  Yes.
23     Q.  What is the date that you signed that?
24     A.  It has 11/12/2009.
25     Q.  And you see that it's a sworn statement;

Page 21

1  is that correct?
2      A.  Yes.
3      Q.  Do you remember giving a statement in or
4  around 11/12/2009?
5      A.  Yes.
6      Q.  And is the entirety of that statement
7  true, accurate, and correct?
8      A.  Yes.
9      Q.  Okay.
10     A.  Yes.
11     Q.  Okay.  Who is -- I'm flipping to the
12  next page, Page JC-870.
13         Who is Helen Wilson?
14     A.  That's a distant cousin.
15     Q.  Of yours or of Mr. Graham's?
16     A.  Of mine.  I don't even know how we're
17  related.  I just know we always called each other
18  cousins.
19     Q.  Okay.  Prior to the Tuesday when
20  Mr. Graham shot you, did you know that he had told
21  Helen Wilson that he was going to kill you?
22     A.  No.
23     Q.  When did Helen Wilson tell you that,
24  that Albert Graham had told her that he was going
25  to kill you?

Jeanetter Graham
March 28, 2014

Page 22

1   A.  This was after all of this had happened.
2   Q.  It was after he had shot you?
3   A.  Yes.
4   Q.  Okay.  And you noticed that her
5   statement is signed 11/16/2009 -- November 16th,
6   2009; is that right?
7   A.  Yes.
8   Q.  Did you read her statement back in
9   November of 2009?
10   A.  No.  This was my first time seeing the
11   statement.
12   Q.  Seeing her statement?
13   A.  Uh-huh (affirmative response).  But I
14   knew this Sumrall -- I believe that was his
15   name -- the investigative officer was going to
16   talk with her.
17   Q.  Prior to November of 2009, was Albert
18   Graham on any form of prescription medication?
19   A.  Yes.
20   Q.  Do you know where he had that
21   prescription medication filled?
22   A.  Other than the samples we got from the
23   doctor's office, he got from Wal-Mart.
24   Q.  Did he use any other pharmacy besides
25   Wal-Mart?

Page 23

1   A.  No.
2   Q.  No?
3   A.  No.
4   Q.  Now, would you typically go and pick up
5   the prescriptions at Wal-Mart or would he?
6   A.  It would vary.  Sometime he would go,
7   and sometimes I would go.
8   Q.  Okay.
9   A.  Now, before he got his disability, I --
10   we got samples on top of samples from the Heart
11   Care Center.  You know, they have drug reps come
12   in, and if they have patients that's indigent or
13   something, they would -- they would give them
14   samples.
15   Q.  But after he got on disability, he would
16   actually go to Wal-Mart and get the prescriptions?
17   A.  Yes.  They was $4.
18   Q.  When did he get on disability, if you
19   can recall?
20   A.  He got disability 2008.  He didn't have
21   any insurance or nothing.
22   Q.  Going back to an earlier statement that
23   you made about how he would spend his pension
24   money and his disability money.
25        Would you ever have to pay for his

Page 24

1   medication out of the money that you made?
2   A.  No.
3   Q.  Did you have to pay rent or car note or
4   anything out of the money that you made?
5   A.  The money I made?
6   Q.  Yes, ma'am.
7   A.  Yes.
8   Q.  Okay.  So, if I understand correctly,
9   you kept your money separate from the money that
10   he brought in for pension and disability; is that
11   right?
12   A.  Well, no, I wouldn't say that, because
13   Albert would give me money.  Albert would give me
14   money, and I would see about the household for his
15   mother, things that she needed, food and stuff,
16   you know.  And if she needed personal items, you
17   know, I would see about that.
18   Q.  So he would give you money for his mom?
19   A.  His mom and my daughter.
20   Q.  Okay.
21   A.  My daughter.  And he helped me buy her
22   car and stuff like that.  He seen about us.
23   Q.  Did he ever use your money for beer,
24   cigarettes, and crack cocaine?
25   A.  Not that I'm aware of.

Page 25

1   Q.  Okay.  When did he buy your daughter a
2   car?
3   A.  He paid down on my daughter a car.  I
4   paid the car notes.
5   Q.  Okay.  How much did he pay down on the
6   car?
7   A.  A thousand.
8   Q.  Did he have any bank accounts in or
9   around 2008 or 2009?
10   A.  I believe.
11   Q.  Who was the bank account through?
12   A.  Community Bank.
13   Q.  Was this a joint account that both you
14   and Albert shared, or was this his own private
15   account?
16   A.  It was his account.  And I was like POD
17   on it.  Because he had -- he got it before we got
18   married.
19   Q.  How long had y'all dated prior to 2008
20   when you got married?
21   A.  I had known him all of my adult life,
22   and -- 40 years.
23   Q.  You dated for 40 years before you got
24   married?
25   A.  Yes.  I was 16 years old.

Davis Court Reporting, LLC   601.856.8889
marytodd@daviscourtreporting.com   877.496.0079

Jeanetter Graham
March 28, 2014

Page 26

1  Q.  Okay.
2  A.  All my life.  My first and my last.
3  Q.  Were y'all dating when he was married?
4  A.  No.
5  Q.  Okay.  And you weren't dating when you
6  were married either?
7  A.  No.  We had -- he went his way.  I went
8  mine.  And we got back together after his divorce,
9  after my divorce.
10  Q.  So it wasn't straight for 40 years, it
11  was off and on for 40 years, basically?
12  A.  I've known him for 40 years of my life.
13  Q.  Right.  And maybe I used a term that I
14  shouldn't have.  When I say dating, how long prior
15  to you being married were you and Albert in an
16  exclusive relationship where you were only seeing
17  each other?
18  A.  I will say about -- when I got divorced,
19  we got back together.  And when he got divorced,
20  we got together.  Because I was not married at the
21  time.  It was in-between those times.
22  Q.  So you got a divorce in 1992?
23  A.  Uh-huh (affirmative response).
24  Q.  Yes, ma'am?
25  A.  Yes.

Page 27

1  Q.  Just wanted to make sure.
2    So you think that maybe you started
3  exclusively dating Mr. Graham -- Albert Graham
4  after your divorce in 1992; is that right?
5  A.  Yes.
6  Q.  Okay.  In 2010, were you still using the
7  name of Jeanetter Jones?
8  A.  In 2010?
9  Q.  Yes, ma'am.
10  A.  I was married in 2010.
11  Q.  Ms. Graham, what I am going to do is
12  have marked as Exhibit 2 to your deposition some
13  documents that your attorney produced to me.
14  A.  Uh-huh (affirmative response).
15  Q.  This is JG-6, 7 and 8.
16  A.  Okay.
17    (Exhibit No. 2 was marked for
18    identification.)
19  BY MR. DARE:
20  Q.  All right.  Ms. Graham, I'm going to
21  hand you what has been marked as Exhibit 2 to your
22  deposition.  Let's start on that first page.
23  A.  Okay.
24  Q.  You see, "To whom it may concern, I,
25  Jeanetter Jones"?  Is that you?

Page 28

1  A.  Yes.  And that was me in 2004, that's
2  how it was listed.  Okay.
3  Q.  Do you see at the top it says
4  10/18/2010?
5  A.  Okay.
6  Q.  Is that your writing?
7  A.  That is my writing.
8  Q.  All right.  So on 10/18/2010, had you
9  gone back to using the name Jeanetter Jones?
10  A.  No.
11  Q.  Okay.
12  A.  I was making the statement because that
13  was my name at the time when that happened in
14  2004.
15  Q.  So May 27, 2004, you were using the name
16  Jeanetter Jones?
17  A.  Yes.
18  Q.  And you didn't become Jeanetter Graham
19  until --
20  A.  2008.
21  Q.  -- 2008?  Understood.  Okay.  Why were
22  you arrested in May of 2004?
23  A.  I had -- was -- I had bought an old car.
24  And the old car didn't get all of the kicks out of
25  it, I guess.  It overheated.  And when it

Page 29

1  overheated, I parked at a friend of mine's place.
2  And I asked her if I could park the car there and
3  let it cool down because it was running hot.
4    And then as I parked the car, I
5  left the car and went and sat in the van with her.
6  And when I sat in the van with her and I was
7  telling her how good God has been to me because I
8  got two jobs private sitting.  And -- and that
9  wasn't very long after my mother had passed and
10  all.
11    So I was just telling her how good
12  God was.  And about the time I got how God is, all
13  hell broke loose.  They -- I mean, they come up
14  everywhere.  It was a bust -- a drug bust.  And I
15  was in the middle of all of this.  I was in the
16  wrong place at the wrong time.
17  Q.  You didn't know that she had drugs in
18  the van?
19  A.  No.  Didn't know.  She had kids in the
20  van.
21  Q.  Did she?
22  A.  Yes.
23  Q.  Oh, wow.
24  A.  I didn't know that.
25  Q.  All right.  So you were arrested.

8 (Pages 26 to 29)

Jeanetter Graham
March 28, 2014

Page 30

1    Now, who represented you in this
2  criminal proceeding in May of 2004?
3    A.  I had no representation.  Because I -- I
4  don't know.  I didn't have representation.  It
5  didn't go any further.  The charges was dropped,
6  because as they watched the film they saw exactly
7  what I said.  Like I said, I was in the wrong
8  place at the wrong time.
9    Q.  Uh-huh (affirmative response).
10    A.  And a bad situation.  But I -- by God's
11  grace, I made it through.  But like I said, I
12  stayed in that place.
13    Q.  So you had an initial appearance, and
14  then the charges were dropped; is that right?
15    A.  I got out on bond.  And then I
16  challenged the -- I challenged the whole thing by
17  writing letters and everything.  And the DA
18  reviewed the -- the video.  And he said he had no
19  evidence to convict me on these charges.
20    Q.  When was your bond set?
21    A.  Six days later.
22    Q.  Okay.  Now, you were arrested on May 27,
23  2004?
24    A.  I believe.  I do believe.
25    Q.  And you said you spent six days in jail?

Page 31

1    A.  Yes.
2    Q.  Okay.  Who arrested you?
3    A.  Oh, gosh.  I don't know.  I just know it
4  was a whole bunch of people.  I don't know.
5    Q.  Was it Laurel PD?  Jones County
6  Sheriff's Department?
7    A.  Well, Jones County Sheriff's Department
8  had a narcotic section.  I don't know.  84 West.
9  And, actually, Jones County, most of these people
10  that arrested me, they ended up getting arrested
11  themselves because they was doing underhanded
12  stuff.
13    I mean, this was the narcotics
14  squad or whatever.  They ended up getting
15  prosecuted and sent to jail and prison.
16    Q.  Okay.  But as you sit here today, you
17  don't know who arrested you or who -- I'm sorry --
18  what entity arrested you, whether they were with
19  the Mississippi Bureau of Narcotics or whether
20  they were with the Laurel PD or with the Jones
21  County Sheriff's Department?
22    A.  This was Jones County Sheriff's
23  Department, because I was in the county jail.
24    Q.  All right.  And then after six days, you
25  believe that you bonded out; is that right?

Page 32

1    A.  Yes.
2    Q.  Okay.  What medication were you taking
3  in 2004, that you claimed was not provided to you
4  in 2004?
5    A.  Me?
6    Q.  Yes, ma'am.
7    A.  Oh, I was taking insulin, Glucophage,
8  Lotensin.  I had a purse -- just like I got a
9  purse full right now, I had a purse full then.
10  And my meter, my Accu-Chek machine, everything.
11    Q.  Did you know anybody at the Jones County
12  Jail?  Who did you talk with at the Jones County
13  Jail in May of 2004 about your medication?
14    A.  Nurse Booth.
15    Q.  Okay.
16    A.  She is deceased.
17    Q.  You talked with Nurse Booth at the Jones
18  County Jail about your medication; is that
19  correct?
20    A.  That's correct.
21    Q.  What did Nurse Booth tell you about your
22  medication?
23    A.  She said she will see about it.
24    Q.  Did you ever -- well, Sheriff Hodge
25  wasn't the sheriff back in 2004, was he?

Page 33

1    A.  No.
2    Q.  Other than talking with Nurse Booth
3  about not receiving your medication in May of
4  2004, did you talk with anybody else with Jones
5  County or the Jones County Sheriff's Department
6  about your medication?
7    A.  Whoever passed the cell at the time.
8  And it could have been different officers, but I
9  don't remember their name.  But I did inquire
10  about my medication.
11    Q.  Okay.
12    A.  But Nurse Booth, like I said, after 72
13  hours I got my medicine.
14    Q.  Okay.  So you did get your medicine
15  after 72 hours?
16    A.  After 72 hours.
17    Q.  Okay.  Understood.
18    And that was after you spoke with
19  Nurse Booth?
20    A.  Yes.
21    Q.  Okay.  Going to the second page.  Who is
22  Jerald L. Ulmer, Sr.?
23    A.  That's -- that was an associate minister
24  at my local church and a family friend.
25    Q.  Now, you talked with Jerald -- is it

9  (Pages 30 to 33)

Jeanetter Graham
March 28, 2014

Page 34

1  Pastor Ulmer?
2      A.  Yes.
3      Q.  All right.  Have talked with Pastor
4  Ulmer at all about Albert Graham and any requests
5  for medication?
6      A.  During that time I asked him to
7  personally bring it down there.  And I -- and I
8  know Albert had asked also.  But I asked him
9  personally to bring it.  And it was within several
10  days.  I mean, I was out there in that old raggedy
11  trailer trying to find the medicine.  And first of
12  all I gave it to Terryl.  I do believe Terryl.
13  And he couldn't do it.  And then I asked Jerald, I
14  believe, in that manner.
15      Q.  Did they bring the medication back to
16  you?
17      A.  Yes.
18      Q.  Now, as part of the notice of
19  deposition, I also asked that you bring any pill
20  bottles that you sent them up there with, either
21  the Ulmers or anybody else.
22          Did you happen to bring those
23  today?
24      A.  No.  I discarded those.
25      Q.  Okay.

Page 35

1      A.  I didn't even know that I was going to
2  go ahead on and pursue this, but I -- every time I
3  thought about it, I just thought about maybe this
4  could help somebody else get their medicine on
5  time.  So...
6      Q.  So you do not have those pill bottles as
7  we sit here today?
8      A.  I don't have them with me, no.
9      Q.  Okay.  Now, those pill bottles, were
10  those prescriptions that you had picked up from
11  Wal-Mart?
12      A.  Those were prescriptions.
13      Q.  From Wal-Mart though?
14      A.  Yes.
15      Q.  Okay.  And as you sit here today, do you
16  know which -- well, for starters, how many pill
17  bottles did you send up there with either Terryl
18  or Jerald Ulmer?
19      A.  That would be at least three.  That was
20  the Coumadin, the Coreg, and the aspirin.  I had
21  it, but it wasn't many left in there to -- say at
22  least it was three.
23      Q.  Okay.
24      A.  Now --
25      Q.  Go ahead.

Page 36

1      A.  I'm sorry.
2      Q.  No.  It's okay.
3      A.  Those pill bottles, I would take the --
4  the samples and open the samples up, which it
5  wasn't no more than like four or five in a sample
6  bottle, and put them in a pill bottle.
7      Q.  Remember I asked before whether or not
8  you still received samples after Mr. Graham got on
9  disability?
10      A.  Yes.
11      Q.  And remember you said that he didn't get
12  samples anymore once he got on disability, that he
13  was able get the medication from Wal-Mart; is that
14  right?
15      A.  I didn't think I said he didn't receive
16  them.
17      Q.  Okay.  Let's -- and I want to be sure on
18  this.
19      A.  Okay.
20      Q.  Did he get any samples after he got on
21  disability?
22      A.  Yes.
23      Q.  From --
24      A.  He did.
25      Q.  -- who?

Page 37

1      A.  He got them from the Heart Care Center.
2  We had a nurse practitioner there named Parker, I
3  believe, last name.  And also there was a Joyce
4  White that worked there.  And she would check the
5  chart sometime.
6          And if I would tell her that he's
7  low in his medicine and stuff, she would go and
8  ask, you know, if we could get some medicine, and
9  we'd get some more samples.
10      Q.  And what heart clinic is this?  Do you
11  know the name?
12      A.  It is Hattiesburg Heart Center, but it
13  is at Heart Care Center in Laurel.
14      Q.  Do you know Nurse Practitioner Parker's
15  first name?
16      A.  Not right offhand.
17      Q.  Okay.  As you sit here today, do you
18  know whether or not Albert Graham took Coumadin,
19  Coreg, and Aspirin on a daily basis?
20      A.  He did take it.  But if he was drinking,
21  he didn't take that medicine.  Because we didn't
22  want something to kind of react to another, you
23  know.
24      Q.  And you said that he would drink for the
25  first part of the month after he got his

Davis Court Reporting, LLC   601.856.8889
marytodd@daviscourtreporting.com   877.496.0079

Jeanetter Graham
March 28, 2014

Page 38

1  disability and pension checks; is that right?
2  A. I did.
3  Q. And so he would typically go the first
4  half of a month without taking any medication, and
5  then he would take his medication the second half
6  of the month; is that correct?
7  A. No. I would say the first week. The
8  first half, no, but the first week. And I
9  wouldn't even give it a week. Maybe the first few
10  days. It didn't last long.
11  Q. In November -- Mr. Graham shot you on
12  November the 10th of 2009; is that right?
13  A. That sound correct.
14  Q. So that's getting into the second week;
15  is it not?
16  A. Yes.
17  Q. So at least in November, Mr. Graham was
18  still drinking into the second week; is that
19  right?
20  A. Yes.
21  Q. Okay.
22  A. More drinks -- more people that he hung
23  around with they like to drink, too, so he always
24  had somebody to drink with.
25  Q. Okay. Did you ever personally bring any

Page 39

1  medication up to the Jones County Jail for
2  Mr. Graham?
3  A. No.
4  Q. So any information about what was said
5  up at the jail or who brought medication up to the
6  jail or anything at the jail, that would come from
7  either Jerald or Terryl Ulmer; is that correct?
8  A. Yes.
9  Q. Okay. You have no personal firsthand
10  knowledge of anything that was said at the jail
11  with regards to Albert Graham's medication; is
12  that correct?
13  A. That's correct.
14  Q. Okay. Did you go to any office visits
15  at the Hattiesburg Heart Center or anywhere else
16  with Mr. Graham in 2008 and 2009?
17  A. Yes.
18  Q. Were you ever told why he was taking
19  Coumadin?
20  A. To thin his blood.
21  Q. Do know why he was taking -- or were you
22  told why he was taking the Coreg?
23  A. For his heart.
24  Q. Okay. Did they tell you what the Coreg
25  did for his heart?

Page 40

1  A. No.
2  Q. Okay. Was he -- I'm sorry. Go ahead.
3  A. That was the cardiac doctor that
4  requested the Coreg.
5  Q. Was he on any form of blood pressure
6  medication?
7  A. Yes. I believe that was Benazepril or
8  something like that.
9  Q. Okay.
10  A. It was -- yeah, Benazepril.
11  Q. When is the last time that you can
12  recall having anything filled at the Wal-Mart
13  pharmacy for Mr. Graham?
14  A. It was 2009.
15  Q. Ms. Graham, I'm going to have marked
16  here as Exhibit 3 to your deposition the Wal-Mart
17  pharmacy records for Albert Graham.
18  (Exhibit No. 3 marked for
19  identification.)
20  BY MR. DARE:
21  Q. All right. I'm going to hand you
22  Exhibit 3. I want to ask you a few questions
23  about these.
24  A. Okay.
25  Q. Please just let me know whenever you've

Page 41

1  had a chance to finish reviewing over that.
2  A. Yes.
3  Q. Okay. You ready?
4  A. I'm ready. May I say something?
5  Q. Yes, ma'am.
6  A. The -- the Benazepril must have been my
7  medicine I was thinking about, because I take it.
8  I have blood pressure medicine, too. But I know
9  he was given high blood pressure medicine, but I
10  don't know which one it was.
11  Okay. I was just correcting that
12  statement. Okay. I'm ready.
13  Q. Thank you.
14  Do you see Coumadin anywhere on
15  this list of medications?
16  A. The warfarin and Coumadin, I do believe,
17  is the same thing.
18  Q. All right. So his blood thinner on here
19  is listed as warfarin?
20  A. Uh-huh (affirmative response).
21  Q. And you believe that's the same thing as
22  Coumadin.
23  Do you see the fill date on there?
24  And this is on page JC-867.
25  A. Okay.

11  (Pages 38 to 41)

Jeanetter Graham
March 28, 2014

Page 42

1    Q.  There is a fill date of February 8th,
2  2008.  Do you see that?
3    A.  Uh-huh (affirmative response).
4    Q.  There is also a fill date of January
5  12th of 2009.
6        Do you see that?
7    A.  Yes.
8    Q.  And under each the quantity is 30; is
9  that right?
10    A.  I see that.
11    Q.  And under S-I-G under both of them it
12  says take one and a half tablets by mouth every
13  day; is that right?
14    A.  Yes.
15    Q.  Okay.  So if the quantity is 30, he
16  would have run out of his warfarin, if he took it
17  as directed, in less than a month, would he not
18  have, if he is taking one and a half tablets by
19  mouth every day?
20    A.  Yes.
21    Q.  And so he would have run out of his
22  Warfarin in or around February of 2009; is that
23  right?
24    A.  Yes.
25    Q.  Okay.  Now, going to the Coreg,

Page 43

1  C-O-U-R-E-G.
2        You see that anywhere on here?
3    A.  No.  But it must be another name for it.
4  I don't know.  It must be a generic name for it on
5  here.  But like I said, we got samples -- bags of
6  samples.  And I got that for quite sometime.
7    Q.  Do you have any samples still at home,
8  or did you throw all those away as well?
9    A.  No.  As you -- as I was opening the
10  samples, I put them in the bottles.  And, yes, I
11  discarded it.
12    Q.  So you don't have any samples even left
13  as of today's date?
14    A.  No.
15    Q.  Okay.
16    A.  Four years.
17    Q.  Now, aspirin -- you said that he was
18  taking aspirin as well.
19    A.  Uh-huh (affirmative response).
20    Q.  Aspirin is only listed here once.
21        Do you see that?
22    A.  Uh-huh (affirmative response).
23    Q.  Yes, ma'am?
24    A.  Yes.  But you could buy aspirin over the
25  counter, 81 milligrams.  OTC.

Page 44

1    Q.  I understand.
2        However, as far as prescription
3  aspirin, it is only listed that you picked it up
4  once; is that correct?
5    A.  I didn't know you can get prescription
6  aspirin.  The 81 milligrams, you buy those over
7  the counter, because that's what I take, 81
8  milligrams.  Okay.
9    Q.  And I'm certainly not a doctor and --
10    A.  Uh-huh (affirmative response.)
11    Q.  -- don't know what aspirin has to be
12  prescribed and what aspirin you can get over the
13  counter.
14    A.  Okay.
15    Q.  I do know that on JC-867, it does say
16  that you picked up aspirin on 10/24/2008.
17        Do you see that?
18    A.  Uh-huh (affirmative response).
19    Q.  Yes, ma'am?
20    A.  Yes.
21    Q.  And you see that the quantity under
22  aspirin is 30, and that he was required to take
23  one by mouth every day.
24        Do you see that?
25    A.  Yes.

Page 45

1    Q.  Okay.  So that he would have run out of
2  the prescription aspirin at least by November of
3  2008, if he was taking that as directed, would he
4  not have?
5    A.  He didn't run out, because I got him
6  over the counter aspirin at 81 milligram.  It was
7  the same.  I think the only difference in this one
8  it has a coating on it to protect the stomach.
9  That's what I think.  But he always took his
10  aspirin, because I kept him with 81 milligram
11  aspirin.
12    Q.  Were you putting the aspirin that you
13  purchased into the prescription bottle that you
14  had filled on 10/24/2008?
15    A.  No.  Aspirin is taken right out of the
16  bottle.
17    Q.  Can you tell me all -- the names of all
18  the samples that you were provided, the sample
19  medication?
20    A.  Well, it was Coumadin.  It was written
21  out Coumadin on the bottle.  It was the Coreg.  It
22  was some dig medicine.  It was -- I mean, just off
23  the top of my head.
24        And the question was?  Repeat it
25  again.

Davis Court Reporting, LLC   601.856.8889
marytodd@daviscourtreporting.com   877.496.0079

Jeanetter Graham
March 28, 2014

Page 46

1    Q.  I need know the name of all of the
2    samples that you were provided.
3    A.  At this time, that's all I can think of.
4    Q.  Okay.  So you think Coumadin, Coreg --
5    would Digoxin sound right?
6    A.  Yes.  D-I-G --
7    Q.  -- O-X-Y-N, I believe.
8    A.  I'm not sure.
9    Q.  I think it's -- I know it's a Y-N.
10   Yeah.  That sounds right.  We'll go with that.
11   A.  Okay.
12   Q.  Who is Bobby Graham?
13   A.  That is his brother.
14   Q.  And is Bobby Graham still living?
15   A.  He is.  I believe he's in Tennessee.  He
16   drives trucks.
17   Q.  Did you know that Bobby Graham went to
18   visit his brother, Albert Graham, on or around
19   November the 19th of 2009?
20   A.  He said he did.
21   Q.  Did Bobby Graham attempt to bring any
22   medication to Albert Graham that you know of?
23   A.  Not that I know of.
24   Q.  Who is Bryant Matthews?
25   A.  That's a drinking buddy.

Page 47

1    Q.  Did you know that Bryant Matthews went
2    and visited Albert Graham on November 19th, 2009?
3    A.  I know he probably did several visits.
4    Q.  Do you know if Bryant Matthews attempted
5    to bring any medication to Albert Graham?
6    A.  Not that I'm aware of.
7    Q.  Okay.  And his attorney was Michael
8    Mitchell.
9        Did you ever meet with his
10   attorney -- with Albert Graham's attorney, Michael
11   Mitchell, at any point in time?
12   A.  No.  He stated to me that he was not
13   going to use him.  That was his statement to me.
14   Q.  Okay.
15   A.  That's my phone.  It's yours?  Okay.
16   I'm sorry.
17   Q.  Do you know when you gave medication to
18   Jerald Ulmer to bring up to the jail?
19   A.  It had to be within -- I went looking
20   for it the next day.  So it had to be within the
21   next 24 hours after the whole incident.  I'll say
22   within -- within two days at least.
23   Q.  How long were you in jail -- excuse me.
24       How long were you in the hospital
25   after he shot you?

Page 48

1    A.  Just -- I got out that day.
2    Q.  You got out the same day?
3    A.  Got out the same day.
4    Q.  You got out the same day, and then you
5    went back to the trailer; and you immediately put
6    together medication to bring to Albert?
7    A.  I got out the same day.  I went home.
8    And then the next day I went and got the medicine.
9    Q.  Okay.  Did you ever speak with Albert
10   Graham while he was incarcerated at the Jones
11   County Jail in or around November of 2009 till
12   April of 2010?
13   A.  It was after the first of the year that
14   I visited my husband.  We would write letters.
15   And then I wanted to visit him against my
16   investigator's advice, because that's my husband.
17   I wanted to see how he was doing, how he was
18   looking, what he needed.
19       I put money on his books.  I talked
20   with him.  I prayed with him.  And I said, "You
21   sound like you're drowning."  I said, "You sound
22   like you bubbly, you know."  He said, "Well, I get
23   on the floor and do -- I can't walk like I want to
24   walk."
25       I said, "Well, you sound" -- he

Page 49

1    said, "They won't get me no -- no attention.  They
2    won't get me no medicine.  They won't even take me
3    to the doctor."
4        And I said, "Well, I -- I'll see
5    about that.  I'll see about that.  See about
6    that."  I said, "They don't know that you're a
7    heart person evidently."
8        He said, "I told them.  I done
9    asked them several times to get some -- get some
10   medicine or go to see somebody."  And I said,
11   "Well, it's a Christian lady here.  Her name is
12   Ms. Walls.  I'll talk with her" --
13   Q.  Stacey Walls?
14   A.  -- "to see about you getting some
15   treatment."
16       And I eventually talked with her.
17   And I believe that was the latter part of January.
18   And Stacey said, "I talked to the nurse.  And the
19   nurse will see about what she can do about getting
20   his medicine or his records from the Heart Care
21   Center so they can see exactly what he's on."
22       And then it was going to be like
23   right before Valentine's Day.  And he said, "I
24   still hadn't heard anything."  He said, "They said
25   they going to get my records."

13  (Pages 46 to 49)

Jeanetter Graham
March 28, 2014

Page 50

1    And, anyway, he said, "I signed the
2  form, and it has been over a week; and I hadn't
3  heard anything."  And then I talked to Stacey
4  again.  Stacey said, "We're going to get right on
5  it, because they supposed to have faxed that
6  information over here."
7    And, anyway, I do believe they
8  wouldn't even seen about it then unless I talked
9  to Stacey.  So she went out of her way to talk
10  with the nurse.  The nurse took a minute, but we
11  got that faxed information from the Heart Care
12  Center to see what he was on.
13    And then they sent him to a --
14  eventually sent him down to a -- the clinic in
15  Ellisville to see Donnie Scoggin, which is a nurse
16  practitioner, also.
17    Q.  Uh-huh (affirmative response).  Let's
18  take a step back.
19    When was the first time that you
20  went up to the Jones County Jail to visit Albert
21  Graham?  What date?
22    A.  The exact date?  I don't know an exact
23  date, but I believe it was in January.
24    Q.  Did you talk with Stacey Walls in
25  January of 2010?

Page 51

1    A.  I do believe it was the last week of
2  January.
3    Q.  How many times did you go up to the jail
4  from the moment Albert Graham was arrested and
5  placed in jail until the moment he died?  Was it
6  just that once in January?
7    A.  No.  It was January, and it was
8  February; and it was March.
9    Q.  Did you speak with Albert Graham each
10  time that you went up there?
11    A.  I did.
12    Q.  So you -- did you go multiple times in
13  January, February, and March or just once in
14  January and February and March?
15    A.  I believe it was several, because you
16  couldn't go but once a week.  And I'm not sure if
17  the visiting day was Saturday or Sunday.  But it
18  was at least twice a month I went.  At least.
19    Q.  Okay.
20    A.  Because I work.  I go to church.  I got
21  children and grandchildren.  I did what I could.
22    Q.  You are aware that Mr. Graham was taken
23  to a clinic and was placed on medication in March
24  of 2010; is that correct?
25    A.  Yes.

Page 52

1    Q.  Do you need to take a break?
2    A.  No.  I'm good.
3    Q.  Now, I've got or your attorney has
4  produced to me some letters -- one from Albert
5  Graham to you and one from you to Albert Graham.
6    Do you have any other letters
7  either from you to him or from him to you?
8    A.  I could have some.
9    Q.  As you sit here today, do you know of
10  any?
11    A.  I could have some old letters.  I have
12  to pull them out.  I call myself trying to save
13  them.
14    MR. DARE:  You can go off the record.
15    (A short recess was taken.)
16  BY MR. DARE:
17    Q.  I'm going to have marked as Exhibit 4 to
18  your deposition a letter dated 3/13/2010.
19    (Exhibit No. 4 marked for
20    identification.)
21  BY MR. DARE:
22    Q.  Okay.  I'm going to hand you what has
23  been marked as Exhibit 4.  Can you identify that
24  for me, please?
25    A.  Yes.  Just a minute.

Page 53

1    Q.  All right.  You notice on the first page
2  there's a fax line from Office Depot dated
3  7/1/2013 --
4    A.  Uh-huh (affirmative response).
5    Q.  -- 15:59.
6    Who faxed this document from Office
7  Depot?
8    A.  I'm sure I did.
9    Q.  And you see how it says that it is Page
10  4 of 4, right?
11    A.  Okay.
12    Q.  Do you know who you were faxing it to?
13    A.  It's a copy of a letter.
14    Q.  Do you know who you were faxing this
15  page to?
16    A.  I'm sure I was faxing a copy of it to my
17  attorney.
18    Q.  All right.  And you notice that the
19  first page says that it is Page 4 of 4, right?
20    A.  Okay.
21    Q.  If you flip to the second page, JG-26,
22  look at the top, and it says William Mullins.  And
23  then it says Page 1.
24    See that?
25    A.  Yes.

14  (Pages 50 to 53)

Jeanetter Graham
March 28, 2014

Page 54

1    Q.  Who is William Mullins?
2    A.  That is where I work.  That is his fax.
3    Q.  Do you have the original of this letter?
4    A.  I'm -- I'm sure I can probably dig it
5  out.
6    Q.  Well, and I -- to the extent that I
7  haven't, I believe I have asked in discovery for
8  copies of any and all similar letters.  If I
9  haven't, I'm going to.  If you can hold on to all
10  of the letters that you have either to Albert
11  Graham or from Albert Graham, I'm going to ask for
12  a copy of all of them.
13    A.  Okay.
14    Q.  Now, who is Victor?
15    A.  That is his nephew.
16    Q.  You see on the P.S., it says, "If Victor
17  has deposited a check" -- what does that say?  "I
18  won't be" --
19    A.  "I won't be mad.  I just want to know."
20    Q.  Okay.  What check is -- are you talking
21  about here?
22    A.  Whatever one came.  I started getting
23  them, and I deposit them when I -- but I had to
24  change the address to a P.O. Box.
25    Q.  So who is Bobby Ray?

Page 55

1    A.  Oh, that's his brother.  He's a little
2  wild.
3    Q.  Is that the one that's the --
4    A.  Truck driver.
5    Q.  The truck driver.  Okay.
6        So you think -- you didn't know if
7  Bobby Ray had gotten the -- his pension check or
8  not.  Is that what you were concerned about in the
9  P.S.?
10    A.  Yes.
11    Q.  Okay.  And on Page 1 and actually
12  through Page 2, you are talking about being able
13  to get ahold of his pension check.
14        Do you know if in or around March
15  13, 2010, if you were actually receiving the
16  pension check or if somebody else was getting it?
17    A.  It came to that address.
18    Q.  To what address?
19    A.  2469 Bush Dairy Road.
20    Q.  And by the tone of this letter,
21  evidently somebody else had picked up the check,
22  and you didn't get it in or around, I'm guessing,
23  March of 2010; is that right?
24    A.  That's correct.
25    Q.  Okay.  Who's Uncle Thomas?

Page 56

1    A.  That's my uncle.  That's my uncle and
2  his brother-in-law.
3    Q.  That explain -- it's Albert's
4  brother-in-law?  Okay.  Explain that one.
5    A.  Okay.  Albert's sister married my uncle.
6    Q.  Was that before or after y'all were
7  married?
8    A.  Decades before.
9    Q.  Okay.
10    A.  Albert's other sister married my brother
11  decades before.
12    Q.  Got you.
13        I take it Uncle Thomas didn't like
14  Albert too much?
15    A.  Well, he hurt me.  He hurt me.  And
16  that's one thing about you don't hurt women.
17    Q.  On this letter, first paragraph, it says
18  that you asked Captain Stacey to pay close
19  attention to -- to you, which I suppose is Albert?
20    A.  Uh-huh (affirmative response).
21    Q.  And get that nurse to check you.
22        Did you ever personally speak with
23  the nurse?
24    A.  Yes.  Stacey let me talk with her.
25    Q.  Was that before or after this 3/13/2010

Page 57

1  letter?
2    A.  I believe it was after.
3    Q.  Did this letter reflect the first time
4  that you had spoken with Stacey Walls?
5    A.  I spoke to Stacey prior to this letter.
6    Q.  Correct.
7        How many times prior to this letter
8  had you spoken with Captain Stacey Walls?
9    A.  I believe it was the end of January I
10  spoke with -- spoke with her.
11    Q.  Okay.  Other than Stacey Walls, did you
12  speak with anybody else with the Jones County
13  Sheriff's Department?
14    A.  It was between Stacey and the nurse.
15    Q.  Did you ever speak with Sheriff Hodge?
16    A.  I did not.  Sheriff Hodge is on one end
17  of the town, and the jail was on another -- way on
18  another.
19    Q.  Did you ever send Sheriff Hodge any
20  letters?
21    A.  No.
22    Q.  When you went to the jail, did they ask
23  you to sign in?
24    A.  Yes.  Everybody had to sign in.  That
25  was one of the procedures.

15  (Pages 54 to 57)

Jeanetter Graham
March 28, 2014

Page 58

1      Q.  Uh-huh (affirmative response).  Excuse
2  me if I have already asked this.
3            How many times do you think you
4  spoke with Stacey Walls prior to your 3/13/2010
5  letter?
6      A.  At least twice.  I talked to her and
7  told her about, you know, his problem.  And then
8  she said, "Well, I talked to the nurse, and I will
9  get you to talk to the nurse and -- and get the
10  information you need."
11           And then -- then when we didn't --
12  then when I didn't hear anything, I called again
13  and talked to her.  So at least twice.
14      Q.  Okay.  So the second time you talked to
15  her it was on the phone?
16      A.  Uh-huh (affirmative response).
17      Q.  Yes?
18      A.  Yes.
19      Q.  Thank you.
20      A.  Because I didn't understand why it took
21  a minute to get a fax when I -- it just takes
22  minutes to get a fax.  And it took about a week or
23  so to get the information.  Maybe two.  I don't
24  know.  I'm not sure on that one.
25      Q.  Now, in your letter, you make reference

Page 59

1  to the fact that you were personally going to get
2  the records from the heart center; is that right?
3      A.  Yes.
4      Q.  Okay.
5      A.  I had called when they said that they
6  didn't get it or hadn't received it.  You know,
7  they -- they put the blame on the Heart Care
8  Center, and the Heart Care Center said I faxed it.
9  And -- and, anyway, that was it basically.
10      MR. DARE:  Tell you what, give me just a
11  little bit of time.  I'm going to review over
12  a few things, and I may be done.
13           (A short recess was taken.)
14      MR. DARE:  Go back on.
15  BY MR. DARE:
16      Q.  All right.  Before the deposition, I
17  informed your counsel that I was going to ask you
18  one legal question.  And he may have to help out
19  with this.  But I want to make sure that you have
20  not filed any state law claims in your complaints.
21           And I'll ask today:  In your suit
22  against Jones County and Sheriff Alex Hodge, have
23  you filed any state law claims?
24      A.  Not that I'm aware of.
25      Q.  All right.

Page 60

1      MR. DARE:  Mr. Sanders, I would
2  respectfully ask and, if you could, can you
3  confirm that the plaintiff has not filed any
4  state law claims?
5      MR. SANDERS:  Not that -- we have not
6  filed any at this time that I'm aware of.
7      MR. DARE:  Thank you, sir.
8      MR. SANDERS:  Unless there's something
9  in the pleadings I missed.
10  BY MR. DARE:
11      Q.  In going through prediscovery
12  disclosures, I'm not sure I have seen a list of
13  witnesses.
14           Do you know anybody else not with
15  Jones County, but either friends, family members,
16  or other church members who went up to the Jones
17  County Jail to visit with Albert Graham other than
18  the ones that we have discussed here today?
19      A.  There is an associate minister named
20  Travis -- Eddie Travis.  I know he went.  And that
21  was his ex-wife's husband.  So Eddie Travis.
22      Q.  What did Eddie Travis go up there for?
23      A.  He's a friend.  A friend.
24      Q.  Did you speak with Eddie Travis after he
25  went up there to visit with Albert Graham?

Page 61

1      A.  I have talked with Eddie.  He was going
2  to the same church I was going to at that time.
3      Q.  What church were you going to at that
4  time?
5      A.  West Pleasant Grove Baptist Church.
6      Q.  Did Albert Graham go with you to church?
7      A.  Sometimes.
8      Q.  Okay.  What do you recall Eddie Travis
9  telling you about his visit with Albert Graham?
10      A.  He said he sound bubbly inside.
11      Q.  Anything else that you can recall?
12      A.  That he was truly sorry about what he
13  had done.  He was -- he said he was concerned
14  about me.
15      Q.  Do you know when Eddie Travis went up
16  there to visit with Albert Graham?
17      A.  I think Eddie went several times.  The
18  exact month and dates and stuff I cannot say for
19  sure.
20      Q.  Is there anything that you can recall as
21  you sit here today about what either Terryl or
22  Jerald Ulmer said about their visits with Albert
23  Graham?
24      A.  Well, Jerald had stated that he was real
25  quiet and withdrawn the first time.  And then he

16  (Pages 58 to 61)

Jeanetter Graham
March 28, 2014

Page 62

1    said the second time that he was -- he wanted --
2    he needed his -- well, that must have been the
3    first time, too, he said about his medicine. And
4    that he walked a lot. And, you know, he hadn't
5    got out on the yard to walk or anything. That
6    walking would help him out. And that he was
7    concerned about me, and he was concerned about his
8    mom.
9           And he was concerned about, you
10   know, his medicine. Because, you know, when
11   you -- he knew if he got built up with fluid, he
12   needed a fluid pill, you know, to get some of that
13   out from out of his chest. When he become bubbly,
14   I always told him, "If you feel like that, you
15   know you need to get some of that off of you, you
16   know."
17   Q.  Other than Dr. -- is it Mouannes?
18   A.  Mouannes.
19   Q.  Mouannes, M-O-U-A-N-N-E-S?
20   A.  Uh-huh (affirmative response).
21   Q.  Other than Dr. Mouannes, are all of
22   Albert Graham's healthcare practitioners that he
23   saw between say 2009 listed on these Wal-Mart
24   pharmacy records?
25   A.  I don't know. I don't know. He saw

Page 63

1    several doctors, you know, when we was back and
2    forth to the emergency room and stuff. He saw --
3    it's like Kimberly Dodd -- Dr. Kimberly Dodd.
4    She's a pulmonary doctor. And I think that
5    initial visit with the ER doctor was a Dr. David
6    Sullivan. But Kimberly Dodd had found a spot on
7    his lung.
8    Q.  Was that cancer?
9    A.  I -- I don't know. Because we did not
10   pursue it. He just --
11   Q.  When did she find that?
12   A.  I think it was 2007 or 2008. That's --
13   that's during the time of the CVA. And I think
14   the CVA came before the heart attack. The stroke
15   come before the heart attack. It was all right
16   behind each other.
17   Q.  Okay. Other than the one time in 2004,
18   have you ever been incarcerated in the Jones
19   County Jail?
20   A.  No.
21   Q.  Thank you.
22         Who is Janice Knight?
23   A.  She is a deceased friend. And that's
24   who I was sitting with when I got -- when all of
25   this happened to me in 2004.

Page 64

1    Q.  When did Ms. Knight die?
2    A.  It was this year. Couple of months ago.
3    Q.  Okay. Who is Curtis Ulmer?
4    A.  Curtis Ulmer?
5    Q.  Yes, ma'am.
6    A.  I think that was one of her employees
7    that kept her stock fed. One of her workers.
8    Q.  One of Janice Knight's workers?
9    A.  Uh-huh (affirmative response). He
10   worked -- he worked for her like feeding the hogs
11   and the cows and stuff like that.
12   Q.  Okay. Any relation to Jerald or Terryl
13   Ulmer?
14   A.  Not that I'm aware of.
15   Q.  Who is Abe Jones, Jr.?
16   A.  He has a nickname. We call him G.G. He
17   is a family friend.
18   Q.  Okay. No relation to your former
19   husband?
20   A.  Not that I'm aware of. No.
21   Q.  Okay. Who is Lou Ulmer?
22   A.  Lou Ulmer? She is a childhood friend of
23   mine. Her -- her son was incarcerated, and they
24   let him out because he had seizures real bad. He
25   never did get his medicine either.

Page 65

1    Q.  Okay. Did you ask Lou Ulmer to write a
2    letter to -- for you?
3    A.  I could have. I can't remember back
4    then. I could have. I don't know if she did or
5    not. I don't recall.
6    Q.  Okay. Did you ask Abe Jones, Jr., to
7    write a letter for you?
8    A.  Between -- I believe that was Abe or his
9    momma. And his momma is deceased, which is
10   Hill -- Hilma Jones. Uh-huh (affirmative
11   response). Because he almost died in jail without
12   getting his medicine.
13         Now, I don't know if that was under
14   the same sheriff or not. But I know he was there,
15   and he didn't get his medicine.
16   Q.  Okay. Did you ask Curtis Ulmer to write
17   a letter for you?
18   A.  I did.
19   Q.  And did you ask Janice Knight to write a
20   letter for you?
21   A.  I did.
22   Q.  Did you help any of -- whether it is
23   Janice Knight, Curtis Ulmer, Abe Jones, or Lou
24   Ulmer, did you help any of them write the letter?
25   A.  No.

17  (Pages 62 to 65)

Jeanetter Graham
March 28, 2014

Page 66

1     Q.   Were you sitting there with them as they
2  were writing the letter?
3     A.   No.
4     Q.   How did you go about asking them to
5  write a letter for you?
6     A.   Telephone.
7     Q.   And what did they do, just deliver it to
8  you?
9     A.   No.  I think I went by and picked it up.
10     Q.   Did they all have their letters
11  together, or did you just drive around to each of
12  their houses?
13     A.   Separately.
14     Q.   Between 2008 and 2009 until 2010, had
15  you ever filed for divorce from Albert Graham?
16     A.   No.
17        MR. DARE:  Ms. Graham, thank you for
18  your time here today.  I have no further
19  questions for you.
20        THE WITNESS:  Okay.  Thank you.
21        MR. SANDERS:  We are off the record.
22        (Ended at 11:08 a.m.)
23
24
25

Page 67

1        CERTIFICATE OF COURT REPORTER
2        I, Todd J. Davis, Court Reporter and
3  Notary Public in and for the County of Madison,
4  State of Mississippi, hereby certify that the
5  foregoing pages contain a true and correct
6  transcript of the testimony of JEANETTER GRAHAM,
7  as taken by me in the aforementioned matter at the
8  time and place heretofore stated, as taken by
9  stenotype and later reduced to typewritten form
10  under my supervision to the best of my skill and
11  ability by means of computer-aided transcription.
12        I further certify that under the
13  authority vested in me by the State of Mississippi
14  that the witness was placed under oath by me to
15  truthfully answer all questions in this matter.
16        I further certify that I am not in the
17  employ of or related to any counsel or party in
18  this matter and have no interest, monetary or
19  otherwise, in the final outcome of this matter.
20        Witness my signature and seal this the
21  3RD day of APRIL, 2014.
22
23        _____
          TODD J. DAVIS, CSR #1406
24  My Commission Expires:
25  March 27, 2017

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                   EASTERN DIVISION
   JEANETTER GRAHAM, ETC.          PLAINTIFF
3   VERSUS            CAUSE NO. 2:13CV67-KS-MTP
   ALEX HODGE, ET AL.            DEFENDANTS
4   Original:  Jason Dare, Esq.
5        CERTIFICATE OF DEPONENT
6        I, JEANETTER GRAHAM, certify that I have
7  examined the foregoing pages as to the correctness
8  thereof, and that after reading said pages, I find
9  them to contain a full and true transcript of the
10  testimony as given by me on MARCH 28, 2014, except
11  for the list of corrections, if any, attached on a
12  separate sheet with the page number, line number
13  and the desired correction/change.  Witness my
14  hand, this the _____day of_____, 2014.
15
16            _____
               JEANETTER GRAHAM
17               CERTIFICATE
18        Subscribed and sworn to before me, this
19  the ____ day of _____, 2014.
20
21
   My Commission Expires:   _____
22
   _____     Notary Public
23
24
25

Davis Court Reporting, LLC   601.856.8889
marytodd@daviscourtreporting.com   877.496.0079



**DENNIS L. BISNETTE**
ASSISTANT DISTRICT ATTORNEY

**J. RONALD PARRISH**
ASSISTANT DISTRICT ATTORNEY

**ANTHONY J. BUCKLEY**
District Attorney
Eighteenth Circuit Court District

P.O. BOX 313
LAUREL, MS 39441

TELEPHONE (601) 649-4606
FAX (601) 428-3191

# FAX COVER SHEET

TO: _Jean Coppenbarger_

ATTN: _____

FAX NO: _601-987-5353_

FROM: _Frances Wright_

RE: _Graham_

DATE: _3/27/14_          NUMBER OF PAGES ___4___
(Including Cover Sheet)

MESSAGE:

_I apologize for the delay - Deborah Warren, our Victim Advocate, has asked that I forward this information to you - Thank You - Frances Wgt_

**PRIVATE AND CONFIDENTIAL.** The Sender intends to communicate the contents of this transmission only to the person or entity to whom it is addressed. This transmission may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If the recipient of this transmission is not the designated recipient or the employee or agent responsible for delivering this transmission to the designated recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this transmission in error, please notify us immediately by telephone, and promptly return the original transmission to us at the address above.

JONES COUNTY MISSISSIPPI

03-27-'14 13:48 FROM- JCDA                6014283191               T-823  P0002/0004 F-995



**ANTHONY J. BUCKLEY**

$\mathfrak{District\ Attorney}$

$\mathfrak{Eighteenth\ Circuit\ Court\ District}$

**DENNIS L. BISNETTE**
ASSISTANT DISTRICT ATTORNEY

**J. RONALD PARRISH**
ASSISTANT DISTRICT ATTORNEY

P.O. BOX 313
LAUREL, MS 39441

TELEPHONE (601) 649-4606
FAX (601) 428-3191

April 7, 2010

Investigator Don Sumrall
Jones County Sheriff's Dept.
P.O. Box 185
Laurel, MS  39441

*Re:*   *Albert Lee Graham*
       *#2009-256-2*
       *Aggravated Assault*

Dear Don:

Please be advised that I am **declining** the above referenced matter against Albert
Lee Graham at this time on the grounds the defendant is deceased.

Please mark your files and records appropriately.

Sincerely,

Dennis L. Bisnette
Assistant District Attorney

dlb /skh

cc:  Faye Norton Brent
     Capt. Stacy Walls

JONES COUNTY MISSISSIPPI

JC 000868

03-27-'14 13:49 FROM- JCDA          6014283191          T-823  P0003/0004 F-995

# JONES COUNTY SHERIFF'S OFFICE
## VOLUNTARY STATEMENT

THIS STATEMENT WAS TAKEN AT THE JONES COUNTY SHERIFF'S OFFICE
ON NOVEMBER 12, 2009 AT 10:18 A.M. FROM THE FOLLOWING INDIVIDUAL:

NAME:       Jeanetter Graham
ADDRESS:  2469 Bush Dairy Rd., Laurel, MS 39443
PHONE #:
DOB:
SS#:

Last Tuesday morning ,about 8:45 my husband, Albert Graham, had used the car to go
to the store to get more beer, cigarettes and stuff. After he came back with the car, I
was getting ready to go to work. I had fixed his mamma's breakfast and fed her. He
ask to use the car again and I said no I gotta go to work and I have a doctor's
appointment. He said F..... you cuz, I'll get to where I need to go and I am through with
you. I said, thank you Jesus, praise the Lord, I was saying these things sarcastically. I
also said Glory to God. He was standing by the driveway, the second driveway. That's
the way I was going out. I was going fast but I was not trying to hit him. He got up by
the hedges, the azalea bushes I think they are, as I was getting ready to pass him; he
shot me. I stopped the car, I was bleeding. I felt the burning sensation in my chest and
blood was pumping everywhere. He came up to the car after he shot me and I said you
shot me. I got my lab jacket and started pressing to apply pressure. I knew to do that
from my training. I said Albert you shot me, why did you shoot me. You know I
wouldn't hurt you. He said I didn't know what to believe, I thought you were going to run
over me. I said Albert why did you have to shoot me. You could have shot the car or
the wheels, why did you shoot me. He got in the car and I asked him to take me to the
hospital. I was bleeding to death. I was praying dear God, forgive me for my sins,
prepare me a place in heaven if that's your will. Please see about my children and
grandchildren. I said Lord, forgive Albert for what he has done to me for no reason.
Albert drove me straight to the hospital. He said I know they are going to arrest me but
I don't care. I'm gonna tell them you was trying to run over me. He is a killer. He
choked me once before until I almost passed out. I believe it was this year and I
contacted the Sheriff's Department. There have been numerous occasions I have
called the Sheriff's Department. He told Helen Darby Wilson last Monday night that he
was going to kill that bitch, meaning me. End of statement.

_____          11-12-2009
        NAME                              DATE

_____
        WITNESS

ID # 91393
**FAYE NORTON**
Commission Expires
Oct. 16, 2012

Sworn to and subscribed before me this the 12th day of November 2009

_____
        NOTARY

My Commission Expires: Oct. 16, 2012

JC 000869

03-27-'14 13:49 FROM- JCDA                    6014283191              T-823  P0004/0004 F-995

# JONES COUNTY SHERIFF'S OFFICE
## VOLUNTARY STATEMENT

THIS STATEMENT WAS TAKEN AT THE JONES COUNTY SHERIFF'S OFFICE
ON NOVEMBER 16, 2009 AT 9:31 A.M. FROM THE FOLLOWING INDIVIDUAL:

NAME:      HELEN WILSON
ADDRESS:   305 UNION LINE RD., LAUREL, MS 39443
PHONE #:
DOB:
SS#:

Last Wednesday night, I was at Short Stop in Soso putting gas in my truck and Albert
Lee Graham pulled up with someone and got out of the truck and ask me if I would drop
him off at home. He said he would put gas in my truck for me. I told him yes I will. We
left Short Stop and he wanted to go by the Shady Oak School to some man's house.
The man's car was not there and we did not stop. I went by my cousin's house on
Shady School Rd where everybody was going to play cards and dominoes. We stayed
there about 10 minutes. Just before we left, we were sitting in the vehicle and I said I
really don't have to take you home, there's your wife. She was parked behind me. He
got out of the car to go ask her if she would drop him off at home. She kept pulling off
and he kept walking toward her. He was saying, hold up, let me get in the car with you.
I heard her say, no Albert Lee, you had my car all day long. Albert got back in my truck
and said come on please take me home. He said, as we drove down the road, I'm tired
of her taking my kindness for weakness. I'm gonna kill that bitch. He never said
anything else until I got him home and he said thank you cuz. He got out of my truck
and that's the last time I saw him. End of statement.

_____          11-16-09
           NAME                                DATE

_____
           WITNESS

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 91393
FAYE NORTON
Commission Expires
Oct. 16, 2012
JONES COUNTY

Sworn to and subscribed before me this the 16th day of November, 2009.

_____
           NOTARY

My Commission Expires: Oct. 16, 2012

JC 000870