Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

JEANETTER GRAHAM, ETC.                    PLAINTIFF

VERSUS                   CAUSE NO. 2:13CV67-KS-MTP

ALEX HODGE, ET AL.                       DEFENDANTS
*******************************************************
DEPOSITION OF TERRYL M. ULMER
*******************************************************
APPEARANCES NOTED HEREIN

DATE: MARCH 28, 2014
PLACE: WYATT, TARRANT & COMBS
4450 OLD CANTON ROAD, STE 210
JACKSON, MISSISSIPPI
TIME: 11:26 A.M.


REPORTED BY: TODD J. DAVIS
CSR #1406, RPR




DAVIS COURT REPORTING
Post Office Box 44
Madison, Mississippi 39130
(601) 856-8889
www.daviscourtreporting.com

Terryl Ulmer
March 28, 2014

Page 2

```
 1   APPEARANCES:
 2
 3   EVERETT SANDERS, ESQ.
     Sanders Law Firm
 4   Post Office Box 565
     Natchez, Mississippi 39120
 5
 6
        COUNSEL FOR PLAINTIFF
 7
 8
     JASON DARE, ESQ.
 9   Wyatt, Tarrant & Combs
     Post Office Box 16089
10   Jackson, Mississippi 39236
11
12      COUNSEL FOR DEFENDANTS
13
14
15
16
17
18
19
20
21
22
23        TODD J. DAVIS
        DAVIS COURT REPORTING
24        Post Office Box 44
        Madison, Mississippi 39130
25         (601) 856-8889
```

Page 3

```
 1                INDEX
 2   Style and Appearances ................  1
 3   Index ....................  3
 4   Examination by Mr. Dare ...............  4
 5   Examination by Mr. Sanders ............ 21
 6   Further Examination by Mr. Dare ....... 22
 7   Certificate of Court Reporter ......... 24
 8
 9   EXHIBITS:
10       Exhibit No. 1 ..................... 18
```

Page 4

```
 1           TERRYL MONKEITH ULMER,
 2   having been first duly sworn, was examined and
 3   testified under oath as follows:
 4   EXAMINATION BY MR. DARE:
 5       Q.  Can you state your full name for the
 6   record, please, sir?
 7       A.  Terryl Monkeith Ulmer.  Terryl,
 8   T-E-R-R-Y-L.  Monkeith, M-O-N-K-E-I-T-H.  Ulmer,
 9   U-L-M-E-R.
10       Q.  And, Reverend Ulmer, have you ever given
11   a deposition before?
12       A.  No, I haven't.
13       Q.  Basically, this is my opportunity to sit
14   down and talk with you about what you remember
15   about Mr. Albert Graham and, specifically, the --
16   any information you may have about the suit that
17   Ms. Jeanetter Graham has filed against the Jones
18   County Sheriff's Department.
19           As you notice, we have a court
20   reporter over here taking down everything that you
21   and I say.  Lot easier on him if you don't answer
22   while I'm still asking.  Also, if you say uh-huh
23   or uh-uh, which I know a lot of people in the
24   South do, I will ask you to say yes or no, so that
25   it looks better on the record.
```

Page 5

```
 1           If you ever don't understand one of
 2   my questions, please, ask me to rephrase it.
 3   Attorneys have a -- are notorious for asking
 4   sometimes horrible questions.  And so -- but if
 5   you answer, I'm going to assume that you
 6   understood the question.
 7           For starters, I have noticed that
 8   you are a reverend.  Where -- where do you --
 9       A.  I pastor at Mt. Vernon Missionary
10   Baptist Church in Soso, Mississippi.
11       Q.  Where is Soso?  That's in Jones County?
12       A.  In Jones County, exactly.
13       Q.  How long have you been doing that?
14       A.  This is my fourth year.
15       Q.  Have either Albert Graham or Jeanetter
16   Graham -- have either one been -- ever been in
17   your congregation?
18       A.  Well, Sister Graham -- Jeanetter Graham,
19   she's part of the -- my home church.  And I was a
20   associate pastor at that church during that time.
21   So we actually fellowshipped together, I guess you
22   would say, per se.
23       Q.  Where was that home church?
24       A.  West Pleasant Grove Missionary Baptist
25   Church.
```

2 (Pages 2 to 5)

Terryl Ulmer
March 28, 2014

## Page 6

1   Q.  Okay. Did Albert Graham ever go to West
2  Pleasant Grove Missionary Baptist Church?
3   A.  He did. Wasn't often, but he did attend
4  occasionally. I think -- I want to say they got
5  married there, if I'm not mistaken.
6   Q.  If I understand you correctly --
7   A.  I take that back. No. They didn't get
8  married there. I think they got married at
9  another church. So...
10   Q.  I believe, according to some records I
11  received, that you actually went up to the jail to
12  speak with Albert Graham, did you not?
13   A.  Yes, I did.
14   Q.  Do you remember when that was?
15   A.  It has been several years ago. It was
16  actually after the incident that him and her had.
17  And I try to as a minister to go and visit people
18  that I know that I affiliate with in the church
19  atmosphere and also as a personal atmosphere.
20       But, yes, I did go up to speak with
21  him on occasion. I think maybe twice I went up to
22  see him and visit him during that time.
23   Q.  Did you first go up there at the request
24  of Jeanetter Graham, or had you just heard that he
25  was incarcerated and go up to see him?

## Page 7

1   A.  Well, I actually went up there myself to
2  visit him mainly because he's -- he's a relative,
3  and he was a neighbor. And, also, you know, I
4  knew him. And I just try to keep tabs with people
5  that I associate and know personally when they are
6  incarcerated.
7   Q.  Did he tell you anything about what
8  occurred between him and Ms. Graham?
9   A.  Well, he did. He just said it was a
10  mistake. And I don't really go into details when
11  dealing with issues like that. I just try to
12  encourage them and help them do the right thing
13  and make the right decision and turn to the Lord
14  and ask for forgiveness for what they have done.
15       So, you know, I -- he tried. And I
16  really don't pry into personal business like that.
17  My main thing is just to make sure he's got a
18  stable mind and had his bearings straight at that
19  point.
20   Q.  Did you bring anything to the jail with
21  you when you went on either occasion?
22   A.  Well, the second time when she asked was
23  I going to visit him, and I went and asked if she
24  suggested -- I wouldn't say it was a suggestion.
25  She just asked if I was going there. And I told

## Page 8

1  her I was. And she asked if I would take him some
2  personal items.
3       And if I can remember exactly
4  the -- I think she did say his medication, because
5  when she gave it to me, it was in a -- one of
6  those plastic grocery Wal-Mart like type bags,
7  kind of wrapped up. So I didn't -- I didn't look
8  into it or pry into it.
9       I just -- when I got there, I said
10  that she sent some items that she thought he would
11  need. And I think they looked through it and said
12  that they couldn't accept it from that point.
13   Q.  Now, when you say they, do you know who
14  you're talking about?
15   A.  Yeah. The jailer, I guess, you would
16  call him, the person at the front desk. When I
17  went to check in or ask to visit him, they said
18  they wasn't able to take outside items to give to
19  him.
20   Q.  So you didn't know really what was in
21  the bag?
22   A.  Well, I didn't. I knew, but I didn't,
23  per se, put my eyes on it. I knew from what she
24  gave me. And I, you know, I took her at her word
25  that it was what it was, because it was some

## Page 9

1  underclothes that I could very well say that I
2  knew -- knew it was pill bottle in there. What it
3  was, I don't know, because I didn't open it and
4  look in it because it was personal.
5   Q.  Uh-huh (affirmative response).
6   A.  And so I knew it was some clothing and
7  also some pills, some medication.
8   Q.  Now, you said it was a pill bottle.
9       Was it only one?
10   A.  I think it was maybe two. Two pill
11  bottles.
12   Q.  Okay. And as you sit here today, do you
13  know the names of any of the medication in those
14  pill bottles?
15   A.  No, I don't know. Like I say, I
16  didn't -- I didn't look in the bag. I don't -- I
17  didn't pry to see what it was.
18   Q.  Did they look like prescription pill
19  bottles?
20   A.  Well, I knew that he was on -- he was
21  taking medication, because like I say, we talked
22  because we were neighbors.
23       And we would talk just about every
24  day, because I would see him. And I knew that he
25  was taking -- he was taking medication, so I just

Davis Court Reporting, LLC   601.856.8889
marytodd@daviscourtreporting.com   877.496.0079

Terryl Ulmer
March 28, 2014

## Page 10

1. assumed that it was his medication.
2. Because she had -- she wanted to
3. get it to him pretty bad because she said he
4. needed it. Because he was dealing with some
5. health issues at the time, and so that was -- that
6. was that.
7. Q. And do you know -- and you don't know
8. when the second time was that you went up there to
9. visit with him? Even a month?
10. A. Well, the first time I went there -- let
11. me think. When it first happened, it was maybe a
12. day after it happened I went there to visit him.
13. Then the next visit was pretty shortly after that.
14. I want to say it was around -- I hate to get my
15. dates wrong, because, like I say, it has been a
16. while and --
17. Q. If he was --
18. A. -- it might have been around April,
19. May, somewhere in there.
20. Q. He was arrested and incarcerated
21. November the 10th of 2009.
22. A. Wow.
23. Q. And he died April of -- April 6th of
24. 2010. Those are the dates that we are --
25. A. Okay.

## Page 11

1. Q. -- working with. Would you --
2. A. Well, I knew -- I know it was fairly
3. warm. Wasn't hot about this time of the year was
4. the second visit. So it had to be, you know, if
5. he was arrested in November, I saw him in November
6. when he first -- so it was around March when I saw
7. him. Shortly before he died.
8. Q. All right. So around March of 2010, is
9. when you actually brought the medication --
10. A. Right.
11. Q. -- up to the jail?
12. A. Right.
13. Q. Okay. Do you recall what the jailer
14. looked like that you spoke with? Male or female?
15. A. It was two. It was a male and a female
16. there. I actually knew both of them because they
17. went to high school with me. Well, one of -- the
18. guy did, went to high school with me. I want to
19. say his name was Maurice. It was -- he had a twin
20. brother. Laurice and Maurice, I believe. It was
21. one of those two. And the girl was --
22. Q. Do you know their last name?
23. A. I don't.
24. Q. Okay.
25. A. I can't remember the girl's name. I

## Page 12

1. know her as well, but I can't remember her name --
2. to call her name. So...
3. Q. Now, were they working the front door?
4. A. Well, the lady -- the young lady was
5. working the front. Well, actually, I guess both
6. of them were considered working the first, because
7. they would make rounds.
8. And he was just actually there
9. before he make -- made his rounds, because he said
10. he had to make the rounds, and he would have him
11. come up to the visiting part on his way through.
12. So both of them actually worked up there on that
13. shift during that time.
14. Q. Now, when the guards told you that they
15. could not accept outside medication, what did you
16. do with the bag?
17. A. I just brought it back to Ms. Graham and
18. told them that she -- you know, they wouldn't
19. accept it.
20. Q. And immediately that day in March of
21. 2010, when the guards -- when you had the bag with
22. you inside the jail and said, "I would like to
23. deliver this to Albert Graham," the guards say,
24. "We can't accept outside medication," did you walk
25. right back out to your car at that time?

## Page 13

1. A. No. I actually -- I think he
2. actually -- if I -- like I say, it has been a
3. while. I want to say either he kept it till after
4. I finished visiting with him or I don't know if I
5. took it back. Because it was behind the glass. I
6. wouldn't be able to have physical contact with
7. him.
8. Q. Right.
9. A. So I don't know if I had it with me when
10. I went there and just sat it down or he kept it
11. and gave it back as I was departing. But I know
12. that he said that they couldn't accept any outside
13. personal items or things from anyone to give to
14. him.
15. Q. You had obviously met Mr. Graham prior
16. to him being incarcerated; is that right?
17. A. Right.
18. Q. Did you notice anything different about
19. Mr. Graham when you visited with him in March, for
20. instance, of 2010?
21. A. Well, actually, he looked a lot cleaner.
22. Well, not cleaner, but, you know, more at a calmer
23. state, so to speak. He looked -- he looked sane.
24. He didn't seem to me to have any problems, so to
25. speak.

Davis Court Reporting, LLC   601.856.8889
marytodd@daviscourtreporting.com   877.496.0079

Page 14

1   He was calm. He knew he had made a
2   mistake. He regretted he made that mistake and --
3   but he never mentioned anything to me as, you
4   know, physical wrong with him or mentally wrong
5   with him or anything like that, illness.
6       Q. When you say he looked cleaner and
7   calmer, were you aware of his addictions --
8       A. Yes.
9       Q. -- when he was in the community?
10      A. Yeah. I knew that he had a drinking
11  problem because, like I say, he lived next door
12  and -- he's always shown me respect and just -- I
13  mean, when I say cleaner, he was more, per se, as
14  not as rugged looking as he was during every day.
15      Because he did a lot of walking the
16  street, or he would go through the woods and hunt
17  and just things of that nature. And he just was a
18  lot cleaner looking as far as what he had on and
19  how he -- was shaving or his hair. Just cleaner,
20  you know.
21      Q. Right.
22      A. So.
23      Q. Now, living next door to him did you
24  also know that he had an addiction to crack
25  cocaine?

Page 15

1       A. No, I didn't. I have heard, but I, per
2   se, not physically, like I say, seeing him do
3   anything, because he respected me.
4       I just, you know, you could hear a
5   lot of things and --
6       Q. Sure.
7       A. -- and people say a lot of things. So,
8   you know, until I know for myself or see for
9   myself, I don't usually go on what people say
10  about a person. But I have heard that, you know,
11  he did have a drug addiction. But I knew that he
12  drank. I saw him drink. But other than that,
13  that was it.
14      Q. How often would you see him drinking?
15      A. Not often. He might have a can of beer
16  or something. When I am outside mowing the yard
17  or something or he would walk out at the edge of
18  the adjoining yards and, you know, just kind of
19  talk to me. Because his dog -- he had a bunch of
20  dogs, and he would call them from over there. And
21  so he would have a can of beer occasionally, I
22  would say, when I would see him.
23      Q. Okay. Were you at home or do you have
24  any firsthand knowledge of the incident that
25  occurred in November of -- specifically November

Page 16

1   10th, 2009, when he shot Ms. Graham?
2       A. No. I actually -- I wasn't at home. I
3   don't -- I don't think. No. I wasn't at home. I
4   got a call that he did. And immediately I
5   called -- I tried to call Ms. Jeanetter. And then
6   I called her or her cousin or sister -- cousin or
7   something, Michelle Barnett. And that's when she
8   told me what happened. They were at the hospital
9   at the time.
10      So I didn't -- I don't -- I wasn't
11  actually at home when it happened, because it was
12  right there, I guess, at home. Because if I had
13  known it, I would have, you know, seen it or heard
14  it, but I wasn't there at that time.
15      Q. Did you go visit Ms. Graham in the
16  hospital?
17      A. Yeah. I went -- I went to see her at
18  the Laurel Emergency Room. And, you know, she
19  just explained what happened. And I prayed for
20  her, and that was it. I left.
21      Q. Had you ever seen Albert Graham threaten
22  Ms. Graham prior to that day?
23      A. No. No. I never seen him threaten her,
24  but I knew they had arguments. You know, every
25  family has arguments. I would kind of hear them

Page 17

1   every now and then, you know, yell or fuss or
2   something like that. But it wasn't to a point to
3   where I would say he was abusive or he was
4   threatening or -- from my knowledge.
5       Q. Are you related to Curtis Ulmer?
6       A. Curtis Ulmer, that is my uncle.
7       Q. Okay. Are you related to Lou Ulmer?
8       A. Lou Ulmer?
9       Q. L-O-U. Female?
10      A. That's, I guess, Lou Aldridge Ulmer
11  or -- would it be that? I know a Lou. I didn't
12  know her last name was Ulmer. But there's --
13  there's several sets of Ulmers right around that
14  part. And from my knowledge, I don't think we are
15  related. But I know of them.
16      Q. Okay. I think she has a son. Perhaps
17  Hilma Jones?
18      A. Emma Jones?
19      Q. Right.
20      A. I am not familiar with -- with him --
21  with those.
22      Q. Okay. You wrote a letter dated
23  10/14/2010 and addressed it "to whom it may
24  concern."
25      Who asked you to write the letter?

## Page 18

1  MR. SANDERS: I don't think that's the
2  correct date.
3  MR. DARE: 10/14/2010?
4  MR. SANDERS: Yeah. Because I have it
5  as 10/5/10. It is Jerald Ulmer, right?
6  MR. DARE: Terryl.
7  MR. SANDERS: Terryl. Oh, I'm sorry.
8  Okay.
9  A. Can I see that letter?
10 BY MR. DARE:
11 Q. Yes, sir. In fact, what I will do, this
12 is JG-8. And it is marked -- it will be marked as
13 Exhibit 1 to your deposition.
14         (Exhibit No. 1 marked for
15         identification.)
16 BY MR. DARE:
17 Q. You can take the time to look through
18 that. I think that date is wrong.
19 A. I think that date is wrong, if I'm not
20 mistaken.
21 Q. Well, let's start from the beginning.
22         Is all of that your handwriting?
23 A. No. That is my signature. But it is
24 not my handwriting. My wife might have wrote it
25 for me.

## Page 19

1  Q. So the only part on here is your
2  signature?
3  A. Just my signature, exactly.
4  Q. And as you sit here today, do you know
5  who actually wrote this?
6  A. I'm assuming my wife, because if it's
7  anything that I signed, she would write it for me.
8  She does a lot of writing and typing for me, and I
9  sign it. But this is definitely not my
10 handwriting.
11 Q. And you don't know who put the date up
12 there as 10/14/2010?
13 A. No.
14 Q. Do you know why this document was
15 created, whether in October of 2010 or at any
16 other time?
17 A. Well, I knew that she was upset about
18 not being able to get him his prescriptions and
19 get his medication. And like I say, she might
20 have asked if I would write a letter stating that
21 I had -- did deliver or tried to attempt to
22 deliver it. And I told her, you know, I would.
23         And I'm assuming my wife wrote
24 this, and I signed it. So that's -- yeah. I
25 mean, everything happened as it states. But, you

## Page 20

1  know, like I say, I -- this is not my handwriting.
2  But it is my signature, so.
3  Q. Have you -- well -- and please don't
4  take off with that.
5  A. Okay.
6  Q. Have you ever tried to deliver
7  medication to anybody else at the Jones County
8  Jail?
9  A. No. Like I say, there are several
10 people -- I usually go down there and minister. I
11 was with one group before that we actually did
12 devotion for the jailers in there. I visited, I
13 guess, one of my members that was incarcerated
14 there similar to that -- this type of incident
15 dealing with domestic.
16         So, you know, I go there and visit
17 often. But I never have been asked to take or
18 deliver any clothes or meds to this point. Like I
19 say, this was the first time I ever was asked to,
20 you know, take personal items and medication down
21 to a --
22 Q. Have you ever been asked since that
23 time?
24 A. No. No.
25 MR. DARE: Reverend Ulmer, I appreciate

## Page 21

1  you coming up for this deposition here today.
2        And I am going to tender the witness.
3  EXAMINATION BY MR. SANDERS:
4  Q. I have a couple of questions.
5        Did you have any discussions with
6  Mr. Graham about not being able to deliver the
7  medication?
8  A. I did. I did tell him I tried. His
9  wife sent him some things. Sent him his
10 medication. And I told him that I wasn't able to
11 deliver it to him. Well, they weren't able to
12 give it to him -- any outside things to him. So
13 he did ask me if I brought his meds and some
14 underwear and clothing.
15 Q. Uh-huh (affirmative response).
16 A. But, I think, if I can remember, there
17 was some underclothing and stuff like that.
18 Q. Okay. Did he seem concerned about his
19 medication?
20 A. At that point, he asked about it. But
21 he wasn't -- he wasn't to a point to where he was
22 just furious about not having it. He asked if she
23 sent it, and I said, "Yeah. She sent it," but I
24 wasn't -- they wouldn't allow me to give it to
25 him --

Terryl Ulmer
March 28, 2014

Page 22

1  Q. Okay.
2  A. -- other than that.
3  Q. All right.
4      MR. SANDERS: I don't have anything
5  else.
6  FURTHER EXAMINATION BY MR. DARE:
7  Q. Do you know, as you sit here today, why
8  Ms. Graham herself didn't bring the medication up
9  to him in March of 2010?
10  A. No, I don't. I don't. I know she asked
11  if I would take it. Well, I take that back. I
12  don't think that with the circumstances that they
13  were going through that she was allowed to -- to
14  visit him at that point. I don't know.
15      But I knew that she knew that I
16  would go up there and that I would have more, per
17  se, as being a minister and able to visit him more
18  regularly than she would. I think it was during
19  the time that visiting hours weren't permitted.
20  And -- and they do allow clergymen to visit at any
21  time of the day or any point of the -- that they
22  wanted to.
23  Q. All right.
24  A. So, I wouldn't say that she didn't want
25  to take them herself, but it was just during that

Page 23

1  time that -- when it was non-visiting hours, per
2  se.
3      MR. DARE: Again, thank you for coming
4  here. I have no other questions.
5      THE WITNESS: All right.
6      (Ended at 11:52 a.m.)

Page 24

1  CERTIFICATE OF COURT REPORTER
2      I, Todd J. Davis, Court Reporter and
3  Notary Public in and for the County of Madison,
4  State of Mississippi, hereby certify that the
5  foregoing pages contain a true and correct
6  transcript of the testimony of TERRYL ULMER, as
7  taken by me in the aforementioned matter at the
8  time and place heretofore stated, as taken by
9  stenotype and later reduced to typewritten form
10  under my supervision to the best of my skill and
11  ability by means of computer-aided transcription.
12      I further certify that under the
13  authority vested in me by the State of Mississippi
14  that the witness was placed under oath by me to
15  truthfully answer all questions in this matter.
16      I further certify that I am not in the
17  employ of or related to any counsel or party in
18  this matter and have no interest, monetary or
19  otherwise, in the final outcome of this matter.
20      Witness my signature and seal this the
21  3RD day of APRIL, 2014.
22
23      _____
        TODD J. DAVIS, CSR #1406
24  My Commission Expires:
25  March 27, 2017

10/14/2010

To Whom it may concern:

This letter is written to verify that I attempted to deliver medication to Mr. Albert Lee Graham at the Jones County Adult Jail. Some months ago I was not allowed to leave medication for Mr. Graham. The guards refused to take outside meds. I did not argue or complain, I simply returned the medication to his wife Jeannette Graham. If you have any further questions, please call me at (601) 319-1736.

Submitted

Rev. Terry M. Ulmer
2493 Bush Dairy Rd
Laurel, MS 39443
(601) 319-1736

EXHIBIT
1
Terry 1 U.

JG008