Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

JEANETTER GRAHAM, INDIVIDUALLY AND
AS WRONGFUL DEATH BENEFICIARY OF
ALBERT GRAHAM, DECEASED          PLAINTIFF

VS.         CAUSE NO. 2:13cv67-KS-MTP

ALEX HODGE, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS SHERIFF OF JONES
COUNTY; JONES COUNTY, MISSISSIPPI AND
DEPUTY "JOHN DOE" IN HIS OFFICIAL CAPACITY
                  DEFENDANTS

DEPOSITION OF MALCOLM TAYLOR, M.D.,

Taken at the instance of the Plaintiff at Jackson
Cardiology Associates, 971 Lakeland Drive, Ste. 850,
Jackson, Mississippi, on Monday, July 28, 2014,
beginning at approximately 2:30 p.m.

Page 2

APPEARANCES:
   Everett T. Sanders, Esq.
   SANDERS LAW FIRM, PLLC
   P.O. Box 565
   Natchez, MS  39121

   COUNSEL FOR PLAINTIFF

   Jason Edward Dare, Esq.
   WYATT, TARRANT & COMBS
   P. O. Box 16089
   Jackson, MS  39236
   COUNSEL FOR DEFENDANT


Reported By:  TAMIKA T. BARTEE, BCR, CCR #1782
   Providence Court Reporting, LLC
   Post Office Box 787
   Madison, MS  39130
   (601) 720-3862
   tbartee@providencecourtreporting.net
   www.providencecourtreporting.net

Page 3

TABLE OF CONTENTS

Style & Appearances....................... 1-2

Index.................................. 3

Examination by:

   Mr. Sanders...................... 5, 40

   Mr. Dare.......................... 38

Signature Page............................ 42

Certificate of Court Reporter.............. 43

EXHIBITS

Exhibit 1,
   Walmart Pharmacy -
   Medical Expense Summary................ 14

Exhibit 2,
   Comprehensive Cardiology Report....... 38

Page 4

STIPULATION

It is hereby stipulated and agreed by and
between the parties hereto, through their respective
attorneys of record, that this deposition may be
taken at the time and place hereinbefore set forth,
by Tamika Bartee, Court Reporter and Notary Public,
pursuant to the Rules;
   That the formality of reading and
signing is specifically NOT WAIVED;
   That all objections, except as to the form
of the questions and the responsiveness of the
answers, are reserved until such time as the
deposition, or any part thereof, may be used or
sought to be used in evidence.
                   * * *

Providence Court Reporting, LLC
Phone:  (601)720-3862

**EXHIBIT 17**

Page 5

1   MALCOLM TAYLOR, M.D.,
2   Having been duly sworn and examined, testified as
3   follows:
4   EXAMINATION BY MR. SANDERS:
5       Q.   Would you state your name, please?
6       A.   Malcolm P. Taylor.
7       Q.   Dr. Taylor, I take it that you have given
8   depositions previously?
9       A.   Yes, sir.
10      Q.   And if I should ask you a question you
11  don't understand, please ask me to repeat it,
12  otherwise I am going to assume that you answered the
13  question that I asked.  Fair enough?
14      A.   Correct.
15      Q.   Thank you.
16           MR. DARE:  Can we have the same
17  stipulations?
18           MR. SANDERS:  Yes.
19           MR. DARE:  All of my objections, except
20  to the form of the question, are reserved until
21  trial or at hearing or until such time as I can
22  raise that.
23           MR. SANDERS:  That's fine.
24           MR. DARE:  Thank you.
25  BY MR. SANDERS:

Page 6

1       Q.   Would you give us a little of your
2   educational background, Dr. Taylor?
3       A.   Well, I am from Vicksburg, Mississippi.
4   I went to college at Tougaloo College here in
5   Jackson, and then on to Tufts University in Boston,
6   Massachusetts where I received my M.D. degree.
7            And I did my internal medicine training
8   at the Washington Hospital Center and then my
9   cardiology fellowship at Georgetown University in
10  Washington DC.  And that was completed in 1978.
11      Q.   Good.  Do you practice in the area of
12  cardiology?
13      A.   Yes.
14      Q.   And where are you employed?
15      A.   For Jackson Cardiology Associates here in
16  Jackson, Mississippi.  I started this practice along
17  with Dr. T. B. Ellis in 1978.
18      Q.   Did you have an occasion to review
19  certain documents in connection with Albert Graham,
20  the late Albert Graham?
21      A.   Yes.  I had an opportunity to review his
22  medical records from South Central Regional Medical
23  Center, and also some records where he visited one
24  of the cardiologist down in, I think it was
25  Hattiesburg.  And also an incident report from the

Page 7

1   Jones County Detention Center.
2            And I also had a chance to review the
3   coroner's report and medication list from Walmart,
4   as well as the records from Jefferson Medical
5   Associates.
6            And I also reviewed the complaint and
7   some of the interrogatory answers and the questions,
8   as well as the depositions of Ms. Graham, Jerald
9   Ulmer and Terryl Ulmer.
10      Q.   Did you do a report in connection with --
11      A.   Yes.  I did a report back in April of
12  this year and submitted it to Attorney Dare.
13      Q.   Have you reviewed any additional
14  documents since then?
15      A.   I have reviewed -- there was a deposition
16  from the cardiologist that I had a chance to peruse;
17  not in detail, but I did read some of his
18  statements.
19           And I have a deposition of the nurse who
20  saw him, but I have not read it.
21      Q.   You did read the deposition of
22  Ms. Graham, you said?
23      A.   Yes, right.
24      Q.   Now, based upon your reading of the
25  documents, you prepared a report.  Is that correct?

Page 8

1       A.   That's correct.
2       Q.   Now, you indicated that Mr. Graham did
3   not have myocardial infarction, what is that?
4       A.   That is damage from poor circulation.
5   Well, it depends on -- let me define that two ways:
6            A myocardial infarction is an acute
7   occlusion of an artery to the heart that leads to a
8   lack of blood flow to the heart causing damage.
9   That's a myocardial infarction.
10      Q.   And you concluded that -- that his death
11  was not associated with that, with a heart attack?
12      A.   Right, right.  I felt he died of what we
13  call a sudden cardiac death.  And in a patient with
14  known heart disease, with a prior history of heart
15  disease, the most common cause is arrythmia,
16  abnormal beating of the heart, and it's associated
17  with poor outcomes outside the hospital setting.
18      Q.   Did Mr. Graham have a history of cardiac
19  arrythmia?
20      A.   He had had, I think, an arrythmia treated
21  in Laurel when he had a stroke.  I think he had a
22  history of congestive heart failure, and he came in
23  the second time with a stroke, which was felt most
24  likely to be related to a cardiac arrythmia such as
25  atrial fibrillation.  Although that was not

Page 9

1  documented, he was placed on a blood thinner.
2       Q.   Okay. So cardiac arrythmia is abnormal
3  beating of the heart?
4       A.   Right. Correct.
5       Q.   Can that be treated?
6       A.   Yes. If it's in a -- if it's acute, it
7  has to be treated in a hospital setting, and that's
8  why there is such a high mortality when patients are
9  not in the hospital when they have a malignant
10 cardiac arrythmia.
11           There are other arrythmias of the heart
12 that are not life-threatening, but still can be
13 quite devastating, but not life-threatening at the
14 time they occur that can be treated as an outpatient
15 or either in a hospital setting, but it doesn't
16 cause total cardiac collapse. And that's what
17 happened to him.
18      Q.   Can it be treated with medication?
19      A.   The arrythmias are normally treated with
20 medication. And also, you oftentimes treat the
21 underlying cause of the arrythmia, which could be
22 damage to the heart from high blood pressure; damage
23 to the heart from illicit drug use, such as cocaine,
24 alcohol, or some people end up with viral damage to
25 the heart. All of those things that you can treat

Page 10

1  may make the arrythmia go away because the heart
2  gets better.
3       Q.   What kind of medications would --
4       A.   Well, for our arrythmias, we use a lot of
5  different medications. It depends on whether it is
6  chronic or acute. The most -- acutely with an
7  arrythmia for a cardiomyopathy type patient would be
8  a drug called amiodarone or Pacerone.
9            We can use beta blockers, digitalis. We
10 can use -- there are a number of other drugs,
11 Betapace. There are a lot of different drugs that
12 we can use to suppress arrythmias.
13           Some drugs suppress abnormal rhythms in
14 the top part of the heart better and some suppress
15 abnormal rhythms in the bottom part of the heart,
16 meaning the ventricle, better.
17      Q.   Beta blockers are used --
18      A.   Uh-huh (affirmative response).
19      Q.   Do you know from your examination of the
20 pharmacy records of Mr. Graham whether or not he was
21 on beta blockers?
22      A.   Yes. He had taken a beta blocker called
23 coreg in a very low dose.
24      Q.   And what does coreg do?
25      A.   Coreg is a beta blocker. It has multiple

Page 11

1  uses: One is congestive heart failure. Two is
2  hypertension. Three is heart attacks. Four is
3  control of heart rate in abnormal rhythms like
4  atrial fibrillation.
5            So multiple indications for coreg
6  depending on the type of illness the patient
7  experiences.
8       Q.   In terms of Mr. Graham, were you able to
9  determine why --
10      A.   Why he was on it?
11      Q.   Yes.
12      A.   He was on coreg, according to the
13 cardiologist, because he had congestive heart
14 failure. He started on low dose coreg, which
15 decreases -- which helps improve heart function. It
16 decreases the amount of oxygen the heart needs to
17 perform a certain amount of work. It slows the
18 heart rate down and it lowers blood pressure,
19 although the dosage he was on were not for blood
20 pressure.
21      Q.   You determined that his death was related
22 to cardiac arrythmia caused by ventricular
23 tachycardia.
24           Is that correct?
25      A.   Correct. Ventricular tachycardia and

Page 12

1  fibrillation.
2       Q.   Okay. Ventricular tachycardia, what is
3  that?
4       A.   It's an abnormal beat of the bottom part
5  of the heart, which would be the ventricle of the
6  heart. It's more life-threatening associated with
7  low blood pressure, absence of blood pressure,
8  absence of pulse. And it deteriorates overtime into
9  ventricular fibrillation, which is arrythmia where
10 the heart is not pumping at all, it is just
11 quivering.
12      Q.   Would it be fair to say that coreg is
13 used to treat ventricular tachycardia?
14      A.   No, it would not be used to treat
15 ventricular tachycardia.
16      Q.   Well, what medication would you use?
17      A.   Well, ventricular tachycardia, the first
18 thing you're going to do is shock the patient
19 electrically to convert them. We use drugs like
20 amiodarone in the acute setting with a cardiac
21 arrythmia.
22           We use cardiac defibrillators. Those are
23 going to be the main drugs to use for ventricular
24 tachycardia.
25           Then some patients may even get what we

Page 13

 1  call an ablation, which is using a laser to actually
 2  burn the part of the heart that's causing this
 3  excitable rhythm. That's one other way to treat it.
 4      But beta blockers are not used to treat
 5  ventricular tachycardia or ventricular fibrillation,
 6  although they may help it in the long run to prevent
 7  it, but once you have it, you have it.
 8      Q.  But the beta blockers slow down the beat
 9  of the heart, right?
10      A.  Yeah. The normal beating of the heart,
11  not the -- and it will slow down ventricular
12  tachycardia; it will slow down the normal beating of
13  the heart, and it would slow atrial fibrillation,
14  which is a another type of abnormal beat of the
15  heart. Probably about 4, 5 million people in this
16  country have that rhythm. He did not have that
17  documented, atrial fibrillation.
18      Q.  Were you able to determine -- well, you
19  determined that Mr. Graham's failure to receive
20  medication during the time that he was incarcerated
21  did not cause his death.
22      Is that correct?
23      A.  Yeah. That's correct. I think he had a
24  severe cardiomyopathy, and if you can go back and
25  look at his records, he was on multiple drugs back

Page 14

 1  in 2008, 2009, but apparently had discontinued many
 2  of these drugs on his own and had not followed up
 3  with a cardiologist. So he was on suboptimal
 4  therapy for his cardiac problem. Mainly because he
 5  didn't get the drugs.
 6      Q.  You said that he had discontinued the
 7  drugs?
 8      A.  Yes.
 9      (Exhibit 1 marked.)
10  BY MR. SANDERS:
11      Q.  In reviewing -- well, let me hand you
12  this and ask you if you've seen this.
13      A.  Yes. This is a medication list from
14  2007, 2008. And there is one prescription for 2009.
15      Q.  Okay. That was the coreg?
16      A.  Right.
17      Q.  So you had indicated that he had stopped
18  taking the medications?
19      A.  Well, there is no evidence he was getting
20  it from the pharmacy; so, you know, we normally
21  follow your prescription records or the records from
22  the doctor.
23      And after 2009, there was only one
24  prescription in 2000 -- after 2008, there was only
25  one prescription in June of 2009, and that was for

Page 15

 1  Carvedilol. All the other medication that he had
 2  previously been on in 2008, there was no evidence
 3  that he was getting that by his pharmacy.
 4      Q.  Okay. Are you aware that Ms. Graham
 5  testified that during a period of time that he was
 6  receiving samples that were being supplied by the
 7  drug companies or the detailers?
 8      A.  Well, I read that; but, I just know in my
 9  own experience, some of these drugs are not -- these
10  drugs are not supplied by drug companies on a
11  regular basis, other than maybe the Diovan, and
12  usually not in the dose that he was on; he was on
13  40. Most times they're going to supply that drug,
14  it's in 80.
15      Digitalis would never be supplied as a
16  drug; it's too old. Lasix, which is a fluid pill,
17  would not be supplied; they don't sample that. And
18  coreg, Carvedilol, they would not sample the dose
19  that he was on during that time. I think they had
20  gone to maybe some other type of formulation.
21      So of the drugs he was getting here, I
22  don't see how she could have gotten samples on a
23  regular basis because most of the time they don't
24  sample these.
25      Q.  Did you read Dr. Mouannes' deposition

Page 16

 1  where he says that they did provide samples of the
 2  medication that he was taking?
 3      MR. DARE: Object to the form of the
 4  question.
 5      THE WITNESS: I don't remember that.
 6  Which one did he provide because -- I just don't
 7  see -- in my experience as a cardiologist, we just
 8  don't get these drugs. Especially digitalis, Lasix,
 9  they're generic, so...
10      But also, I would think that also we
11  would not -- if you're supplying samples, you know,
12  he would have needed samples for almost a year and a
13  half or so.
14  BY MR. SANDERS:
15      Q.  Okay. The last prescription that you see
16  is in June, right?
17      A.  Yes, June 2009. That was just a 30-day
18  supply, I believe.
19      Q.  So that would get him to July?
20      A.  Right.
21      Q.  Now, I notice that you indicated that the
22  failure to provide him with medication between
23  November and April, or November and March -- I'm
24  sorry -- November of 2009 and March of 2010 did not
25  cause his death and you went on to qualify that.

Page 17

1   I think you said that because he suffered
2 death related to cardiac arrythmia that he had not
3 been on the appropriate medication for at least a
4 year and that he did not have an internal cardiac
5 defibrillator.
6   Is that correct?
7 A.  Right.
8 Q.  Now, would it be fair to say that the
9 absence of the medication contributed to his death?
10 A.  Well, my feeling is he was on
11 inadequate -- if you're talking about one drug,
12 coreg, he was on a very small dose.  The treatment
13 of congestive heart failure is a combination of
14 drugs that he was on originally.
15   And so the fact that he, at this point,
16 appears to be only on one drug that he had back in
17 June, had not -- or at least had no evidence that he
18 got for four months or before his incarceration --
19 anything is possible.  I don't think it is probable
20 to a reasonable degree of medical certainty that
21 that would have played a role in his death had he
22 gotten it.
23 Q.  Well, what I am trying to understand is,
24 you said he had not been on proper medication for at
25 least a year?

Page 18

1 A.  Right.
2 Q.  So I assume that -- well, what did you
3 mean when you said "proper medication"?
4 A.  Well, proper medication.  Well, you know,
5 he was on digitalis, Carvedilol, Lasix and Diovan as
6 a combination of drugs for treatment of his heart
7 failure.
8 Q.  Okay.
9 A.  And that is the acceptable medical
10 treatment for a patient with his medical -- with his
11 heart problem.  It's just that there is no evidence
12 that he got any of those drugs except Carvedilol in
13 June of 2009 from when he called in the prescription
14 for him.
15   So he had periods where he was off of
16 medication for long periods of time, and then when I
17 look at the dose of Carvedilol he was on, it was a
18 very, very small dose.  So I don't think that would
19 have made a difference in his survival long-term.
20 Q.  Well -- I'm sorry.
21 A.  Mainly because his heart problem was
22 associated with a 50 percent mortality in five
23 years.
24 Q.  Well, what I am trying to determine is,
25 if he did not have the medications that he needed

Page 19

1 for a year prior to his death, is that what we're
2 talking about?
3 A.  Right.
4 Q.  And of that time that he did not have
5 that medication, he was incarcerated?
6   MR. DARE:  Object to the form.
7   THE WITNESS:  Well, it looks to me like
8 2008 was the last time he had medication that was
9 inclusive of all the things he was getting.
10   It appeared that in some kind of a way in
11 2007 he was on adequate therapy.  In 2008, some of
12 that therapy changed and dropped out.  I don't see
13 lisinopril.  I don't see -- on this medication list,
14 I don't see Diovan except in 2009, January.  It
15 looks like that was the last time he got that.
16   So it would have been a year since he had
17 any Diovan, maybe even more than that for the
18 Lanoxin or digoxin.  And we know he got a
19 prescription for Carvedilol in June of 2009.
20   So there appears to be a sporadic use of
21 medication; for the majority periods of time he
22 appeared to be off medication for whatever reason,
23 or there was no evidence that he was taking
24 medication.  And he saw no provider, which is
25 unusual in a patient with this degree of heart

Page 20

1 disease.
2 BY MR. SANDERS:
3 Q.  At the time when Mr. Graham was
4 incarcerated, had he been taken to a cardiologist at
5 that point in time, could the cardiologist have
6 taken the appropriate steps to preserve his life?
7 A.  Well, yes, if he had been taken to a
8 cardiologist when he came in.  If he would have
9 setup an appointment with the cardiologist, he would
10 have had an echo of his heart.  And he had not had
11 an echo, so we really don't know the status of his
12 heart from the time he was last seen by the
13 cardiologist in Laurel until he died because he
14 didn't go back for follow up.  He didn't get a
15 followup echo.  He had a stress test that was
16 abnormal, but he didn't follow up.
17   So if you say, okay, Mr. Graham, we're
18 going to send you to a cardiologist, the
19 cardiologist would have had to do an echo.  And then
20 when he saw the echo, he would have treated the
21 changes.  If the heart function was still poor,
22 which I think it probably was, he would have started
23 him on the same drug that the original cardiologist
24 had him on, all four of those drugs, or at least
25 three of those drugs: Carvedilol, either lisinopril

Providence Court Reporting, LLC
Phone:  (601) 720-3862

Page 21

1  or Diovan. Maybe even Lanoxin as a fourth drug.
2  And Lasix, which is a fluid pill as needed. But he
3  did not see a cardiologist when he was in prison.
4      Q.  He did see a medical person in March of
5  2010. Is that right?
6      A.  Yes. He went to see a nurse
7  practitioner. I forgot her name. It is in my
8  report. He had high blood pressure, and that was at
9  the Ellisville Medical Clinic. His blood pressure
10 was elevated and the nurse practitioner who saw him
11 noted that he had not taken any medication in over a
12 year and started him on Lotensin/HCT, which is a
13 blood pressure pill.
14     Q.  Assuming that the nurse was aware of the
15 fact that he had a history of heart problems, was it
16 reasonable for her to send him to a nurse
17 practitioner versus a heart specialist?
18         MR. DARE:  Object to the form of the
19 question.
20         You can answer.
21         THE WITNESS:  Well, I think the key
22 reason she was sending him for treatment was for
23 blood pressure, so she was sending him to someone
24 who could treat that.
25         And then it would be incumbent upon the

Page 22

1  nurse practitioner to get a history and decide if
2  they need to send him for other tests or to a
3  specialist.
4          So I think the nurse did the right thing.
5  He complained of some problems, so she said, 'Okay.
6  I will get his nurse practitioner.' The nurse
7  practitioner said he had high blood pressure, and
8  that examination, there was no evidence that he was
9  to be compensated so they treated his blood
10 pressure, which is appropriate. And that drug is a
11 good drug and not inappropriate. It actually does
12 help the heart a little bit as well, but he was
13 treating high blood pressure.
14 BY MR. SANDERS:
15     Q.  I'll hand you this document and ask you
16 if you've seen that.
17     A.  Yes. I've seen this document before from
18 Jones County Detention Center.
19     Q.  In that document he indicates that he had
20 what medical problems?
21     A.  Well, on here it says, "Congestive heart
22 failure; says it's borderline." And then "corad"
23 I'm sure that means coreg. "Heart condition and
24 disability." That's what I see under "explanation
25 of questions." I am not sure who typed that in for

Page 23

1  him.
2      Q.  There is no indication that he has any
3  high blood pressure, is there?
4      A.  No. It is kind of -- yeah. There is no
5  indication. Although high blood pressure is a
6  medical question on the sheet at the top, in the
7  middle, next to -- between epilepsy and ulcers is
8  high blood pressure. So I don't know what he
9  answered to that.
10     Q.  Yeah, he answered "yes."
11     A.  Okay.
12     Q.  Can you say that the failure to have an
13 internal cardiac defibrillator contributed to
14 Mr. Graham's death?
15     A.  Well, yes. More likely than not the lack
16 of a defibrillator meant that he --
17         Let me put it like this. More likely
18 than not, the presence of a cardiac defibrillator
19 would have saved his life.
20     Q.  So the lack of one?
21     A.  The lack of one contributed to his not
22 surviving his cardiac arrest.
23     Q.  Now, the lack of medication contributed
24 to his death. Is that correct?
25     A.  Well, the lack of adequate optimum

Page 24

1  therapy contributed to his ultimate cardiac demise.
2      Q.  Okay. Tell me what that means.
3      A.  The lack of optimal therapy, optimal
4  meaning, the drugs that his cardiologists had put
5  him on, which was a combination of drugs, ACE
6  inhibitors, beta blocker, fluid pill and digoxin. A
7  lack of that combination of drugs, contributed to
8  his cardiac demise.
9      Q.  And you can say that to a reasonable
10 degree of medical certainty?
11     A.  Well, yeah. I think the fact that he
12 didn't have any medication that was optimal for his
13 heart condition would be a problem. But he had been
14 without that medication long before he was
15 incarcerated to the point that it appeared he didn't
16 think that was a part of his regular regiment.
17     Q.  Can you say that the deprivation of the
18 medication during the time that he was incarcerated
19 had nothing to do with his demise?
20     A.  Well, the only medication that he told
21 them about was coreg. And he was on a very low
22 dose, and had not, at least, for sure, not taken it
23 since July of that year.
24         I don't think the presence of that one
25 drug with a patient with his degree of heart disease

Page 25

1  would have changed his outcome. Anything is
2  possible, but the probability to a degree of medical
3  certainty, I don't think would have played a role --
4  the presence of coreg alone would have changed his
5  outcome and not cause him to have a cardiac arrest.
6      Q.  Well, I'm not only focussing on coreg. I
7  am focusing on -- well, your review of the medical
8  records indicated that he didn't receive any kind of
9  medication from the time he was incarcerated until
10 March of 2010. Is that correct?
11     A.  Right.
12     Q.  And what I am saying is, during that
13 period of time, the deprivation of that medication,
14 did it -- the entire medication, did that contribute
15 to his death?
16     A.  Well, yeah. When the entire regiment he
17 had been on -- so he had a worsening of his heart
18 condition because he was not on an entire regiment
19 that he had been on in 2007. But that regiment had
20 changed before he was incarcerated.
21         But I was trying to say that just to say
22 coreg would have made the difference in his survival
23 as opposed to all the other drugs he should have
24 been on, to a reasonable degree of medical
25 certainty, I don't think that that was correct.

Page 26

1      Q.  But what I am asking is, the deprivation
2  of those, the entire panoply -- well, maybe that's
3  not --
4      A.  Concoction or the right combination?
5      Q.  Right. Well, for the period of his
6  incarceration, can you say that that contributed to
7  his --
8      A.  Well, and there was no reason to think
9  his heart was going to get better. So I would say
10 the lack of medication for a heart condition allowed
11 it to deteriorate.
12     Q.  Okay. And that's to a reasonable degree
13 of medical certainty?
14     A.  Yes.
15     Q.  Based upon your review of the medical
16 records -- well -- strike that.
17         Is it your understanding that based upon
18 your review of the medical records that whether
19 drugs were available to Mr. Graham was not totally
20 dependent upon -- totally dependent upon him?
21     A.  Well, the availability of the drugs, you
22 mean, while he was incarcerated?
23     Q.  Right.
24     A.  Because the availability of drugs prior
25 to incarceration was totally up to him.

Page 27

1      Q.  Correct.
2      A.  After he was incarcerated, the only drug
3  he mentioned to them was coreg, and he did not get
4  coreg while he was incarcerated.
5          But coreg alone, I don't think was enough
6  to make a difference in his survival.
7      Q.  That's based on the records, you say the
8  only thing he mentioned. That was based on your
9  review of the records?
10     A.  Right. I am just looking at what the
11 record says.
12     Q.  Were you aware that he had requested to
13 get medication during the time that he was
14 incarcerated?
15     A.  No, I don't remember that. I remember he
16 fell sick; he went to the nurse and she immediately
17 sent him over to see the nurse practitioner, and he
18 did get medication because his blood pressure was
19 high.
20     Q.  Would it be fair to say that your
21 determination as to the time period that he was
22 without medication prior to his incarceration is
23 based upon Exhibit 1, the medication from Walmart?
24     A.  Yes.
25     Q.  Now, what was the drug you said that was

Page 28

1  prescribed by the --
2      A.  Lotensin/HCT.
3      Q.  Okay. And what is that?
4      A.  That's a high blood pressure medicine.
5  It's an ACE inhibitor, plus a small dose diuretic,
6  frequently used for hypertension. It's indicated
7  for hypertension.
8      Q.  You indicated that it would have been
9  left up to the nurse practitioner to determine based
10 upon a history what other ailments Mr. Graham had.
11         Is that correct?
12     A.  Yes. Once the nurse practitioner is
13 evaluating the patient and getting a history, then
14 it would be up to that person to the best of their
15 medical ability to decide what's the next step. And
16 the reason he had come, he thought his blood
17 pressure was up. And as it turns out it was, and
18 his nurse practitioner gave him medication that was
19 more than adequate to treat that.
20     Q.  Assuming that the nurse was aware of
21 Mr. Graham's prior heart condition, and that he had
22 not had medication for a substantial period of time
23 included in his incarceration, to determine the
24 appropriate treatment, wouldn't it have been more
25 appropriate to send him to a hospital emergency

Page 29

```
 1   room?
 2         MR. DARE: Object to the form of the
 3   question.
 4         THE WITNESS: Well, it just appears from
 5   the note that was written that he was not acutely
 6   ill. My interpretation of the note from the nurse
 7   practitioner, it wasn't like he had rapid pulse or
 8   he was short of breath in heart failure, grossly.
 9   He had high blood pressure and was treated.
10         So just based on that note, it didn't
11   seem like he needed to go to the emergency room.
12   You would start him on the blood pressure medication
13   and then perhaps follow him up in a month or so or a
14   week or so, depending on whatever they do in prison
15   in terms of getting patients followed up.
16   BY MR. SANDERS:
17      Q.  Were you aware that the nurse had
18   reviewed his -- the same medical records that you
19   had?
20      A.  Well, the nurse -- which nurse? Are we
21   talking about the nurse in prison or the nurse
22   practitioner?
23      Q.  The nurse in the prison.
24      A.  Okay. The nurse in the prison had access
25   to, I guess, all these medical records. I assume
```

Page 30

```
 1   this intake sheet would be available in his records.
 2   And she sent him over to the nurse practitioner,
 3   which was appropriate for therapy. I have not read
 4   her deposition as to how many times she may have
 5   looked at his records or whatever. How many times
 6   she had seen him.
 7      Q.  What I am saying is, you were not aware
 8   that the nurse at the prison had reviewed his
 9   medical records the same one that you reviewed prior
10   to her sending him to the nurse practitioner?
11      A.  No, no. I don't remember a statement to
12   that effect. She may have said that in her
13   deposition, which I have not read.
14      Q.  Yeah, she did.
15         Wouldn't the nurse have been in a
16   position to make a determination that based upon
17   those records that he needed to have cardiac
18   treatment?
19      A.  Well, I think, based on what his
20   complaints were, she was going to send him over for
21   an examination by a well-trained professional, a
22   nurse practitioner, which was one level above her
23   for an evaluation, and then leaving it to the nurse
24   practitioner to decide what the next step was.
25         And the nurse practitioner decided to
```

Page 31

```
 1   treat him and did not refer him out. It didn't seem
 2   like he needed to go to the emergency room. You
 3   know, his cardiac arrest wasn't until the next
 4   month.
 5      Q.  So if he had had a cardiac arrest then --
 6      A.  Well, it was just that things change
 7   overtime. He was seen in March and treated for high
 8   blood pressure and apparently did not have to go
 9   back to see the doctor. There is no records of any
10   medical treatment or complaints, that I saw, and he
11   died suddenly in his cell in April of 2010,
12   essentially a month later or three weeks later or
13   so.
14         So I was just saying it didn't appear
15   that he was acutely ill when the nurse practitioner
16   saw him, based on the nurse practitioner's note that
17   he needed to go from the nurse practitioner to the
18   emergency room.
19      Q.  It would be fair to say that the time
20   period that he was incarcerated and did not have the
21   overall medication that his condition did not
22   improve as a result of that?
23      A.  Right. It didn't improve, right. And it
24   may have worsened because he wasn't on blood
25   pressure medication.
```

Page 32

```
 1      Q.  And you could say that to a reasonable
 2   degree of medical certainty?
 3      A.  Well, yeah, because he didn't have
 4   medication. I don't know what his blood pressure
 5   was when he went into the prison. I don't think a
 6   blood pressure was taken when he went in. So it
 7   could have been the same blood pressure when he went
 8   in that it was in August of 2010 or '9, before he
 9   went to prison.
10         We know there was a period of time when
11   he was on no medication, or appears to be on no
12   medication. There is a period of time when he got
13   to the prison where he's also on no medication.
14         And the first blood pressure that is
15   taken, in the record that I see, he has hypertension
16   that is appropriately treated.
17      Q.  Okay. Based upon -- when you reviewed
18   the autopsy report, was it -- was it a complete
19   report or was it a summary?
20      A.  Very superficial. It's just a summary.
21   I've never seen the completed autopsy report. I
22   don't know where that is.
23      Q.  And the summary indicated that the cause
24   of death is what?
25      A.  Well, I think it is hypertensive heart
```

Page 33

1  disease. If you have a copy of it I can look at it.
2  I think he had hypertensive heart disease and he
3  also had atherosclerosis.
4      The autopsy findings state, "Cardiomegaly
5  with biventricular hypertrophy and severe
6  atherosclerotic coronary artery disease. There are
7  also some lung findings that I don't think are
8  important, but emphysematous lung changes.
9      Q.  What does all of that mean, Doctor? Take
10 us through it a little bit at a time.
11     A.  Well, he has an enlarged heart. The
12 heart is very thickened in both sides; the right
13 side and the left side. That's what biventricular
14 means. And he has some disease of his coronary
15 artery that's severe. And they read the cause of
16 death as atherosclerotic coronary artery disease.
17     Q.  So that's -- he had a heart disease?
18     A.  Yeah. He had a heart disease,
19 circulatory problems with his heart. Meaning he had
20 an enlarged heart and a thickened heart.
21     Q.  What is warfarin?
22     A.  Warfarin is a blood thinner. He had a
23 stroke back in 2008 and was placed on warfarin.
24     Q.  What happens if you don't take the
25 warfarin?

Page 34

1      A.  Well, your blood is not thin and you're
2  at risk for stroke.
3      Q.  What happens if you don't take the coreg?
4      A.  Well, if you don't take the coreg, your
5  heart problem won't get any better, especially if
6  you're not taking it along with all the other
7  medications that we prescribed, such as digitalis,
8  digoxin, and lisinopril and then eventually Diovan.
9      So that is an important part of the
10 cocktail. If you're saying -- if you could say that
11 the treatment of heart failure is based on four
12 corners of the chair, four legs of a chair and each
13 leg being important, but does not in itself make the
14 chair stand up. So you need all of those to help
15 the heart get better. It is not a good analogy,
16 but...
17     Q.  And none of them would make it worse?
18     A.  It will. If you get none, then we know
19 the mortality is very high.
20     Q.  Do you have to be deprived of the
21 cocktail for a definite duration in order to do
22 irreparable harm?
23     A.  Well, the lack of adequate medication
24 normally means lack of improvement, and places you
25 at risk for further complication of your heart

Page 35

1  condition, which includes death.
2      So he was at risk. Any time he was not
3  taking the medication that the cardiologist
4  prescribed to him, it was like going outside without
5  an umbrella to protect himself, protect his heart.
6      Q.  Would it be fair to say that you can't
7  pinpoint any particular time where his condition is
8  generated to a point of irrepair?
9      A.  No. I could not do that. I would be
10 speculating there.
11     Q.  As far as you know, Doctor, if the
12 regiment of medication had been reinstituted while
13 he was incarcerated, he may very well have lived?
14     A.  His best chance of survival was to be on
15 appropriate medical therapy for his condition before
16 he went to prison and even after he went to prison.
17     Q.  And that's to a reasonable degree of
18 medical certainty?
19     A.  Yes.
20     Q.  At what point, based upon your review of
21 the medical records, did you determine that
22 Mr. Graham needed an internal cardiac defibrillator?
23     A.  Well, when you present and your ejection
24 fraction is 10, 15 percent -- 15 percent, and this
25 was back in 2007 when we probably weren't putting in

Page 36

1  as many defibrillators as we are now, that would be
2  a time when you would be alerted to the fact that
3  this is a high-risk patient, high risk of dying when
4  his cardiologist saw him back at South Central
5  Regional Medical Center when he was short of breath.
6      You hope that with the appropriate
7  treatment instituted by his cardiologist that there
8  would be improvement of his heart function to
9  greater than 35 percent from the 15 percent.
10     Unfortunately, he never went back to the
11 cardiologist to receive those tests, which probably
12 would have been done six months to a year later as a
13 followup. He never got those tests done.
14     So we never knew what his ejection
15 fraction was before he went to prison, while he was
16 in prison, and after he died you can't get it,
17 because it is how the heart is pumping.
18     So we expect with medication we expect
19 them to hopefully get better. If they don't and the
20 pumping function does not reach a certain level,
21 then they might be a candidate for a defibrillator.
22     Q.  Would it be fair to say that at the time
23 that he was incarcerated that he was a candidate for
24 a defibrillator?
25     A.  I would be totally speculating on that.

Page 37

1  I don't know what his number was. I expect that he
2  could have been. If he was a candidate, because his
3  heart function had not reached 35 percent, he would
4  have to see a heart specialist and have an echo, and
5  he never went back to see his heart specialist.
6          So the probability of seeing a
7  heart specialist in prison is decreased because we
8  don't have cardiologists on staff at the prison that
9  I'm aware of.
10     Q.   You don't know whether they have access
11  to cardiologists?
12     A.   Oh, they might have access, but not
13  immediate access.
14     Q.   I asked you that because you indicated in
15  your statement that the failure to have a
16  defibrillator contributed to his death.
17     A.   No doubt about it. That was his best
18  chance of survival. Even if he had been on
19  medication, he still could have a cardiac arrest.
20  The best chance of survival is to have an internal
21  cardiac defibrillator.
22     Q.   Okay. And the next best would be to take
23  the medication?
24     A.   Yeah. The next best is to take the
25  medication, but medication may not get you to a

Page 38

1  point where you don't need a defibrillator. And the
2  best scenario would be a defibrillator.
3          Again, that requires a long-term followup
4  with a specialist. That's not a determination made
5  by a nurse or nurse partitioner or family medicine
6  doctor. Only heart specialists who deal with it all
7  the time would be the best people to make that
8  decision.
9          MR. SANDERS: I don't think I have any
10  further questions.
11          (Exhibit 2 marked.)
12  EXAMINATION BY MR. DARE:
13     Q.   I am going to have marked as Exhibit 2 to
14  your deposition the comprehensive cardiology report
15  that you have been referring to.
16          Dr. Taylor, I am going to hand you what's
17  been marked as Exhibit 2 to your deposition.
18          Can you identify that for me, please?
19     A.   Yes. This is my report on Mr. Albert
20  Graham that I submitted back in April of 2014.
21     Q.   Is that a true and correct copy of the
22  opinions that you will hold and that you do hold and
23  that you would express at trial if asked to do so?
24     A.   Yes.
25     Q.   There has been some talk during your

Page 39

1  deposition today about expectations for Mr. Graham.
2          In 2007, when Mr. Graham first presented
3  with signs of congestive heart failure and had the
4  10- to 15 percent ejection fraction, assuming that
5  he received best available treatment in 2007 and
6  continued on, what would have been his average life
7  span from that point?
8          MR. SANDERS: Object to the form.
9          THE WITNESS: Well, based on the ejection
10  fraction of 15 percent, he has a high morbidity and
11  mortality. And the five-year mortally untreated is
12  probably 50 percent. I would say treated it would
13  lower that to maybe about 20 percent. And then he
14  also had some other social activities that could
15  exacerbate his cardiac condition such as alcohol and
16  cocaine. All those things could contribute or
17  prevent improvement.
18          So life span, if he continued to use
19  those drugs, along with a heart condition, you know,
20  four, five years, maybe, probably less than that, to
21  be honest with you.
22          Cocaine is a very bad drug for people
23  with heart disease. It's a bad drug for people with
24  good hearts, so it is definitely real bad for people
25  with bad hearts. And then alcohol as a combination

Page 40

1  with that, which his wife described, through the
2  extent of his use would be a major detriment.
3  BY MR. DARE:
4     Q.   Thank you, sir.
5          Would you like to read and sign your
6  deposition, once that is through?
7     A.   Yes.
8          MR. DARE: I tender the witness.
9  FURTHER EXAMINATION BY MR. SANDERS:
10     Q.   In light of that testimony, would it
11  be -- well, you said that the things that were
12  mentioned could very easily shorten his life
13  expectancy. Is that right?
14     A.   Yes.
15     Q.   Wouldn't that make it all the more
16  important that he receive medical attention at the
17  time that he was incarcerated?
18     A.   Right. I think you ought to be treated
19  for the medicine that you're on and for your
20  problems that you have. If you have a heart
21  problem, then you need your medication.
22          But also, the patient has a
23  responsibility to also take his medication and also
24  to let people know how and when he needs it.
25     Q.   Okay. And when you say, "let him know,"

Page 41

1  you're talking about what they recorded that he told
2  you?
3      A.  Right.  Because he only mentioned one
4  drug.  In the record, now, he only mentioned coreg.
5      Q.  Okay.  Were you aware that this was not
6  communicated to the nurse at the time he was
7  incarcerated?
8      A.  That information?
9      Q.  Yes.
10     A.  No.
11     Q.  And you indicated you were not aware that
12 she had gotten his medical records prior to sending
13 him to the --
14     A.  No.  Because I haven't read her
15 deposition.  It wasn't in the medical record that --
16 I have not read her deposition.  I have it, but I
17 have not read it.
18         (Off the record 3:21 p.m.)

Page 42

1  ERRATA SHEET
2  I, DR. MALCOLM TAYLOR, do solemnly swear
   that I have read the foregoing _____ pages
3  and that the same is a true and correct transcript
   of the testimony given by me at
4  the time and place hereinbefore set forth, with the
   following corrections:
5  Page: Line:  Correction:
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
       DR. MALCOLM TAYLOR
16
17     NOTARIZATION
18 I,_____, notary public for the
19 State of Mississippi, _____ County, do hereby
20 certify that Dr. Malcolm Taylor personally appeared
21 before me this ____ day of _____, 2014, at
22 _____, Mississippi.
23 My Commission Expires:_____
24 _____
   (NOTARY PUBLIC
25

Page 43

1  CERTIFICATE OF COURT REPORTER
2
3  I, Tamika T. Bartee, Court Reporter and
4  Notary Public, in and for the State of Mississippi,
5  hereby certify that the foregoing contains a true
6  and correct transcript as taken by me in the
7  aforementioned matter at the time and place
8  heretofore stated, as taken by stenotype and later
9  reduced to typewritten form under my supervision by
10 means of computer-aided transcription.
11     I further certify that under the authority
12 vested in me by the State of Mississippi that the
13 witness was placed under oath by me to truthfully
14 answer all questions in the matter.
15     I further certify that I am not in the
16 employ of or related to any counsel or party in this
17 matter and have no interest, monetary or otherwise,
18 in the final outcome of this matter.
19     Witness my signature and seal this the
20 ____ day of _____, 2014.
21
22     _____
       TAMIKA T. BARTEE, BCR, CSR#1782
23
24 My Commission Expires:
   June 10, 2016
25

11 (Pages 41 to 43)

Jun 05 14 11:56a   William Mullins                                    6014251767                          p.1

Case 2:19-cv-00067-KS-MTP   Document 69-17   Filed 08/04/14   Page 12 of 15

Page 1 of 2

Store #: 501
Report Date: 06/05/2014

**Connexus Pharmacy System**
**Wal-Mart Pharmacy 10-501**
**Medical Expenses Summary**

Patient: GRAHAM, ALBERT,
2469 BUSH DAIRY RD
LAUREL MS-39443

Birthdate: 06/01/1951



EXHIBIT 1

Below is a list of your Pharmacy Orders for the date range of: 01/01/2007 To 06/05/2014

**Wal-Mart Pharmacy, 1621 HWY 15 NORTH, LAUREL MS-39440**
NABP Number: 2513984  ID: BW5376163  NPI Number: 1609893007

| Date Filled / Date Written | Rx Fill ID | Drug Name / NDC | Prescriber / Physician NPI | Qty / Refill # | Days Supply | Dispense As Written | Patient Paid / TP Ref # |
|---|---|---|---|---|---|---|---|
| 11/27/2007 11/27/2007 | 7714503 3699629 | CARVEDILOL 3.125MG TAB 00378-3631-01 | PARKER, SCOTT R 1528155660 | 60 0 | 30 | 0 | $4.00 |
| 11/27/2007 11/27/2007 | 7714504 3699631 | LISINOPRIL 2.5MG TAB 00378-2072-01 | PARKER, SCOTT R 1528155660 | 60 0 | 30 | 0 | $8.00 |
| 12/11/2007 12/11/2007 | 7718456 3709992 | CARVEDILOL 3.125MG TAB 00378-3631-01 | NORTON, MARK 1881608495 | 60 0 | 30 | 0 | $4.00 |
| 12/11/2007 12/11/2007 | 7718460 3709995 | DIGITEK 0.125MG TAB 62794-0145-01 | NORTON, MARK 1881608495 | 30 0 | 30 | 0 | $4.00 |
| 12/11/2007 12/11/2007 | 7718458 3709993 | DIOVAN 40MG TAB 00078-0423-15 | NORTON, MARK 1881608495 | 30 0 | 30 | 0 | $57.62 |
| 12/11/2007 12/11/2007 | 7718455 3709985 | FUROSEMIDE 40MG TAB 00378-0216-01 | NORTON, MARK 1881608495 | 60 0 | 30 | 0 | $8.00 |
| 12/11/2007 12/11/2007 | 7718462 3709996 | KLOR-CON M20 TAB 00245-0058-11 | NORTON, MARK 1881608495 | 30 0 | 30 | 0 | $15.84 |
| 01/31/2008 12/11/2007 | 7718460 3746316 | DIGITEK 0.125MG TAB 62794-0145-01 | NORTON, MARK 1881608495 | 30 1 | 30 | 0 | $4.00 |
| 01/31/2008 12/11/2007 | 7718458 3746315 | DIOVAN 40MG TAB 00078-0423-15 | NORTON, MARK 1881608495 | 30 1 | 30 | 0 | $60.88 |
| 01/31/2008 12/11/2007 | 7718455 3746317 | FUROSEMIDE 40MG TAB 00378-0216-01 | NORTON, MARK 1881608495 | 60 1 | 30 | 0 | $8.00 |
| 02/08/2008 02/08/2008 | 7734503 3753656 | WARFARIN 5MG TAB 62584-0994-77 | MOUANNES, WASSIM E 1780799965 | 30 0 | 20 | 0 | $4.00 |
| 02/18/2008 11/27/2007 | 7714503 3760777 | CARVEDILOL 3.125MG TAB 00378-3631-01 | PARKER, SCOTT R 1528155660 | 60 1 | 30 | 0 | $4.00 |
| 02/18/2008 12/11/2007 | 7718462 3760776 | KLOR-CON M20 TAB 00245-0058-11 | NORTON, MARK 1881608495 | 30 1 | 30 | 0 | $15.84 |
| 03/10/2008 11/27/2007 | 7714503 3778130 | CARVEDILOL 3.125MG TAB 00378-3631-01 | PARKER, SCOTT R 1528155660 | 60 2 | 30 | 0 | $4.00 |
| 03/21/2008 03/21/2008 | 7747278 3785909 | FUROSEMIDE 40MG TAB 00378-0216-01 | MOUANNES, WASSIM E 1780799965 | 60 0 | 30 | 0 | $8.00 |
| 03/28/2008 02/08/2008 | 7734504 3790858 | DIGITEK 0.125MG TAB 51079-0945-63 | MOUANNES, WASSIM E 1780799965 | 30 0 | 30 | 0 | $4.00 |
| 04/04/2008 11/27/2007 | 7714503 3796073 | CARVEDILOL 3.125MG TAB 00378-3631-01 | PARKER, SCOTT R 1528155660 | 60 3 | 30 | 0 | $4.00 |
| 04/11/2008 12/11/2007 | 7718462 3800767 | KLOR-CON M20 TAB 00245-0058-11 | NORTON, MARK 1881608495 | 30 2 | 30 | 0 | $15.84 |
| 05/14/2008 11/27/2007 | 7714503 3823804 | CARVEDILOL 3.125MG TAB 00378-3631-01 | PARKER, SCOTT R 1528155660 | 60 4 | 30 | 0 | $4.00 |
| 06/03/2008 03/21/2008 | 7747278 3837178 | FUROSEMIDE 40MG TAB 00378-0216-01 | MOUANNES, WASSIM E 1780799965 | 30 1 | 15 | 0 | $4.00 |
| 06/24/2008 11/27/2007 | 7714503 3851983 | CARVEDILOL 3.125MG TAB 00378-3631-01 | PARKER, SCOTT R 1528155660 | 60 5 | 30 | 0 | $4.00 |
| 07/31/2008 03/21/2008 | 7747278 3877185 | FUROSEMIDE 40MG TAB 00378-0216-01 | MOUANNES, WASSIM E 1780799965 | 30 2 | 15 | 0 | $4.00 |
| 08/13/2008 11/27/2007 | 7714503 3887086 | CARVEDILOL 3.125MG TAB 00378-3631-01 | PARKER, SCOTT R 1528155660 | 60 6 | 30 | 0 | $4.00 |
| 08/13/2008 02/08/2008 | 7734504 3887088 | DIGOXIN 0.125MG TAB 00527-1324-01 | MOUANNES, WASSIM E 1780799965 | 30 1 | 30 | 0 | $4.00 |

**PRIVATE-IF YOU RECEIVE THIS REPORT IN ERROR, PLEASE RETURN TO WAL*MART PHARMACY IMMEDIATELY.
WAL*MART STORES, INC.**

Store #: 501　　　　　　　　　　　**Connexus Pharmacy System**
Report Date: 06/05/2014　　　　　**Wal-Mart Pharmacy 10-501**
　　　　　　　　　　　　　　　　**Medical Expenses Summary**

Patient:　GRAHAM, ALBERT,
　　　　　2469 BUSH DAIRY RD
　　　　　LAUREL MS-39443

Birthdate:　06/01/1951

Below is a list of your Pharmacy Orders for the date range of: 01/01/2007 To 06/05/2014

**Wal-Mart Pharmacy, 1621 HWY 15 NORTH, LAUREL MS-39440**
**NABP Number: 2513984　ID: BW5376163　NPI Number: 1609893007**

| Date Filled / Date Written | Rx Fill ID | Drug Name NDC | Prescriber / Physician NPI | Qty Refill # | Days Supply | Dispense As Written | Patient Paid TP Ref # |
|---|---|---|---|---|---|---|---|
| 08/13/2008 03/21/2008 | 7747278 3887085 | FUROSEMIDE 40MG TAB 00378-0216-01 | MOUANNES, WASSIM E 1780799965 | 30 3 | 15 | 0 | $ 4.00 |
| 08/13/2008 12/11/2007 | 7718462 3887087 | KLOR-CON M20 TAB 00245-0058-11 | NORTON, MARK 1881603495 | 30 3 | 30 | 0 | $ 15.84 |
| 10/24/2008 02/08/2008 | 8825258 3939317 | ASPIRIN 81MG EC TAB 63739-0272-01 | MOUANNES, WASSIM E 1780799965 | 30 0 | 30 | 0 | $ 4.00 |
| 10/24/2008 02/08/2008 | 7734505 3939316 | CARVEDILOL 3.125MG TAB 00378-3631-01 | MOUANNES, WASSIM E 1780799965 | 60 0 | 30 | 0 | $ 4.00 |
| 10/24/2008 03/21/2008 | 7747278 3939314 | FUROSEMIDE 40MG TAB 00378-0216-01 | MOUANNES, WASSIM E 1780799965 | 30 4 | 15 | 0 | $ 4.00 |
| 01/12/2009 02/08/2008 | 7734505 3999649 | CARVEDILOL 3.125MG TAB 00378-3631-01 | MOUANNES, WASSIM E 1780799965 | 60 1 | 30 | 0 | $ 4.00 |
| 01/12/2009 02/08/2008 | 7734504 3999652 | DIGOXIN 0.125MG TAB 00527-1324-01 | MOUANNES, WASSIM E 1780799965 | 30 2 | 30 | 0 | $ 4.00 |
| 11/12/2009 02/08/2008 | 7734506 3999650 | DIOVAN 40MG TAB 00078-0423-15 | MOUANNES, WASSIM E 1780799965 | 30 0 | 30 | 0 | $ 62.36 |
| 01/12/2009 03/21/2008 | 7747278 3999651 | FUROSEMIDE 40MG TAB 00378-0216-01 | MOUANNES, WASSIM E 1780799965 | 30 5 | 15 | 0 | $ 4.00 |
| 01/12/2009 02/08/2008 | 7734507 3999654 | KLOR-CON M20 TAB 00245-0058-11 | MOUANNES, WASSIM E 1780799965 | 30 0 | 30 | 0 | $ 15.84 |
| 01/12/2009 02/08/2008 | 7734503 3999655 | WARFARIN 5MG TAB 62584-0994-77 | MOUANNES, WASSIM E 1780799965 | 30 1 | 20 | 0 | $ 4.00 |
| 06/05/2009 04/24/2009 | 7852723 4111228 | CARVEDILOL 6.25MG TAB 00378-3632-01 | MOUANNES, WASSIM E 1780799965 | 60 0 | 30 | 0 | $ 4.00 |

Report Date: 06/05/2014
Attested To By:　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Total: $ 388.06
　　　　　　　　　　　　　　　　　Registered Pharmacist

**PRIVATE - IF YOU RECEIVE THIS REPORT IN ERROR, PLEASE RETURN TO WAL*MART PHARMACY IMMEDIATELY.
WAL*MART STORES, INC.

<div style="text-align:center">

**Malcolm P. Taylor, M.D., F.A.C.C.**
971 Lakeland Drive, Suite 850
Jackson, Mississippi 39216
(601) 981-8543

</div>

Albert Graham

COMPREHENSIVE CARDIOLOGY REPORT

My name is Dr. Malcolm Taylor. I am a cardiologist in Jackson, Mississippi, and director of the Congestive Heart Failure Clinic at St. Dominic's Hospital. My qualifications and authored publications are attached in Exhibit A. I have reviewed the medical records of Mr. Albert Graham, including his multiple hospitalizations at South Central Regional Medical Center, clinic visits at the Hattiesburg Clinic, and the incident reports from the Jones County Detention Center. I have also reviewed the coroner's report, Walmart medication list, and records from Jefferson Medical Associates, the complaint, defense answers, and the depositions of Jeanetter Graham, Jerald Ulmer, and Terryl Ulmer.

Mr. Albert Graham was diagnosed with congestive heart failure in November 2007 when he presented to the South Central Regional Medical Center with shortness of breath. At that time, he was found to have a dilated heart with pulmonary congestion and a left ventricular ejection fraction of 15%. He was started on beta blockers, diuretics, and an ACE inhibitor. The etiology of this congestive heart failure was felt to be either viral or alcoholic. During that admission, he underwent a Myoview stress test which revealed significant left ventricular impairment with a fixed inferior and lateral wall defect and no evidence of myocardial ischemia. In February of 2008, he presented again to South Central Regional Medical Center with a complaint of right-sided weakness and was diagnosed with a stroke. The stroke was felt to be secondary to his dilated cardiomyopathy with ejection fraction of 10-15%. He also was noted to have nonsustained ventricular tachycardia and mild renal insufficiency. A transesophageal echo did not reveal any evidence of left atrial or left ventricular thrombus. A decision was made not to place him on Coumadin therapy because of a cavernous hemangioma noted on the CT scan during that admission. Patient was seen at the Hattiesburg Clinic periodically for treatment of his congestive heart failure by Dr. Wassim Mouannes, with his last visit to the Hattiesburg Clinic occurring on March 10, 2008. According to prescription records from Walmart pharmacy in Laurel, Mississippi, Mr. Graham last filled a prescription there for Coreg in June 2009.

On November 10, 2009, Mr. Graham was incarcerated at the Jones County Corrections Center because of aggravated assault. During that admission interview, he indicated that he was on medication, but listed Coreg as the only medication he was taking. In March 2010, Mr. Graham complained of possible elevation of blood pressure and feeling ill and was seen at the Ellisville Medical Clinic. The nurse practitioner who saw him at that time stated that he had not had any medications in over a year and started him on Lotensin/HCT 10/12.5 once a day for his blood pressure.

On April 6, 2010, Mr. Graham had a cardiac arrest while in his jail cell and despite CPR, could not be resuscitated. He was pronounced dead.

Mr. Graham had a severe dilated congestive cardiomyopathy with an ejection fraction of only 10-15%, which is associated with a high incidence of sudden death. His records indicate he had had abnormal cardiac arrhythmias during previous admissions to the hospital with congestive heart failure. There is no evidence that Mr. Graham's left ventricular ejection fraction improved from 2007 to his last admission in 2008.

EXHIBIT 2

Albert Graham
04/07/2014
Page 2

Mr. Graham did not have a myocardial infarction but sudden death related to a cardiac arrhythmia which was, to a reasonable degree of medical certainty, caused by ventricular tachycardia and fibrillation. ("The American College of Cardiology / American Heart Association Task force on Sudden Death 2006.") Out of hospital cardiac arrest is associated with high mortality, with less than 50% survival rate, even with all appropriate treatment. The best treatment to prevent sudden cardiac death with nonischemic congestive cardiomyopathy is placement of an internal cardiac defibrillator, but there is no evidence in the record that this treatment was ever considered by his cardiologist in 2008.

Due to the fact that Mr. Graham suffered sudden death related to a cardiac arrhythmia, and due to the fact that Mr. Graham had not been on the appropriate medication for at least over a year, if not more, and did not have an internal cardiac defibrillator, then it is my opinion, to a reasonable degree of medical probability, that failure to provide Mr. Graham medication from November 2009 to March 2010 did not proximately cause or result in his death in April of 2010.

Each of my foregoing opinions are based upon my education, training and background as a cardiologist, and are stated to a reasonable degree of medical certainty.

Attached to this report are my qualifications and a list of any publications I have authored in the previous 10 years. I have also attached a list of other cases in which, during the previous 4 years, I have testified as an expert at trial or by deposition. A statement of compensation I charged for the study of records and my testimony in this case is also attached to this report.

Malcolm P. Taylor, M.D., F.A.C.C.

MPT/SW