IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

JEANETTER GRAHAM, INDIVIDUALLY AND
AS WRONGFUL DEATH BENEFICIARY OF
ALBERT GRAHAM, DECEASED                                              PLAINTIFF

V.                                              CIVIL ACTION NO. 2:13cv67-KS-MTP

ALEX HODGE, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS SHERIFF OF
JONES COUNTY; JONES COUNTY,
MISSISSIPPI AND DEPUTY "JOHN DOE"
IN HIS OFFICIAL CAPACITY                                              DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Defendants' Motion for Summary

Judgment [69].  Having considered the submissions of the parties, the record, and the

applicable law, the Court finds that the motion is well taken and should be granted.

## I.  BACKGROUND

This is a wrongful death action brought by Jeanetter Graham, the surviving

spouse of the decedent, Albert Graham.  Defendant Alex Hodge is presently, and was

at all times relevant to the Complaint, the Sheriff of Jones County, Mississippi.  Albert

Graham died on April 6, 2010, while he was a pretrial detainee in the custody of Jones

County.

On November 10, 2009, Albert Graham was arrested for aggravated assault and

booked into the Jones County Adult Detention Facility ("Jail" or "Jones County Jail").

(*See* Jail Records [69-2 at ECF p. 8].)  This arrest stemmed from Albert Graham

shooting Jeanetter Graham in the chest with a .38 caliber handgun.  (*See* J. Graham

Dep. [82] 16:7-25.)  Albert Graham was fifty-eight (58) years old at the time of his arrest.

Graham's Booking Medical Sheet indicates, in pertinent part, that he had a heart condition; he had been diagnosed with congestive heart failure; he had borderline high blood pressure; he was taking "Corad," which presumably meant "Coreg," a beta-blocker used to treat congestive heart failure;[1] and, he was on disability.  (*See* Jail Records [69-2 at ECF pp. 25-26].)  Policies and procedures in place at the Jones County Jail required the booking officer to forward the Booking Medical Sheet to the nurse employed at the Jail.  (*See* Hodge Dep. [79-1] 34:6-18; Walls Dep. [80] 36:15-25.)[2]  Generally, the booking officer would place the Booking Medical Sheet in the nurse's box, and the nurse would follow up with the inmate the next day regarding his medical issues.  (*See* Walls Dep. [80] 6:25-7:12.)  The booking officer completing Albert Graham's Booking Medical Sheet failed to comply with Jail protocol by not forwarding the document to Carol Johnston, the nurse employed by Jones County.  (*See* Hodge Dep. [79-1] 34:6-18; Walls Dep. [80] 36:15-25; Johnston Dep. [81] 20:14-21:6.)

Albert Graham did not receive any medication at the Jail between November 10, 2009, and March 9, 2010.  Jeanetter Graham testified by deposition that at some point during this time period, she asked her pastor, Terryl Ulmer, to bring certain medications (Coreg, Coumadin, and aspirin) to the Jail for Mr. Graham.  (*See* J. Graham Dep. [82] 34:6-35:22.)  At his deposition, Terryl Ulmer provided that Jeanetter Graham requested

---

[1] (*See* Taylor Dep. [69-17] 10:24-11:7.)  Dr. Malcolm Taylor is a cardiologist who has been designated by the Defendants to provide expert testimony in this case.

[2] Stacy Walls was the Jail Administrator at the time of Albert Graham's incarceration.  (*See* Walls Dep. [80] 6:10-15.)

-2-

that he take some personal items to Albert Graham, which included two pill bottles. (*See* T. Ulmer Dep. [84] 7:20-9:11.)  Terryl Ulmer did not know what specific medications were inside the bottles.  (*See* T. Ulmer Dep. [84] 9:12-17.)  The guards at the Jail advised Terry Ulmer that they could not accept outside items.  (*See* T. Ulmer Dep. [84] 8:13-19.)

Jeanetter Graham also testified that she visited Albert Graham at the Jones County Jail in January of 2010.  (*See* J. Graham Dep. [82] 48:9-49:12.)  According to Mrs. Graham, Albert Graham told her, "They won't get me no -- no attention.  They won't get me no medicine.  They won't even take me to the doctor."  (J. Graham Dep. [82] 49:1-3.)  Jeanetter Graham thus contacted the Jail Administrator, Stacey Walls, in the latter part of January, and told her about Albert Graham's heart condition and his need for medication.  (*See*  J. Graham Dep. [82] 49:13-50:16.)  At her deposition, Stacy Walls confirmed speaking with Jeanetter Graham about Mr. Graham.  (*See* Walls Dep. [80] 17:9-12.)  Stacy Walls could not recall if this communication took place before or after Christmas in 2009.  (*See* Walls Dep. [80] 18:2-7.)  According to Walls, Jeanetter Graham told her that Mr. Graham "had cocaine problems and I believe drinking problems when he was out and that he didn't take his medication like he should but that she was concerned about his health."  (Walls Dep. [80] 17:13-18.)  Jeanetter Graham further told Walls that Mr. Graham would not complain about his health, and she wanted to make sure he was taken to the doctor and placed on his medication.  (*See* Walls Dep. [80] 17:19-21.)   As a result of this conversation, Stacy Walls spoke with the Jail nurse about Albert Graham and Mr. Graham was taken to the doctor.  (*See* Walls Dep. [80] 17:25-18:1, 19:3-13.)  Stacy Walls had no recollection of Albert Graham himself

requesting medical care.  (*See* Walls Dep. [80] 18:25-19:19.)

Nurse Johnston testified by deposition that she could not recall the first time she saw Albert Graham at the Jones County Jail.  (*See* Johnston Dep. [81] 23:10-12.) However, she thought it was "[p]robably weeks after he was there."  (Johnston Dep. [81] 21:7-10.)  Nurse Johnston also stated that Albert Graham never complained to her, and she could not remember what led to her initial contact with Mr. Graham other than her eventually seeing the Booking Medical Sheet.  (*See* Johnston Dep. [81] 26:4-13.)

The following chronology of events relating to the medical attention Albert Graham received during his incarceration is based on Nurse Johnston's deposition testimony, certain Jail Records [69-2], and Ellisville Medical Clinic Records ("Clinic Records") [69-3]:

- On February 17, 2010, Albert Graham signed a medical authorization enabling the Jail to obtain his records from the Heart Care Center.  (*See* Johnston Dep. [81] 42:25-44:2.)

- On February 22, 2010, Nurse Johnston took Albert Graham's blood pressure.  The result was 140/90, which Nurse Johnston characterized as "[b]orderline, a little bit high."  (Johnston Dep. [81] 27:2-10.)

- On March 2, 2010, Nurse Johnston faxed Albert Graham's medical authorization to the Heart Care Center.  Nurse Johnston thought she received these records prior to March 10.  (*See* Johnston Dep. [81] 45:14-46:23.)

- On March 9, 2010, Nurse Johnston took Albert Graham's blood pressure. The result was 140/82, which was good.  (*See* Johnston Dep. [81] 28:16-19.)

- On March 10, 2010, Albert Graham was transported from the Jail to the Ellisville Medical Clinic with a complaint of elevated blood pressure. Donnie Scoggin, a nurse practitioner, saw Albert Graham at this facility. Mr. Graham was noted to have a healthy general appearance and some swelling in his ankles.  Albert Graham advised Nurse Practitioner Scoggin that he had been off all of his medications for six (6) months.  Nurse

Practitioner Scoggin prescribed Lotensin to Mr. Graham for his high blood pressure. Upon Albert Graham's return to the Jail on March 10, he was transferred to a medical cell where he could be seen by Nurse Johnston and given his medication on a daily basis. Albert Graham started taking his blood pressure medication on March 11, and continued taking the medication until April 5. (*See* Johnston Dep. [81] 23:13-24:25, 38:13-40:14, 54:18-55:18; Jail Records [69-2 at ECF pp. 24, 27-28, 30-31, 41]; Clinic Records [69-3].)

- On March 31, 2010, Nurse Johnston took Albert Graham's blood pressure. (*See* Johnston Dep. [81] 28:24-29:5.)

As previously noted, Albert Graham died on April 6, 2010. An autopsy performed by the State Medical Examiner identifies the preliminary cause of death as atherosclerotic coronary artery disease. (*See* Jail Records [69-2 at ECF p. 1].) The following circumstances occurred shortly before, and led up to Albert Graham's passing. At approximately 11:28 p.m. on April 5, several inmates thought Mr. Graham was having a seizure and thus called for the officers. (*See* Jail Records [69-2 at ECF p. 12].) Sergeant David Hare, Officer Nathan Fayard, and Officer Santana Benjamin responded and noticed that Albert Graham was in distress and was having difficulty breathing. (*See* Hare Dep. [69-10] 12:16-14:1; Fayard Dep. [69-13] 5:17-6:21.) Sergeant Hare requested that Officer Fayard take Mr. Graham's blood pressure, but Officer Fayard was unable to complete this task because the machine would not work. (*See* Jail Records [69-2 at ECF p. 13]; Fayard Dep. [69-13] 6:2-9.) Sergeant Hare either called or had others contact Stacy Walls, Nurse Johnston, and an ambulance in light of Graham's condition. (*See* Jail Records [69-2 at ECF pp. 12-13]; Hare Dep. [69-10] 15:20-25; Fayard Dep. [69-13] 6:10-12.) Officer Fayard began to perform CPR on Graham after noticing his lips turn blue. (*See* Jail Records [69-2 at ECF p. 13]; Fayard Dep. [69-13] 6:13-19.) Officer Fayard breathed for Mr. Graham through a pocket mask, while

Sergeant Hare and Officer Benjamin took turns performing chest compressions.  (*See* Hare Dep. [69-10] 16:22-17:19; Fayard Dep. [69-13] 6:17-7:20.)  Emergency medical personnel arrived at the Jail at approximately 11:38 p.m.  (*See* Jail Records [69-2 at ECF p. 13].)  Albert Graham was then taken to South Central Regional Medical Center, where he died on April 6.

There is no serious dispute between the parties regarding Albert Graham's medical condition and treatment in the two years preceding his incarceration.  Albert Graham began seeing Dr. Wassim Mouannes, a cardiologist, in November of 2007.  (*See* Hattiesburg Clinic Records [69-4 at ECF pp. 60-62]; Mouannes Dep. [69-16] 4:14-23, 5:23-6:2.)  Dr. Mouannes initially saw Mr. Graham in the hospital on November 22, 2007, and diagnosed him with acute congestive heart failure, among other conditions.  (*See* Hattiesburg Clinic Records [69-4 at ECF pp. 60-62].)  Mr. Graham had follow-up visits with Dr. Mouannes in his office on January 16 and 24, 2008.  (*See* Mouannes Dep. [69-16] 7:5-7.)  The medical record from Mr. Graham's January 16 office visit lists impressions of severe cardiomyopathy (disease of the heart muscle) and post congestive heart failure.  (*See* Hattiesburg Clinic Records [69-4 at ECF p. 16].)  Dr. Mouannes prescribed several medications to Mr. Graham for his heart condition, including Coreg (i.e., Carvedilol), Lisinopril, Aldactone, Diovan, Klor-Con, Digoxin (i.e., Digitek), and Furosemide.  (*See* Mouannes Dep. [69-16] 4:24-5:4, 9:2-12:17.)  Dr. Mouannes also prescribed Coumadin, a blood thinner, to Graham after he suffered a stroke in February of 2008.  (*See* Mouannes Dep. [69-16] 6:3-20.)  Albert Graham was scheduled to see Dr. Mouannes on March 19, 2008, but he missed that appointment and never scheduled a follow-up visit.  (*See* Hattiesburg Clinic Records [69-4 at ECF

pp. 46-47]; Mouannes Dep. [69-16] 15:16-16:1.)[3]

On April 4, 2013, Jeanetter Graham (individually and as the wrongful death beneficiary of Albert Graham, deceased) filed suit against Sheriff Hodge (in his individual and official capacities) and Jones County.  (*See* Compl. [1].)  Subject matter jurisdiction is asserted under Title 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).  The Complaint asserts two counts against the Defendants.  Under count one, Plaintiff claims that the Defendants violated Albert Graham's rights under the Eighth Amendment and Fourteenth Amendment by refusing to provide Graham with his medications; by denying Graham's request to see a physician for his heart condition; by ignoring Graham's complaints of chest pains and shortness of breath; and, by delaying in providing Graham with assistance when he suffered a heart attack.  Count two of the Complaint alleges that the deprivation of Graham's rights resulted from the failure of Sheriff Hodge and Jones County to adequately staff the Jones County Jail, as well as the Defendants' failure to properly train and supervise deputies within the Sheriff's Department.  There are no state law claims at issue in this action.  (*See* J. Graham Dep. [82] 59:16-60:9.)

On August 4, 2014, Defendants filed their Motion for Summary Judgment [69].

---

[3] There is some uncertainty as to Albert Graham's medication history in the year leading up to his incarceration.  Mr. Graham's pharmacy records indicate that obtained a thirty-day supply of Warfarin (i.e., Coumadin), Digoxin, Carvedilol, Diovan, Klor-Con, and Furosemide in January of 2009; and, that he subsequently obtained a thirty-day supply of Carvedilol in June of 2009.  (*See* Pharmacy Records [69-5].)  Jeanetter Graham testified that Albert Graham took certain medications (Coumadin, Coreg, and aspirin) on a daily basis unless he was drinking.  (*See* J. Graham Dep. [82] 37:17-23.)  Jeanetter Graham also stated that Albert Graham obtained samples of medication, including Coumadin and Coreg, from the Heart Care Center "for quite sometime."  (J. Graham Dep. [82] 36:20-37:9, 43:3-6, 45:17-23.)

The motion has been fully briefed and the Court is ready to rule.

## II. DISCUSSION

### A.     Standard of Review

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). Initially, the movant has "the burden of demonstrating the absence of a genuine issue of material fact."  *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).  If the movant meets this burden, the nonmovant must go beyond the pleadings and point out specific facts showing the existence of a genuine issue for trial.  *Id.*  "An issue is material if its resolution could affect the outcome of the action."  *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010) (quoting *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001)).  "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party."  *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (citation omitted).

The Court is not permitted to make credibility determinations or weigh the evidence.  *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)).  When deciding whether a genuine fact issue exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party."  *Sierra Club, Inc.*, 627 F.3d at 138.  However, "[c]onclusional allegations and denials, speculation,

-8-

improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (citation omitted).  Summary Judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 766 (5th Cir. 2011) (quoting *Celotex Corp.*, 477 U.S. at 322).

**B.    Title 42 U.S.C. § 1983**

Plaintiff's request for damages based on the alleged violations of Albert Graham's Fourteenth Amendment rights must be viewed through the framework of 42 U.S.C. § 1983.  *See Brown v. Thaler*, No. 3:13cv1181, 2014 WL 2575747, at *3 n.2 (N.D. Tex. June 9, 2014).[4]  Section 1983 does not provide a general remedy for state law torts or allow access to federal courts for all individuals suffering injuries at the hands of state actors.  *White v. Thomas*, 660 F.2d 680, 683 (5th Cir. 1981).  The statute "affords a remedy only to those who suffer, as a result of state action, deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States."  *Id.* (quoting 42 U.S.C. § 1983).  To state a cognizable § 1983 claim, "a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United

---

[4] Plaintiff's reliance upon the Eighth Amendment in support of liability is misplaced since Albert Graham was a pretrial detainee and not a convicted inmate at all times relevant to the Complaint.  *See Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (providing that the Eighth Amendment's prohibition against cruel and unusual punishment affords rights to convicted prisoners, while the constitutional rights of pretrial detainees "flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment") (citations omitted).

States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Doe ex rel. Magee v. Covington County Sch. Dist.*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *James v. Tex. Collin County*, 535 F.3d 365, 373 (5th Cir. 2008)).  Official conduct by a governmental actor in connection with a purported constitutional violation, i.e., the "color of law" requirement,[5] is not in dispute in this case.

Section 1983 claims may be brought against government employees "in their individual or official capacity, or against a governmental entity."  *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (citation omitted).  As to individual capacity claims, the plaintiff must show "that the defendant was either personally involved in the deprivation or that his wrongful actions were causally connected to the deprivation." *Jones v. Lowndes County, Miss.*, 678 F.3d 344, 349 (5th Cir. 2012) (citation omitted). Individual defendants, but not governmental entities, may rely on the defense of qualified immunity.  *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 436 (5th Cir. 2008) (citing *Owen v. City of Independence*, 445 U.S. 622, 657, 100 S. Ct. 1398, 63 L. Ed. 2d 673 (1980)).  "Qualified immunity protects public officers from suit if their conduct does not violate any 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Prison Legal News v. Livingston*, 683 F.3d 201, 224 (5th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  A governmental entity cannot be

_____

[5] *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 464 (5th Cir. 2010).

held liable on a *respondeat superior* theory of recovery under § 1983.  *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  Municipal liability via § 1983 requires that an official policy or custom be the moving force behind the constitutional violation.  *See id.* at 694-95.  A governmental entity may be held liable under § 1983 for inadequately training its employees under certain limited circumstances.  *See Connick v. Thompson*, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011).  Generally, the failure to train must amount to deliberate indifference to the rights of individuals with whom government employees come into contact.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).

C.    **Analysis**

Defendants argue that Sheriff Hodge is entitled to summary judgment on the Plaintiff's claims asserted against him in his individual capacity because there is no evidence showing that he personally participated in the purported deprivation of medical care to Albert Graham.  Plaintiff's briefing in opposition to summary judgment does not address this argument.  Plaintiff instead focuses on her official capacity claims against Sheriff Hodge.  "Plaintiff submits that Defendant's motion for summary judgment should be denied because there are genuine issues of material fact with respect to the liability of Sheriff Hodge in his official capacity and thereby Jones County, due to Sheriff Hodges' [sic] failure to properly train and supervise a Jones County Adult Detention Center official, namely nurse Patricia Carol Johnston."  (Pl.'s Mem. in Opp. to Mot. for SJ [92] at p. 16.)  Plaintiff's opposition to summary judgment also fails to offer arguments or evidence in support of the allegations in the Complaint that the failure of

the Defendants to adequately staff the Jail and train deputies caused a constitutional violation.  The Court therefore finds that the Plaintiff has abandoned any individual capacity claim against Sheriff Hodge, as well as her *Monell* claims centering on the staffing of the Jail and the training of Sheriff's deputies.[6]

Plaintiff's remaining claims against Jones County and Sheriff Hodge, in his official capacity, for failure to train/supervise Nurse Johnston are effectively one and the same. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity."  *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) (internal citation omitted).  Jones County, "the real party in interest", is before the Court.  *Id.*  Plaintiff's official capacity claim against Sheriff Hodge is thus "duplicative or redundant" and subject to dismissal.  *Pride v. City of Biloxi*, No. 1:10cv100, 2011 WL 5835109, at *5 (S.D. Miss. Nov. 21, 2011) (citations omitted), *aff'd*, 552 Fed. Appx. 334 (5th Cir. 2014).

Establishing a case of municipal liability based on inadequate training is a tall task.  *See Connick*, 131 S. Ct. at 1359 ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.") (citation omitted). "Mere negligence or even gross negligence is not enough . . . ."  *Yara v. Perryton Indep.*

---

[6] *See Essinger v. Liberty Mut. Fire Ins. Co.*, 529 F.3d 264, 271 (5th Cir. 2008) (finding that plaintiffs abandoned their claim for tortious breach of contract when their summary judgment response was limited to their bad faith claim); *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (holding that the plaintiff's failure to pursue a claim beyond her complaint resulted in abandonment); *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.") (citation omitted).

*Sch. Dist.*, 560 Fed. Appx. 356, 360 (5th Cir. 2014) (citing *Estate of Davis v. City of N.
Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005)).  Plaintiff must show the following in
order to recover on her failure to train/supervise allegations:  (i) the inadequacy of the
training procedures; (ii) the deliberate indifference of official policymakers in adopting
the training procedures; and (iii) that the inadequate training was a moving force behind
the constitutional violation.  *See Kitchen v. Dallas County, Tex.*, 759 F.3d 468, 484 (5th
Cir. 2014) (citation omitted).  "[I]nadequate supervision, failure to train, and policy,
practice or custom claims fail without an underlying constitutional violation."  *Id.* at 483
n.51 (quoting *Whitley v. Hanna*, 726 F.3d 631, 648 (5th Cir. 2013)).

### 1.    The Alleged Underlying Constitutional Violation

A pretrial detainee's right to medical care arises from the Fourteenth
Amendment's guarantee of due process.  *See Mace v. City of Palestine*, 333 F.3d 621,
625 (5th Cir. 2003) (citing *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000)).  The
standard for determining liability under this Amendment depends on whether the pretrial
detainee attacks "a condition of confinement" or alleges "episodic acts or omissions" by
one or more government officials.  *Gilbert v. Berndt*, 400 Fed. Appx. 842, 844 (5th Cir.
2010) (citations omitted).  A "condition of confinement" cause of action focuses on
general conditions or restrictions of incarceration, such as the number of bunks in a
prison cell or mail privileges.  *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (citations
omitted).  In an "episodic act or omission" claim, an official is usually interposed
between the prisoner and the governmental entity, such that the prisoner first complains
of a particular act or omission of the official and secondarily points to a policy, custom,
or procedure that caused or allowed the act or omission.  *Id.*  This case falls into the

latter category since the Plaintiff interposes Nurse Johnston between the alleged deprivation of adequate medical care and the training policies of Jones County.  The Fifth Circuit has held that the standard for determining a violation of the Eighth Amendment, subjective deliberate indifference, applies with respect to a Fourteenth Amendment episodic act or omission claim.  *See Hare*, 74 F.3d at 650.  "[A] state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk."  *Id.*

        "Deliberate indifference is an extremely high standard to meet."  *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  Neither negligence nor gross negligence will suffice.  *See Brown v. Bolin*, 500 Fed. Appx. 309, 315 (5th Cir. 2012) (citing *Hare*, 74 F.3d at 645), *cert. denied*, 133 S. Ct. 2833 (2013).  The Fifth Circuit has explained the inquiry in the context of an alleged deprivation of medical care as follows:

> A prison official acts with deliberate indifference only if [ (A) ] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it.  Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances.  Furthermore, the decision whether to provide additional treatment is a classic example of a matter for medical judgment.  A showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.

*Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (internal quotation marks and citations omitted).

No reasonable jury could find that Nurse Johnston was deliberately indifferent to Albert Graham's serious medical needs based on the evidence before the Court.[7]  As an initial matter, Plaintiff's briefing does not allege that Nurse Johnston "purposely neglected . . . [Graham's] medical needs"[8] or that her response to Graham's needs indicates that she "subjectively intended that harm occur."  *Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 458-59 (5th Cir. 2001)).  Rather, Plaintiff references certain acts or omissions (including, but not limited to, the thirteen-day delay between Graham signing a medical authorization and Nurse Johnston faxing the authorization to the Heart Care Center; Nurse Johnston sending Graham to the Ellisville Medical Clinic even though she knew it did not have a cardiologist; and, Nurse Johnston failing to provide the Ellisville Medical Clinic with Graham's records from the Heart Care Center) and suggests that they constitute "general incompetence" or "[im]proper and [un]timely medical care."  (Pl.'s Mem. in Opp. to Mot. for SJ [92] at pp. 19, 24.)  Plaintiff's allegations may sound in negligence or medical malpractice, but they fall short of rising "to the level of egregious intentional conduct required to satisfy the exacting deliberate indifference standard."  *Gobert*, 463 F.3d at 351-52 (holding that the district court erred in denying a prison physician's request for summary judgment even though the jury might find a lapse in treatment to

---

[7] Plaintiff's summary judgment briefing fails to carry forward the allegations in the Complaint to the effect that one or more Sheriff's deputies denied Albert Graham's requests for medical care, ignored his complaints of distress, and delayed in providing medical assistance when Graham suffered a heart attack.  Therefore, these allegations have also been abandoned for purposes of summary judgment.  *See Essinger*, 529 F.3d at 271; *Black*, 461 F.3d at 588 n.1; *Cinel*, 15 F.3d at 1345.

[8] *Gobert*, 463 F.3d at 349.

constitute negligence); *see also Estate of Henson v. Krajca*, 440 Fed. Appx. 341, 345,

346 (5th Cir. 2011) (same result with respect to a prison nurse where some evidence

existed that the nurse did not do what might be considered appropriate; "deliberate

indifference . . . exists wholly independent of an optimal standard of care") (citation

omitted); *Alfred v. Tex. Dep't of Criminal Justice*, 80 Fed. Appx. 926, 927-28 (5th Cir.

2003) (characterizing a claim of deliberate indifference based on the defendant's

alleged refusal to allow the plaintiff to see a medical specialist as a legally inoperative

disagreement with treatment); *Burge v. Stalder*, 54 Fed. Appx. 793, 2002 WL 31845179,

at *1-2 (5th Cir. 2002) (same).

       Furthermore, the summary judgment record does not show that Nurse Johnston

refused to treat Albert Graham, ignored his complaints, or denied him medication.[9]  The

facts before the Court are that Nurse Johnston took Graham's blood pressure on

several occasions; that she obtained Graham's medical records from an outside

treatment facility; that she sent Graham to the Ellisville Medical Clinic in light of his

medical history; that Graham was transferred to a medical cell where he could be seen

_____

       [9] There is evidence in the record of Jail "guards" refusing to accept Albert
Graham's outside medications from Terryl Ulmer.  (*See* T. Ulmer Dep. [84] 8:13-19,
12:14-19.)  However, no proof has been presented showing that Nurse Johnston was
aware of this circumstance prior to Albert Graham's death.  Plaintiff also claims that
Albert Graham complained about not being able to obtain his medication or see the
doctor when she visited him in January of 2010.  (*See* J. Graham Dep. [82] 48:9-49:10.)
Only speculation and conjecture support the inference that these complaints reached
Nurse Johnston and that she ignored them.  It is well settled that "speculation" and
"improbable inferences" fail to preclude a grant of summary judgment.  *Oliver*, 276 F.3d
at 744; *see also Gobert*, 463 F.3d at 346-47 (agreeing with the defendant that the
plaintiff impermissibly relied upon conclusory statements and speculation in attempting
to evidence deliberate indifference.)

by Nurse Johnston and given his medication on a daily basis upon his return from the Ellisville Medical Clinic; and, that Graham was provided with his blood pressure medication between March 11 and April 5, 2014. *See* supra pp. 4-5. Viewing the record, Albert Graham's medical history and condition upon his incarceration, and the resulting inferences in the Plaintiff's favor, one could certainly question the promptness of certain of Nurse Johnston's actions or the adequacy of some of her decisions, such as sending Mr. Graham to a medical clinic as opposed to a hospital or cardiologist. Again, however, the Court is concerned with the question of subjective deliberate indifference and not the existence of a lapse in medical judgment or any failure of Nurse Johnston to comply with the standard of care.

It is undisputed that Albert Graham did not receive any medication at the Jail between November 10, 2009 and March 9, 2010. Further, Nurse Johnston did not take Mr. Graham's blood pressure until February 22, 2010, at the earliest. The summary judgment evidence points to the principal source of these delays as the initial failure of the Jail booking officer to forward Graham's Booking Medical Sheet to Nurse Johnston. (*See* Hodge Dep. [79-1] 34:6-18; Walls Dep. [80] 18:25-19:2, 22:21-23:18, 36:15-25; Johnston Dep. [81] 5:16-6:3, 20:14-21:10, 26:4-8.) An officer's violation of department policy "is constitutionally irrelevant" for purposes of a claim brought under § 1983. *Pasco v. Knoblauch*, 566 F.3d 572, 579 (5th Cir. 2009) ("Violations of non-federal laws cannot form a basis for liability under § 1983, and qualified immunity is not lost because an officer violates department protocol.") (citations omitted); *see also Estate of Henson*, 440 Fed. Appx. at 344-45 (holding that deliberate indifference could not be inferred from violations of official policies and regulations). In addition, "a delay in medical care must

cause 'substantial harm' to be a constitutional violation."  *Horn v. Vaughan*, 469 Fed.

Appx. 360, 362-63 (5th Cir. 2012) (quoting *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir.

2006)).  "[E]xpert testimony establishing medical causation is necessary in all but simple

and routine cases."  *Stuart v. Wexford Health Sources, Inc.*, No. 3:09cv54, 2012 WL

4101911, at *2 (S.D. Miss. Sept. 17, 2012) (citing *Campbell v. McMillin*, 83 F. Supp. 2d

761, 766 (S.D. Miss. 2000)).  The medical questions surrounding Albert Graham's death

are not, in this Court's view, simple or routine, and the only expert medical opinion

before the Court regarding Graham's treatment at the Jail is that of Defendants' expert

witness, Dr. Malcolm Taylor.  Dr. Taylor has opined:

> Due to the fact that Mr. Graham suffered sudden death related to a cardiac
> arrhythmia, and due to the fact that Mr. Graham had not been on the
> appropriate medication for at least over a year, if not more, and did not have
> an internal cardiac defibrillator, then it is my opinion, to a reasonable degree
> of medical probability, that failure to provide Mr. Graham medication from
> November 2009 to March 2010 did not proximately cause or result in his
> death in April of 2010.

(Taylor Dep. [69-17] 38:13-24; Taylor Report [69-17 at ECF p. 15].)

In summation, Plaintiff cannot show that Nurse Johnston violated Albert

Graham's right to medical care under the Due Process Clause.  Plaintiff's cause of

action against Jones County under § 1983 fails in the absence of any underlying

constitutional violation.  *See Kitchen*, 759 F.3d at 483 n.51.

### 2.    Deliberate Indifference and Causation

Even assuming *arguendo* the existence of an underlying constitutional violation,

Plaintiff has failed to evidence jury issues with respect to the "deliberate indifference"

and "moving force" elements of her claim against Jones County for failure to train.

*Longino v. Hinds County, Miss. ex rel. Bd. of Supervisors*, No. 3:13cv167, 2014 WL

4545943, at *8 (S.D. Miss. Sept. 11, 2014) (citing *Valle v. City of Houston*, 613 F.3d

536, 544 (5th Cir. 2010)).[10]  "A pattern of similar constitutional violations by untrained

employees is ordinarily necessary to demonstrate deliberate indifference for purposes

of failure to train." *Connick*, 131 S. Ct. at 1360 (citation and internal quotation marks

omitted).  A narrow single-incident exception may apply in limited circumstances.  *See*

*Burge v. St. Tammany Parish*, 336 F.3d 363, 372-73 (5th Cir. 2003) (citations omitted).

Plaintiff presents no proof of a pattern of similar incidents involving claimed violations of

prisoners' rights to adequate medical care at the Jones County Jail.  Thus, the question

of whether Jones County was deliberately indifferent in adopting its training policies will

turn on the applicability of the single-incident exception.

In *City of Canton*, the Supreme Court hypothesized that where a municipality

arms its officers and expects the officers to arrest fleeing felons, the need to train the

officers on the use of deadly force can be considered so obvious that the failure to

accomplish the training "could properly be characterized as 'deliberate indifference' to

constitutional rights.  489 U.S. at 390 n.10.  In *Brown v. Bryan County, Oklahoma*, 219

F.3d 450 (5th Cir. 2000), the Fifth Circuit largely relied on this portion of *City of Canton*

in holding "that a single incident of an alleged constitutional violation resulting from the

[training] policy may serve as a basis for liability so long as that violation was an obvious

consequence of the policy." *Brown*, 219 F.3d at 460.  The Fifth Circuit upheld a finding

---

[10] The Court need not decide whether the Plaintiff can show the inadequacy of
Jones County's training of Nurse Johnston, the first element of this claim, in light of this
ruling. *Cf. Estate of Davis*, 406 F.3d at 382 ("Because this case falters on the
requirement of deliberate indifference, we need not address the other two prongs of
supervisory liability.").

of *Monell* liability based on the single decision of a sheriff not to require any training of a deputy before placing him in the field to make arrests.  *See id.* at 458, 465.  "[I]t should have been obvious to Sheriff Moore that the highly predictable consequence of not training Burns . . . was that Burns would apply force in such a way that the Fourth Amendment rights of the citizens of Bryan County were at risk . . . ."  *Id.* at 461.  The existence of evidence providing notice to the sheriff of the deputy's "personal record of recklessness and questionable judgment" supported the determination that the sheriff's decision not to train the deputy constituted deliberate indifference.  *Id.* at 463.

Post-*Brown*, the Fifth Circuit has "been reluctant to expand" the narrow single-incident exception.  *Burge*, 336 F.3d at 373 (citing *Pineda v. City of Houston*, 291 F.3d 325, 334-35 (5th Cir. 2002)).  "This court has been wary of finding municipal liability on the basis of a single incident to avoid running afoul of the Supreme Court's consistent rejection of respondeat superior liability."  *Hobart v. Estrada*, No. 13-20022, 2014 WL 4564878, at *9 (5th Cir. Sept. 16, 2014) (quoting *Valle*, 613 F.3d at 549); *see also Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) ("This circuit, in conformity with the Supreme Court's jurisprudence, has been highly reluctant to permit this exception to swallow the rule that forbids mere respondeat superior liability.") (citations and internal footnote omitted).  The Fifth Circuit has also described its ruling in *Brown* as finding a county liable under the single-incident exception for failing "to provide *any* training or supervision for a young, inexperienced officer with a record of recklessness . . . ."  *Estate of Davis*, 406 F.3d at 386 (citations omitted).  In a fairly recent opinion, the Fifth Circuit provided that "the limited exception for single-incident liability [applies] in a narrow range of circumstances where a constitutional violation

would result as the highly predictable consequence of a particular failure to train."

*Kitchen*, 759 F.3d at 484 (citations and internal quotation marks omitted).

The Court finds that the single-incident exception, as applied in *Brown*, has no application in this case.  There is no evidence before the Court of any "record of recklessness" or "questionable judgment" attributable to Nurse Johnston prior to her interactions with Albert Graham.  *Brown*, 219 F.3d at 463.  In fact, Nurse Johnston testified at her deposition that no disciplinary complaints had ever been filed against her with the nursing board.  (*See* Johnston Dep. [81] 4:25-5:2.)  Also unlike the "young, inexperienced" deputy in *Brown*,[11] Nurse Johnston had been a licensed practical nurse for approximately twenty-eight (28) years at the time she was hired by Jones County in October of 2008.  (*See* Personnel Records [69-8 at ECF p. 1]; Johnston Dep. [81] 4:9-24.)  Nurse Johnston's prior experience included special dialysis training and working at an obstetrics clinic and a general practitioner's clinic.  (*See* Johnston Dep. [81] 4:14-19.)  Nurse Johnston was also a licensed emergency medical technician for some period of time.  (*See* Johnston Dep. [81] 4:14-19.)  Based on Nurse Johnston's clean disciplinary record and extensive and varied nursing experience, no reasonable jury could conclude that "the highly predictable consequence of" Jones County or Sheriff Hodge failing to train Nurse Johnston would be her deliberate indifference to Albert Graham's serious medical needs.  *Kitchen*, 759 F.3d at 484.

The Supreme Court's opinion in *Connick v. Thompson* provides analogous support for the preceding holding.  In *Connick*, the Court considered whether the

---

[11] 219 F.3d at 452.

Orleans Parish District Attorney's Office ("D.A.'s Office") could be held liable on a claim for failure to train under § 1983 based on a single instance of prosecutors failing to disclose exculpatory evidence.  131 S. Ct. at 1355-56.  The Court found the concept of "single-incident" liability, previously "hypothesized in *Canton*", inapplicable, and held that the D.A.'s Office should have been granted judgment as a matter of law due to the plaintiff's failure to show a pattern of similar violations establishing deliberate indifference.  *Id.* at 1360-61, 1366.  Constitutional violations were not the "obvious consequence" of the failure of the D.A.'s Office to provide prosecutors with in-house training in light of the legal and professional training the prosecutors were required to obtain in order to become licensed attorneys and maintain their licences to practice law. *Id.* at 1361-63.  The Court reasoned in part:

> A district attorney is entitled to rely on prosecutors' professional training and ethical obligations in the absence of specific reason, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations in "the usual and recurring situations with which [the prosecutors] must deal."  A licensed attorney making legal judgments, in his capacity as a prosecutor, about *Brady* material simply does not present the same "highly predictable" constitutional danger as *Canton*'s untrained officer.
>
>    . . . .
>
> The reason why the *Canton* hypothetical is inapplicable is that attorneys, unlike police officers, are equipped with the tools to find, interpret, and apply legal principles.

*Id.* at 1363, 1364 (internal footnote and citation omitted).  Here too, Jones County and Sheriff Hodge were entitled to rely on Nurse Johnston's prior nursing experience, training, and licensure upon her employment at the Jones County Jail in October of 2008.  Constitutionally deficient medical care is simply not the "obvious consequence" of a county jail's failure to provide an experienced, licensed practical nurse with additional

-22-

in-house training.  *Id.* at 1363.

With respect to the issue of causation, Plaintiff must meet the following

heightened standard in order to hold Jones County liable under § 1983:

> [W]e require that the municipality's failure to train be the "moving force" that
> caused the specific constitutional violation.  In other words, the plaintiff must
> establish a "direct causal link" between the municipal policy and the
> constitutional injury.  "We have said that the connection must be more than
> a mere 'but for' coupling between cause and effect.  The deficiency in training
> must be the actual cause of the constitutional violation."

*Valle*, 613 F.3d at 546 (citations omitted).  Plaintiff offers no competent summary

judgment evidence meeting this stringent requirement.  Plaintiff instead highlights

alleged deficiencies in Nurse Johnston's management of Albert Graham's medical

needs (such as Graham not being taken to a cardiologist) and appears to suggest that

proper training and supervision by Sheriff Hodge would have changed things.

"Presumably, if . . . [Nurse Johnston] had received proper training and supervision, she

would have managed the Graham situation differently."  (Pl.'s Mem. in Opp. to Mot. for

SJ [92] at pp. 21, 23-24.)  Plaintiff's "mere speculation" fails to establish the requisite

"direct causal connection".  *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir.

1992) (affirming the trial court's grant of summary judgment); *see also Roberts*, 397

F.3d at 293 ("[M]ere proof that the injury could have been prevented if the officer had

received better or additional training cannot, without more, support liability.") (citation

omitted).  Furthermore, the suggestion that a sheriff has a constitutional duty to train a

nurse regarding when to seek the assistance of a medical specialist is without merit.  *Cf.*

*Alfred*, 80 Fed. Appx. at 927-28; *Stalder*, 2002 WL 31845179, at *1-2.

The "deliberate indifference" and "moving force" elements of municipal liability

"must not be diluted, for [w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability." *James v. Harris County*, 577 F.3d 612, 618 (5th Cir. 2009) (citation and internal quotation marks omitted).  The application of lesser standards would result "in an endless exercise of second-guessing municipal employee-training programs", a task ill suited for federal courts.  *City of Canton*, 489 U.S. at 392.  The controlling law applied to the facts before the Court necessitates the dismissal of the Plaintiff's failure to train claim against Jones County under § 1983.

### III.  CONCLUSION

Based on the foregoing, there is no genuine issue as to any material fact requiring a trial on the Plaintiff's claims, and the Defendants are entitled to summary judgment as a matter of law.

IT IS THEREFORE ORDERED AND ADJUDGED that the Defendants' Motion for Summary Judgment [69] is granted and Plaintiff's Complaint is dismissed with prejudice. Any other pending motion is denied as moot.  A separate judgment will issue in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED AND ADJUDGED this the 19th day of November, 2014.

*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE